# In The United States Court of Appeals For The Eleventh Circuit

---

**STATE OF FLORIDA, ET AL.,**

*Plaintiffs-Appellants,*

**v.**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,**

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:24-cv-01080-WFJ-TGW

---

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

---

James Uthmeier
  *Attorney General*
Jeffrey DeSousa
  *Acting Solicitor General*
Christine K. Pratt
  *Assistant Solicitor General*
FLORIDA OFFICE OF THE ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
chistine.pratt@myfloridalegal.com

*Counsel for Plaintiff-Appellant State of Florida*

*Additional counsel listed on next page

R. Trent McCotter
James R. Conde
Nicholas Cordova
Walker Fortenberry**
BOYDEN GRAY PLLC
800 Connecticut Ave NW, Suite 900
Washington, DC 20006
202-955-0620
jconde@boydengray.com

*Lead Counsel for Plaintiffs-Appellants Florida Department of Management Services and Florida Agency for Health Care Administration*

** Admitted only in Alabama; practice supervised by D.C. Bar Members.*

Matthew S. Bowman
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 (fax)
mbowman@ADFlegal.org

Julie Marie Blake
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
(571) 707-4790 (fax)
jblake@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE,
Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (fax)
dcortman@ADFlegal.org

*Counsel for Plaintiff-Appellant*
*Catholic Medical Association*

Andrew T. Sheeran
  *General Counsel*
FLORIDA AGENCY FOR HEALTH CARE
ADMINISTRATION
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
andrew.sheeran@
ahca.myflorida.com

*Counsel for Plaintiff-Appellant*
*Agency for Health Care*
*Administration*

Kristen Larson
  *General Counsel*
FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES
4050 Esplanade Way
Tallahassee, Florida 32399
(850) 922-2137
kristen.larson@dms.fl.gov

*Counsel for Plaintiff-Appellant*
*Florida Department of Management*
*Services*

*State of Florida, et al., v. Department of Health and Human Services, et al.,*

## **CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Plaintiffs-Appellants State of Florida, Florida Department of Management Services, Florida Agency for Health Care Administration, and Catholic Medical Association ("Plaintiffs"), file this Certificate of Interested Persons and Corporate Disclosure Statement pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3.

The following individuals and entities may have an interest in the outcome of this case:

1. Alliance Defending Freedom

2. Akey, Angeli Maun, of Gainesville, Florida

3. Blake, Julie Marie, Alliance Defending Freedom

4. Bowman, Matthew S., Alliance Defending Freedom

5. Boyden Gray PLLC

6. Catholic Medical Association

7. Centers for Medicare and Medicaid Services

8. Conde, James R., Boyden Gray PLLC

9. Cordova, Nicholas, Boyden Gray PLLC

10. Cortman, David A., Alliance Defending Freedom

*State of Florida, et al., v. Department of Health and Human Services, et al.,*

11. Department of Health and Human Services

12. DeSousa, Jeffrey, Florida Attorney General's Office

13. Florida

14. Florida Agency for Health Care Administration

15. Florida Department of Management Services

16. Florida Attorney General's Office

17. Fortenberry, Walker, Boyden Gray PLLC

18. Holland, Liam C., U.S. Department of Justice

19. Honold, Ashley Cheung, U.S. Department of Justice

20. Jung, William Frederic, U.S. District Judge

21. Kaiser, Rachel T., of Nashville, Tennessee

22. Kehoe, Gregory W., U.S. Attorney for the Middle District of Florida

23. Kennedy, Jr., Robert F., Secretary, Department of Health and Human Services

24. Larson, Kristen, Florida Department of Management Services

25. McCotter, R. Trent, Boyden Gray PLLC

26.     Oz, Mehmet, Administrator, Centers for Medicare and Medicaid Services

27.     Parker, Michael S. of Mansfield, Ohio

28.     Pope, Allison Holly, Alliance Defending Freedom

29.     Pratt, Christine K., Florida Office of the Attorney General

30.     Scarborough, Charles, U.S. Department of Justice

31.     Shumate, Brett, U.S. Department of Justice

32.     Sheeran, Andrew T., Florida Agency for Healthcare Administration

33.     Sherwood, Zachary, U.S. Department of Justice

34.     Stannard, Paula M., Director, Office for Civil Rights, Department of Health and Human Services

35.     Uthmeier, James, Florida Attorney General

36.     Van Meter, Quentin L. of Atlanta, Georgia

Plaintiffs are unaware of any publicly traded company or corporation that has an interest in the outcome of this appeal.

Dated: November 24, 2025                    /s/ James R. Conde
                                             James R. Conde

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs respectfully request oral argument. This case presents recurring issues relating to principles of mootness in challenges to executive agency action. Oral argument would substantially aid the Court in its resolution of the case.

# TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................. iv

STATEMENT OF JURISDICTION ......................................... 1

INTRODUCTION ................................................................. 2

STATEMENT OF THE ISSUES ............................................ 7

STATEMENT OF THE CASE .............................................. 8

    I.    Background .......................................................... 8

        A.    Section 1557 ................................................ 8

        B.    Section 1557's Regulatory Pendulum .......... 10

        C.    The Final Rule ............................................ 14

    II.    Procedural History ............................................ 22

        A.    The District Court's Original Proceedings ... 22

        B.    The District Court's Proceedings on Remand ............. 27

SUMMARY OF THE ARGUMENT ....................................... 31

ARGUMENT ..................................................................... 34

    I.    The District Court's Summary Dismissal Violated Due Process ............................................................. 34

    II.    The Civil Action Is Live ...................................... 40

        A.    Plaintiffs Had Standing .............................. 40

        B.    The Case Was Live When the District Court Improvidently Dismissed It ......................... 47

        C.    This Case Remains Live .............................. 51

III.   The Court Should Reinstate the Preliminary Relief............58

CONCLUSION ..............................................................61

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Abbott Laboratories v. Gardner,*
387 U.S. 136 (1967) ............................................................... 56

*\*Ala. Legis. Black Caucus v. Alabama,*
575 U.S. 254 (2015) ................................................ 4, 31, 34–36, 38–39

*Alabama v. U.S. Sec'y of Educ.,*
No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) ............... 52

*Apple v. Glen,*
183 F.3d 477 (6th Cir. 1999) (per curiam) ......................................... 40

*Bischoff v. Osceola County,*
222 F.3d 874 (11th Cir. 2000) ...................................................... 37–38

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ............................................................... 13

*Bryan v. Hall Chem. Co.,*
993 F.2d 831 (11th Cir. 1993) ........................................................ 59

*Church of Scientology of Cal. v. United States,*
506 U.S. 9 (1992) ......................................................................... 5

*Compulife Software Inc. v. Newman,*
959 F.3d 1288 (11th Cir. 2020) ................................................... 32, 51

*Cruz v. Bd. of Elections of City of New York,*
396 F. Supp. 2d 354 (S.D.N.Y. 2005) ............................................ 34

*Cummings v. Premier Rehab Keller, PLLC,*
596 U.S. 212 (2022) ...................................................................... 9

*Cypress Barn, Inc. v. W. Elec. Co.,*
812 F.2d 1363 (11th Cir. 1987) ..................................................... 59

*Diamond Alt. Energy, LLC v. EPA,*
606 U.S. 100 (2025) ...................................................................41, 46

*Dierlam v. Trump,*
977 F.3d 471 (5th Cir. 2020) .............................................................55

*Does 1-10 v. Univ. of Wash.,*
849 F. App'x 706 (9th Cir. 2021) ......................................................59

*FBI v. Fikre,*
601 U.S. 234 (2024) ...........................................................47, 50–51

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ...................................................................41, 45

*Florida v. HHS,*
739 F. Supp. 3d 1091 (M.D. Fla. 2024) ................................................3

*Franciscan All., Inc. v. Azar,*
414 F. Supp. 3d 928 (N.D. Tex. 2019) ................................................12

*Franciscan All., Inc. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) .....................................12–14, 54, 56–57

*Franciscan All., Inc. v. Becerra,*
553 F. Supp. 3d 361 (N.D. Tex. 2021) ..........................................6, 12

*Frey v. EPA,*
270 F.3d 1129 (7th Cir. 2001) .......................................................35, 38

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),*
*Inc.*, 528 U.S. 167 (2000) ................................................................. 40

*Georgia-Pac. Corp. v. Lieberam,*
959 F.2d 901 (11th Cir. 1992) ............................................................59

*Grove City Coll. v. Bell,*
465 U.S. 555 (1984) ...................................................................9–10, 48

*Ho v. Russi,*
45 F.4th 1083 (9th Cir. 2022) .......................................................38–40

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ............................................................ 46

*Kennedy v. Braidwood Mgmt., Inc.,*
    606 U.S. 748 (2025) ........................................................... 58

*Kennedy v. Floridian Hotel, Inc.,*
    998 F.3d 1221 (11th Cir. 2021) ........................................ 35

*Knox v. Serv. Emps. Int'l Union, Loc. 1000,*
    567 U.S. 298 (2012) ...................................................... 32, 47

*United States ex. rel. Main v. Oakland City Univ.,*
    426 F.3d 914 (7th Cir. 2005) ............................................ 10

*Morning Star, LLC v. Canter, Tr. of Ctr. Schoen Fam. Tr.,*
    No. 22-56119, 2023 WL 5092764 (9th Cir. Aug. 9, 2023) ............. 59

*Neiderhiser v. Borough of Berwick,*
    840 F.2d 213 (3d Cir. 1988) .............................................. 38

*Religious Sisters of Mercy v. Becerra,*
    55 F.4th 583 (8th Cir. 2022) ............................................. 12

*Reynolds v. Army & Air Force Exch. Serv.,*
    846 F.2d 746 (Fed. Cir. 1988) ........................................... 38

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
    547 U.S. 47 (2006) .......................................................... 44

*Socialist Workers Party v. Leahy,*
    145 F.3d 1240 (11th Cir. 1998) ........................................ 50

*Students for Fair Admissions, Inc. v. President & Fellows of
    Harvard Coll.,*
    600 U.S. 181 (2023) .................................................... 44–45

*Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin,*
    142 F.4th 819 (5th Cir. 2025) .......................................... 56

*SunAmerica Corp. v. Sun Life Assur. Co. of Can.,*
    77 F.3d 1325 (11th Cir. 1996) ....................................... 5, 55

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ................................................................ 48

*Tennessee v. Cardona,*
762 F. Supp. 3d 615 (E.D. Ky. 2025) ................................... 52

*Tennessee v. Dep't of Educ.,*
104 F.4th 577 (6th Cir. 2024) ........................................ 9, 41

*Tennessee v. Kennedy,*
No. 1:24-cv-161, 2025 WL 2982069
(S.D. Miss. Oct. 22, 2025) .................................... 4, 31, 44, 54

*Thomas v. Crosby,*
371 F.3d 782 (11th Cir. 2004) ............................................ 34

*United States v. Nixon,*
418 U.S. 683 (1974) ............................................................ 49

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) ...................................................... 10, 48

*Walker v. Azar,*
480 F. Supp. 3d 417 (E.D.N.Y. 2020) ................................ 54

*Walker v. Kennedy,*
790 F. Supp. 3d 138 (E.D.N.Y. 2025) .......................... 14, 54

*West Virginia v. EPA,*
597 U.S. 697 (2022) .............................................. 37, 47, 52

*West Virginia v. U.S. Dep't of the Treasury,*
59 F.4th 1124 (11th Cir. 2023) .................................... 42–43

**Statutes**

5 U.S.C. § 703 .......................................................................... 56

20 U.S.C. § 1681.......................................................................... 2

20 U.S.C. § 1681(a) .................................................................... 8

28 U.S.C. § 1291 .............................................................. 1

28 U.S.C. § 1292(a)(1) .................................................. 26

31 U.S.C. § 3729(a)(1) ............................................ 10, 48

31 U.S.C. § 3730 ........................................................... 48

42 U.S.C. § 2000e-2(a)(1) ........................................... 13

42 U.S.C. § 18116(a) ........................................... 2, 8, 26

42 U.S.C. § 18116(c) ................................................. 9, 15

Fla. Stat. § 286.311 ................................................. 20, 43

Fla. Stat. § 456.001 ................................................. 20, 43

Fla. Stat. § 456.52 ................................................... 20, 43

Fla. Stat. § 553.865(5) ............................................ 20, 43

Fla. Stat. § 553.865(12) .......................................... 20, 43

## Regulations

28 C.F.R. § 85.5(a) ...................................................... 10

42 C.F.R. § 438.3(a) ..................................................... 22

42 C.F.R. § 438.3(d)(4) .............................................. 2, 55

42 C.F.R. § 457.1201(d) ............................................... 22

45 C.F.R. § 92.5 .................................................. 9, 25, 48

45 C.F.R. § 92.101(a)(2)(iv) ........................................... 2

45 C.F.R. § 92.101(a)(2)(v) ........................................... 31

45 C.F.R. § 92.206 ......................................................... 2

45 C.F.R. § 92.207 ......................................................... 2

45 C.F.R. § 92.301 .................................................... 9

45 C.F.R. § 92.303 .................................................... 9

45 C.F.R. § 92.304 .................................................... 9

81 Fed. Reg. 31,376 (May 18, 2016) ................................. 11–12

85 Fed. Reg. 37,160 (June 19, 2020) ................................. 13

87 Fed. Reg. 47,824 (Aug. 4, 2022) ................................. 16–19

89 Fed. Reg. 37,522 (May 6, 2024) ..... 2, 8–9, 14–22, 41–42, 45–46, 49, 54

*Defending Women from Gender Ideology Extremism and
   Restoring Biological Truth to the Federal Government,*
   Exec. Order No. 14,168, 90 Fed. Reg. 8,615 (Jan. 20, 2025) ........ 27, 49

Exec. Order No. 13,988, 86 Fed. Reg. 7,023 (Jan. 25, 2021) .................. 14

Fla. Admin. Code r. 59G-1.050(7) ................................. 20, 42–43

Fla. Admin. Code r. 64B15-14.014 ................................. 20, 43

Fla. Admin Code r. 64B8-9.019 ................................. 20, 43

*Protecting Children from Chemical and Surgical Mutilation,*
   Exec. Order No. 14,187, 90 Fed. Reg. 8,771 (Feb. 3, 2025) .......... 28, 49

**Other Authorities**

5B *Wright & Miller's Federal Practice and Procedure*
   (4th ed.) ................................................. 35

11th Cir. R. 41-4 ................................................. 29

Dep't of Justice, Press Release, *Justice Department
   Establishes Civil Rights Fraud Initiative* (May 19, 2025),
   https://perma.cc/WG6Y-QTPD ................................. 10

Fed. R. App. P. 4(a)(1)(B) ................................. 31, 52

Fed. R. Civ. P. 60(b) ................................. 5, 52

Jeff Rosen, *The Regulatory Pendulum*, Nat'l Affs. (Fall 2024),
https://perma.cc/8T55-393U ............................................................ 11

Mem. from the Acting Assoc. Att'y Gen., to C.R. Div., U.S.
Dep't of Just. (Feb. 12, 2025), https://perma.cc/J5WF-
STVB.................................................................................................... 28

*Sex-Based Definitions*, Off. on Women's Health, HHS,
https://perma.cc/3HRP-LJYZ (updated Aug. 21, 2025) ...................... 28

## STATEMENT OF JURISDICTION

The district court dismissed this case "without prejudice as moot and not capable of repetition within any reasonable time frame" on June 9, 2025. Dkt. 79.[1] Florida timely appealed on June 16, 2025. Dkt. 80. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

---

[1] References to the district court CM/ECF docket are labeled "Dkt. #."

## INTRODUCTION

This civil action arises from a final rule published by the U.S. Department of Health and Human Services ("HHS") entitled "Nondiscrimination in Health Programs and Activities," 89 Fed. Reg. 37,522 (May 6, 2024) ("Final Rule"), Dkt. 12-1. The Final Rule purports to implement Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a), which incorporates Title IX's longstanding prohibition against providing federal financial assistance to entities that intentionally discriminate "on the basis of sex," 20 U.S.C. § 1681 ("Title IX").

The Final Rule re-writes that law to cover "gender identity," and creates an accompanying regime meant to strongarm funding recipients into allowing males into private female spaces and providing and funding so-called "gender-affirming care," such as cross-sex hormones and surgeries meant to align an individual's sex characteristics with the individual's professed gender identity. *See, e.g.*, 45 C.F.R. §§ 92.101(a)(2)(iv), 92.206, 92.207. For good measure, the Final Rule also reads Section 1557 and the Social Security Act to authorize broad disparate-impact regulations on the basis of gender identity and other bases as well. *See, e.g.*, 42 C.F.R. § 438.3(d)(4). As the district court concluded when granting

preliminary relief, the Final Rule exceeds HHS's authority and manifestly conflicts with this Court's precedent interpreting Title IX. *See Florida v. HHS*, 739 F. Supp. 3d 1091 (M.D. Fla. 2024), Dkt. 41. And neither Section 1557 nor the Social Security Act grant HHS "the power to declare new civil rights guarantees for groups of people," or prohibit "disparate impacts." Dkt. 41, at 28.

Following a change in presidential administration, however, the district court proceedings took a strange turn. Instead of proceeding to final judgment, or holding the case temporarily in abeyance to allow the new administration an opportunity to reconsider the Final Rule, as often happens, the district court charted an unusual course. The district court, on its own initiative, fully closed the case and declared in an unreasoned docket entry that "[t]here is no case or controversy presently pending." Dkt. 76. In a later, also unreasoned, docket entry, the district court then instructed the clerk to "dismiss this case without prejudice as moot and not capable of repetition within any reasonable time frame." Dkt. 79. The district court thus summarily dismissed this lawsuit as moot without allowing the parties an opportunity to brief mootness.

In charting this unusual course, the district court violated "elementary principles of procedural fairness" by acting on its own motion without allowing Plaintiffs notice of its intent to dismiss and "an opportunity to" brief mootness. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015). And unsurprisingly, given the district court's summary process, the district court got it wrong. At the time of the summary dismissal, the Final Rule remained fully on the books, Plaintiffs were still threatened with harm, including through potential exposure to civil penalties, and the district court could have remedied the harm by vacating the Final Rule, enjoining HHS, and entering declaratory relief that would be binding on HHS in subsequent cases. The district court was wrong to bury this case alive.

After Plaintiffs appealed the dismissal, another district court vacated several of the regulations that Plaintiffs challenged in their operative complaint "to the extent that they expand Title IX's definition of sex discrimination to include gender-identity discrimination," but did not vacate the Final Rule's prohibition against discriminating on the basis of "sex characteristics" and "sex stereotypes." *Tennessee v. Kennedy*, No. 1:24-cv-161, 2025 WL 2982069, at *13 (S.D. Miss. Oct. 22, 2025). The

district court never considered this intervening event, so the Court should reverse the premature dismissal of the district court and remand for the district court to assess the partial vacatur's effect on this case in the first instance.

Regardless, even if this Court decides to consider the intervening event in the first instance, this case remains live. First, another district court's partial vacatur cannot moot this case until it is no longer possible that the partial vacatur will be overturned on appeal or that the United States will move for relief from the final judgment. Fed. R. Civ. P. 60(b). Second, because "potential relief remains available" to Plaintiffs, including a broader vacatur, declaratory relief, and injunctive relief, the case is "not moot." *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 77 F.3d 1325, 1333 (11th Cir. 1996). Third, Plaintiffs raise Spending Clause, Free Exercise, Free Speech, and Religious Freedom Restoration Act ("RFRA") claims that would justify entering broader relief than vacatur of the Final Rule. In short, because it is not "impossible for the court to grant any effectual relief whatever," the case is not moot. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quotation marks omitted).

District courts have discretion to manage crowded dockets by entering a stay in some circumstances. Here, the district court could have temporarily entered "a stay of the case, retained jurisdiction, and maintained the full effect of its preliminary injunction in the interim," as HHS suggested. *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 366 (N.D. Tex. 2021). What a district court cannot do is summarily dismiss cases as moot without process and without reasoning. That's what happened here. This Court should reverse and reinstate the preliminary injunction and stay until the district court complies with due process.

## STATEMENT OF THE ISSUES

(1)    Whether the district court violated due process when it dismissed this civil action on its own motion as moot in an unreasoned docket entry without allowing Plaintiffs an opportunity to brief the question of mootness.

(2)    Whether this civil action was moot when the district court summarily dismissed it.

(3)    Whether, if the Court reaches the question, a different district court's partial vacatur of the Final Rule moots this civil action in its entirety.

(4)    Whether this Court should reinstate the preliminary relief entered by the district court.

## STATEMENT OF THE CASE

### I.   BACKGROUND

#### A.   SECTION 1557

Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) … be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance …." 42 U.S.C. § 18116(a). Title IX, in turn, states: "No person in the United States shall, *on the basis of sex*,… be subjected to discrimination under any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a) (emphasis added).

Section 1557 applies to what HHS calls "covered entities." That includes recipients of HHS federal financial assistance through programs such as Medicaid, the Children's Health Insurance Program ("CHIP"), and several other healthcare programs and activities. *See* 89 Fed. Reg. at 37,694. HHS estimates that over 266,000 entities are covered by Section 1557, including state agencies, hospitals, physician offices, clinics, pharmacies, residential facilities for the developmentally disabled, home healthcare services, state-run health-insurance exchanges, and insurance issuers. *Id.* at 37,678.

Section 1557 authorizes HHS to "promulgate regulations to implement this section." 42 U.S.C. § 18116(c). Section 1557 also incorporates "[t]he enforcement mechanisms provided for and available under" the referenced statutes, including, as relevant here, Title IX. *Id.* "Title IX allows the Department to suspend or terminate federal … funding if [a covered entity] doesn't achieve voluntary compliance." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 589 (6th Cir. 2024) (citing 34 C.F.R. § 100.8); *see also* 45 C.F.R. §§ 92.301, 92.303, 92.304. HHS can also use "investigations, informal coercion, and compliance agreements" to impose hardship on funding recipients. *Tennessee*, 104 F.4th at 606. And so long as Plaintiffs accept federal financial assistance, they are subject to an implied right of action under the ACA by individuals alleging discrimination. *See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218 (2022).

To further enforce these funding restrictions and the underlying regulations, HHS requires filing an assurance of compliance with the agency's regulations. *See, e.g.*, 89 Fed. Reg. at 37,696 (codifying 45 C.F.R. § 92.5); *see also Grove City Coll. v. Bell*, 465 U.S. 555, 574–75 (1984) (upholding defunding of a college for failure to file an assurance). This increases the stakes of non-compliance. Private entities filing knowingly

false assurances risk criminal or civil liability under the False Claims Act, including a civil penalty of up to $28,619 for each false claim, "plus 3 times the amount of damages which the Government sustains because of" the false claim. 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5(a); *see, e.g.*, *United States ex. rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (university subject to False Claims Act for violating federal regulations in funding program); *see also* Dep't of Justice, Press Release, *Justice Department Establishes Civil Rights Fraud Initiative* (May 19, 2025), https://perma.cc/WG6Y-QTPD. Under the False Claims Act, "a private person (the relator) may bring a qui tam civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'" *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 (2000) (quoting 31 U.S.C. § 3730(b)(1)). If covered entities refuse to file an assurance of compliance, then they risk immediate termination of federal financial assistance. *See, e.g.*, *Grove City Coll.*, 465 U.S. at 574–75.

## B. SECTION 1557'S REGULATORY PENDULUM

"In recent years, each time a new president has entered the White House, his administration has either repealed or reinstated many of his

predecessors' regulations while implementing dozens more of his own." Jeff Rosen, *The Regulatory Pendulum*, Nat'l Affs. (Fall 2024), https://perma.cc/8T55-393U. Section 1557 is a perfect example of this regulatory pendulum. As the district court explained, HHS's regulations are "ever-changing and unstable." Dkt. 41, at 33. HHS's regulations implementing Section 1557 shifted in 2016, 2020, and most recently in 2024. Each time, a district court enjoined HHS's regulations at least in part; then other courts enjoined the later repeal rules, leaving regulated entities in a fog of uncertainty.

### 1. The 2016 Rule and related litigation

On May 18, 2016, HHS published rules purporting to implement Section 1557. 81 Fed. Reg. 31,376 (May 18, 2016) ("2016 Rule"). Among other things, the 2016 Rule defined discriminating "on the basis of sex" to include discriminating against an individual "on the basis of … sex stereotyping, and gender identity." *Id.* at 31,467. The 2016 Rule also included some specific prohibitions, including a rule requiring that males who identify as women be given "equal access" to private female spaces and a ban on any "categorical coverage exclusion or limitation for all

health services related to gender transition" in state or private coverage policies. *Id.* at 31,471–72.

This 2016 Rule's expansive understanding of "on the basis of sex" was challenged in court. *See Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019). The district court granted summary judgment to the plaintiffs, holding "that the Rule violates the [Administrative Procedure Act ("APA")] and" RFRA insofar as it defined "on the basis of sex" in Section 1557 (and hence Title IX) to include gender identity, and vacated those portions of the 2016 Rule. *Id.* at 946–47. This vacatur remains "in effect." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022). Later, the district court entered "a permanent injunction" prohibiting HHS "from interpreting or enforcing Section 1557 … against Plaintiffs … in a manner that would require them to perform or provide insurance coverage for gender-transition procedures or abortions." *Franciscan All.*, 553 F. Supp. 3d at 378, *aff'd*, 47 F.4th at 379; *see also Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022) (affirming permanent injunctive relief for the plaintiffs against a requirement to provide "gender-transition procedures" under Section 1557 on the ground that it violates RFRA).

## 2. The 2020 Repeal, Bostock, and related litigation

On June 12, 2020, HHS issued a final rule repealing the 2016 Rule's regulations relating to gender identity and replacing them with a simple ban on sex discrimination. 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Repeal").

Three days later, the Supreme Court decided *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* involved Title VII of the Civil Rights Act of 1964, a law prohibiting employers from discriminating against employees "because of" their sex. 42 U.S.C. § 2000e-2(a)(1). According to the Supreme Court's opinion in *Bostock*, "[w]hen an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." *Bostock*, 590 U.S. at 665. The Court, however, did "not purport to address bathrooms, locker rooms, or anything else of the kind," nor did it address other non-discrimination laws. *Id.* at 681.

Following *Bostock*, "[t]wo courts entered nationwide injunctions preventing much of the 2020 [Repeal] from going into effect, effectively reinstating portions of the 2016 Rule." *Franciscan Alliance*, 47 F.4th at 372 (citing *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 60

(D.D.C. 2020); *Walker v. Azar*, 480 F. Supp. 3d 417, 420 (E.D.N.Y. 2020)).

"Both courts acknowledged they had no power to undo the [*Franciscan Alliance*] district court's vacatur in this case. But in effect they did just that. While those courts did not directly resurrect the [prior] prohibition on 'gender identity' discrimination, they did reanimate the rule's 'sex-stereotyping" prohibition. Both courts further reasoned that, in light of *Bostock*, sex-stereotyping discrimination encompasses gender identity discrimination." *Franciscan All.*, 47 F.4th at 372–73. Litigation relating to the 2020 Rule is ongoing, with a district court recently holding that the case is not moot. *Walker v. Kennedy*, 790 F. Supp. 3d 138, 139 (E.D.N.Y. 2025).

## C. THE FINAL RULE

The regulatory pendulum swung again in 2021. The day he was sworn into office, President Biden signed an executive order asserting that "laws that prohibit sex discrimination … prohibit discrimination on the basis of gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg. 7,023, 7,023 (Jan. 25, 2021). Some three years later, on May 6, 2024, HHS promulgated the Final Rule challenged here. 89 Fed. Reg. 37,522 (May 6, 2024).

The Final Rule includes two separate components relevant to this appeal: first, "regulations to implement" Section 1557, *see* 42 U.S.C. § 18116(c), which are codified in Part 92 of Title 45 of the Code of Federal Regulations; second, Centers for Medicare & Medicaid Service ("CMS") regulations to implement different programs under Section 1557 and the Social Security Act, which are codified in Title 42 of the Code of Federal Regulations. The Final Rule was meant to be effective by "July 5, 2024." 89 Fed. Reg. at 37,522, 37,693 (45 C.F.R. § 92.1(b)).

### 1. The Part 92 regulations

Several aspects of the Part 92 regulations are relevant to this civil action.

**Section 101.** First, Section 101 of Part 92 defines "[d]iscrimination on the basis of sex" under Title IX, and hence Section 1557, to include discriminating based on "(i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes." 89 Fed. Reg. at 37,699 (45 C.F.R. § 92.101(a)(2)). "Gender identity" is undefined, but HHS claimed that "gender identity" can encompass a "full range of identities," *id.* at 37,592, including "transgender," "nonbinary," "gender nonconforming,"

"genderqueer," or "genderfluid," 87 Fed. Reg. 47,824, 47,867 (Aug. 4, 2022) ("NPRM"). "[S]ex characteristics" would include discrimination "based on anatomical or physiological sex characteristics (such as genitals, gonads, chromosomes, hormone function, and brain development/ anatomy)" on the theory that accounting for biological reality in the medical field "is inherently sex-based." *Id.* at 47,858. HHS also asserted that by barring sex stereotypes the Final Rule prohibits "requiring persons to conform to stereotypical norms about sex and gender," which HHS claimed overlaps with "the prohibition against discrimination based on gender identity." 89 Fed. Reg. at 37,578.

**Section 206.** Second, Section 206 of Part 92 includes specific rules relating to "equal program access" to health programs and activities, which specifically cover not just "sex" but also "gender identity." *Id.* at 37,700–01 (45 C.F.R. § 92.206).

Section 206 includes a provision providing that covered entities "must not" have "any policy or practice … that prevents an individual from participating in a health program or activity consistent with the individual's gender identity," if this causes the individual "more than *de minimis* harm." *Id.* (45 C.F.R. § 92.206(b)(3)). Preventing a male who

identifies as a woman from sharing a dual-occupancy hospital room with a female "would result in more than *de minimis* harm," as that term includes emotional or dignitary harm. *Id.* at 37,593 ("A covered entity will be in violation of this rule if they refuse to admit a transgender person for care or refuse to place them in facilities consistent with their gender identity, because doing so would result in more than de minimis harm."); NPRM, 87 Fed. Reg. at 47,866–67 (same). HHS, however, asserted without explanation that "this provision" wouldn't prevent a physician from treating a pregnant female who identifies as a man "as a pregnant person, even though pregnancy is generally associated with 'female' sex characteristics, such as having a functioning uterus and ovaries." NPRM, 87 Fed. Reg. at 47,866.[2] And although "sex-specific clinical trials may be permissible," HHS must review them on a case-by-case basis. *Id.*

Section 206 further includes a provision stating that a covered entity "must not … [d]eny or limit health services sought for purpose of gender transition or other gender-affirming care that the covered entity

---

[2] HHS never addressed its separate provision independently prohibiting discriminating based on "sex characteristics," which include a uterus and ovaries.

would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." 89 Fed. Reg. at 37,700–01 (45 C.F.R. § 92.206(b)(4)). This includes "counseling, hormone therapy, surgery, and other services designed to treat gender dysphoria or support gender affirmation or transition." NPRM, 87 Fed. Reg. at 47,834 n.139; *see also* 89 Fed. Reg. at 37,596 ("gender-affirming care" includes "hormone therapy, surgery, and other related services").

Section 206, however, allows entities to show "a legitimate, nondiscriminatory reason for denying or limiting" gender-affirming care, including "where the covered entity reasonably determines that such health service is not clinically appropriate *for a particular individual*." 89 Fed. Reg. at 37,701 (45 C.F.R. § 92.206(c)) (emphasis added). The denial or limitation, however, must not be based on "animus or bias" or "pretext." *Id.*

**Section 207.** Third, Section 207 of Part 92 applies to covered entities "providing or administering health insurance coverage or other health-related coverage." 89 Fed. Reg. at 37,701 (45 C.F.R. § 92.207(a)). Like Section 206, Section 207 includes specific prohibitions relating to

"gender identity" and health-related coverage for "gender transition or other gender-affirming care." *Id.* (45 C.F.R. § 92.207(b)(3)–(5)). That includes prohibiting any "categorical" exclusion for gender-affirming care that "results in discrimination on the basis of sex." *Id.* (45 C.F.R. § 92.207(b)(4)–(5)). And like Section 206, Section 207 allows entities to raise a defense "where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting coverage of the health service," and similarly prohibits "animus or bias" or "pretext." *Id.* (45 C.F.R. § 92.207(c)).

HHS did not define the terms "legitimate," "animus or bias" or "pretext." According to HHS, however, "[c]haracterizing" gender-affirming care as "experimental or cosmetic" would "be considered evidence of pretext because this characterization is not based on current standards of medical care." NPRM, 87 Fed. Reg. at 47,874.

**Preemptive Effect.** HHS claimed that the Final Rule preempts any state or local law that is an "obstacle" to the purpose of the Part 92 provisions. 89 Fed. Reg. at 37,535, 37,598. That includes state laws regulating gender transition. *Id.* at 37,598. In the Final Rule, HHS explained that a covered entity that "believes in good faith it is obligated to [deny

gender-affirming care] by State or local law" could keep its funding. *Id.* Evidence of "good faith," according to HHS, includes a "demonstrated … willingness to refer or provide accurate information about gender-affirming care." *Id.* HHS, however, assured the public that the Final Rule will "nevertheless generally preempt conflicting State law." *Id.* As explained in more detail below, numerous Florida laws and regulations arguably conflict with the Final Rule. *See* Fla. Stat. §§ 286.311, 456.001, 456.52, 553.865(5), (12); Fla. Admin. Code r. 59G-1.050(7), r. 64B8-9.019, and r. 64B15-14.014; *see also* Dkt. 1, ¶¶ 109–29 (describing Florida's laws).

**General requirements.** The Part 92 regulations contain other relevant requirements. Starting on July 5, 2024, each covered entity must (1) "submit an assurance" of compliance with the Part 92 regulations to continue receiving federal financial assistance, (2) "implement written policies and procedures in its health programs and activities that are designed to comply with the requirements of" Part 92, and (3) begin training employees to comply, among other things. 89 Fed. Reg. at 37,696–97 (45 C.F.R. §§ 92.5, 92.8, 92.9).

With respect to religious "covered entities," including individual physicians, Part 92 states that if certain religious freedom protections

are "applicable," then entities with objections may rely upon those protections. *Id.* at 37,701–02 (45 C.F.R. § 92.302). But Part 92 purports to give HHS discretion to decide *if* and *when* those protections apply. In doing so, the Final Rule seeks to force religious doctors and entities to *ask* HHS if it will recognize their religious liberty. *Id.* HHS estimates that the compliance cost for religious entities is $987.70 per request, and that over 6,000 such requests would be filed in the Final Rule's first year. *Id.* at 37,684.

### 2. *The CMS rules*

Two CMS rules are relevant to this appeal. The first applies to standard contract requirements for managed-care plans under Title XIX of the Social Security Act, known as Medicaid, and Title XXI, known as CHIP. The rule requires States to include in their contracts with managed-care organizations and similar contractors a promise that the entities

> will not use any policy or practice that has *the effect* of discriminating on the basis of … sex which includes discrimination on the basis of sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; gender identity; and sex stereotypes.

89 Fed. Reg. at 37,691 (42 C.F.R. § 438.3(d)(4)) (emphasis added); *see also* 42 C.F.R. § 457.1201(d) (CHIP). Under the regulation, CMS "must review and approve all" contracts for compliance. 42 C.F.R. § 438.3(a). HHS relied upon Section 1557 to adopt this provision, but it also cited several provisions of the Social Security Act as authority. *See* 89 Fed. Reg. at 37,668 (citing 42 U.S.C. §§ 1396a(a)(4), (19), 1397aa(a)).

The second requires that State Medicaid and CHIP programs ensure the "delivery of services in a culturally competent manner to all beneficiaries … regardless of sex which includes … gender identity." *Id.* at 37,692 (42 C.F.R. §§ 440.262, 457.495(e)). HHS did not define "culturally competent."

## II. PROCEDURAL HISTORY

### A. THE DISTRICT COURT'S ORIGINAL PROCEEDINGS

On May 6, 2024, the day the Final Rule was published, Plaintiffs-Appellants, State of Florida, the Florida Department of Management Services ("DMS"), the Florida Agency for Health Care Administration ("AHCA") (collectively, "Florida Plaintiffs"), and the Catholic Medical Association ("CMA") sued HHS. Dkt. 1 (Complaint). The complaint raises eight counts, including challenges to the Final Rule under the APA, the

Spending Clause, the First Amendment, and RFRA. Dkt. 1, ¶¶ 216–312. The Complaint seeks not only vacatur, but also declaratory relief against HHS limiting how HHS may apply Section 1557 and Title XI in the future as well as injunctive relief. *Id.* at 81–82 (Prayer for Relief). The complaint targets the Final Rule's expansion of sex discrimination to "gender identity" as well to "sex characteristics" or "sex stereotypes." *Id.* ¶¶ 56, 132, 156.

Plaintiffs moved for preliminary relief on their APA claims, arguing that they will suffer irreparable harm, and asked this Court to stay the effective date of specific provisions of the Final Rule, and to enjoin enforcement of the Final Rule. Dkt. 12. Plaintiffs argued that specific provisions of the Final Rule are contrary to law because (1) Section 1557 does not prohibit discriminating on the basis of "gender identity;" (2) Section 1557 does not authorize certain "equal access" and "health-related coverage" provisions in Section 206 and 207 because they prohibit conduct that is not "discrimination" under Section 1557; and (3) the Social Security Act does not authorize the disparate-impact requirement for managed-care plans. *See id.* at 8–20. HHS opposed any preliminary relief, *see*

*generally* Dkt. 33, Plaintiffs filed a reply, Dkt. 35, and the district court held a hearing on June 21, 2024, Dkt. 41, at 1.

On July 3, 2024, the district court granted a stay and preliminary injunction within the State of Florida. *Id.* at 49–50.

The district court concluded that "Florida has shown that it faces an imminent injury in fact," *id.* at 13, that the suit was "fit for judicial decision," and that Florida would suffer "hardship" without judicial review, *id.* at 16–17. On the merits, the district court concluded that Plaintiffs were likely to succeed in their challenge to the Part 92 regulations:

> The Final Rule is stillborn and a nullity if Title IX does not prohibit discrimination on the basis of "gender identity." The Eleventh Circuit has spoken on this point, clearly: Title IX does not address discrimination on the basis of gender identity. *Adams v. Sch. Bd. of St. John's Cnty.*, 57 F. 4th 791, 812–15 (11th Cir. 2022) (*en banc*). Frankly, this ends the issue—the new Rule appears to be a dead letter in the Eleventh Circuit.

*Id.* at 20. Plaintiffs were also likely to succeed in their challenge to the CMS Rule: "The CMS contracts Rule, like the Title IX Rule, simply rewrites the statute." *Id.* at 28. Nothing in the laws invoked by CMS delegates to the agency "the power to declare new civil rights guarantees for groups of people" by forbidding "disparate impacts." *Id.*

The district court also concluded that "[i]f the Rule is implemented, on July 5, 2024, Florida will face irreparable harm." *Id.* at 29. As the Court noted, Florida's laws and regulations relating to gender-transition interventions and sex-separated facilities conflict with the Final Rule, placing Florida's agencies in an impossible situation: they "must either clearly violate Florida law, or clearly violate the new Rule." *Id.* Further, the Final Rule also caused irreparable harm on the State of Florida in its sovereign capacity, putting unlawful pressure on the State to change its policies. *Id.* at 30–32. Last, the balance of harms favored preliminary relief. *Id.* at 32–47. For CMA, however, the district court denied relief because "the Court simply believes that a nationwide injunction to cover all CMA members is improvident in this case for jurisprudential reasons." *Id.* at 47–48. The injunction covers some of CMA's members, however, including seven Florida state chapters ("guilds") and a specific declarant from Gainesville, Dkt. 1, ¶ 21; Dkt. 12, at 22 (citing Ex. C, Akey Decl., Dkt. 12-3). So CMA's Florida members obtained relief.

The Court stayed the effective date of the challenged requirements of the Final Rule and ordered that "[f]or the duration of this Order, an assurance of compliance with Part 92, see 45 C.F.R. § 92.5, shall not be

construed to assure compliance with any provisions stayed by this Order." Dkt. 41, at 49. The district court also enjoined HHS "from instituting or pursuing any enforcement proceedings under Section 1557, 42 U.S.C. § 18116(a), based on the interpretation of discrimination 'on the basis of sex' to be codified" in the Final Rule. *Id.* And the district court made the order run "throughout the State of Florida," applying the relief to the Florida Plaintiffs as well as to all "covered entities with Florida." *Id.* at 49–50.

HHS filed an interlocutory appeal. Dkt. 46 (docketed as No. 24-12826 (11th Cir.)); 28 U.S.C. § 1292(a)(1). CMA cross-appealed, Dkt. 52.

While HHS's interlocutory appeal remained pending, and shortly after the presidential election, the district court called for a one-page status update by November 15, 2024, to resolve whether it should stay the district court litigation pending the interlocutory appeal, asking the parties to "[c]onsider in this short discussion the pending appeals as well as the likelihood of mootness given a pending change in administration." Dkt. 58. The parties submitted a one-page status report. Plaintiffs noted the following:

> [The new administration] may move to repeal the regulations challenged here. But that will take time. A final rule repealing the

challenged regulations could take years. And even when the regu-
lations are repealed, a district court may still vacate the repeal rule
and reinstate the current regulations.

Dkt. 60, at 2. HHS said only that it could not "speculate about possible future actions." Dkt. 61, at 1.

On December 13, 2024, while HHS's interlocutory appeal was pend-ing, the district court directed the clerk "to administratively close this case," while noting that "[a]ny party may reopen at any time by filing a motion." Dkt. 62.

## B. THE DISTRICT COURT'S PROCEEDINGS ON REMAND

### 1. President Trump's actions

On January 20, 2025, President Donald J. Trump was sworn as President of the United States. The same day, President Trump signed an executive order titled *Defending Women from Gender Ideology Extrem-ism and Restoring Biological Truth to the Federal Government*. Exec. Or-der No. 14,168, 90 Fed. Reg. 8,615 (Jan. 20, 2025) ("*Defending Women*"). The executive order directs changes in the terminology used by agencies and also directs the "Attorney General [to] immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency

activities." *Id.* at 8,616. Federal agencies have begun implementing this executive order. *See* Mem. from the Acting Assoc. Att'y Gen., to C.R. Div., U.S. Dep't of Just. (Feb. 12, 2025), https://perma.cc/J5WF-STVB ("[I]t is the position of the Department of Justice that *Bostock*'s holding does not mandate gender identity-based access to single-sex spaces or athletics, nor does it impair Congress's guarantee to women of equal opportunity under Title IX."); *Sex-Based Definitions*, Off. on Women's Health, HHS, https://perma.cc/3HRP-LJYZ (updated Aug. 21, 2025) (mandating certain terms relating to sex).

On January 28, 2025, President Trump also signed Executive Order 14,187, titled *Protecting Children from Chemical and Surgical Mutilation* ("*Protecting Children*"). In that order, President Trump directed HHS to, among other things, "take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which *may* involve … [S]ection 1557" of the ACA. 90 Fed. Reg. 8,771, 8,772 (Feb. 3, 2025) (emphasis added). To date, however, HHS has not proposed a repeal of the challenged provisions of the Final Rule in whole or in part, nor has it publicly announced any plans to do so by any date certain.

## 2. *The district court's dismissal*

A few weeks after these executive orders, HHS moved to dismiss its interlocutory appeal, this Court construed CMA's response thereto as a dismissal of its cross-appeal, and this Court dismissed the appeals on April 3, 2025, and issued the mandate. Dkt. 70; *see* 11th Cir. R. 41-4.

On remand, the district court proceedings took a strange turn. On April 9, 2025, without notice, the district court entered the following order:

> ENDORSED ORDER: Upon consideration of the Eleventh Circuit's Order of Dismissal and Mandate, the Clerk is directed to lift the stay and convert the administrative closure into a full closure.

Dkt. 71.

Confused by the "full closure," Plaintiffs moved to reopen and to clarify the effect, if any, of the Court's "full closure" order on the pending suit and the preliminary relief. Dkt. 73. As Plaintiffs explained "[w]ith no final judgment on the merits, or even an answer to the Complaint, fully closing the case is premature." *Id.* at 4. Plaintiffs accordingly requested that the district court "clarify (1) that the July 3, 2024 [stay and injunction] remain[] in place notwithstanding the April 9, 2025 full closure order, and (2) that there is, to date, no final appealable judgment." *Id.* at 5.

HHS responded that "[t]he parties do not dispute that this Court has not entered final judgment and that this Court's preliminary injunction has therefore not been dissolved." Dkt. 75, at 3. But, "[i]nsofar as this Court's April 9 Order has caused confusion on the part of Plaintiffs," HHS suggested, "the Court could simply vacate it." *Id.* HHS, however, opposed lifting the stay, claiming that "after *Protecting Children*, Plaintiffs and their members face no credible threat of any such enforcement action by Defendants." *Id.* at 5. HHS also claimed to be "committed to implementing the President's Executive Orders." *Id.* At no point, however, did HHS urge the district court to dismiss the case as moot, nor did HHS tell the Court that it was planning to repeal the Final Rule.

Instead of reopening the case (as Plaintiffs requested), or vacating the full closure order (as HHS suggested), or even awaiting a reply by Plaintiffs, the district court entered the following unreasoned order the day after HHS's response:

> ENDORSED ORDER denying 73 Motion to Reopen Case; denying 73 Motion for Reconsideration / Clarification. *There is no case or controversy presently pending*.

Dkt. 76 (emphasis added).

Four days later, the district court entered the following order:

ENDORSED ORDER: The Clerk will dismiss this case without prejudice as moot and not capable of repetition within any reasonable time frame.

Dkt. 79.

On June 16, 2025, Plaintiffs filed this appeal. Dkt. 80.

### C.    INTERVENING EVENTS DURING THIS APPEAL

While this appeal was pending, another district court partially vacated portions of the Final Rule's specific "gender identity" textual provisions "to the extent they address gender-identity discrimination." *Tennessee*, 2025 WL 2982069, at *1. That court granted no injunctive relief, *id.* at *1 n.1, and left in place a provision that prohibits "discrimination on the basis of … sex stereotypes," 45 C.F.R. § 92.101(a)(2)(v). The deadline for the United States or an intervenor to appeal the judgment is December 22, 2025. *See* Fed. R. App. P. 4(a)(1)(B).

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's aberrant *sua sponte* summary dismissal order because it violated Plaintiffs' due process rights and because the order wrongly asserted that this case was moot. The district court's summary dismissal without giving the parties notice or an opportunity to be heard violated due process under *Alabama*

*Legislative Black Caucus v. Alabama*, 575 U.S. at 270–71. The district court's summary mootness ruling was also wrong as a matter of law: Plaintiffs had standing at the outset, and it was not "impossible for a court to grant *any effectual relief whatever* to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (emphasis added) (quotation marks omitted).

Another district court's recent partial vacatur in the *Tennessee* case doesn't moot the case. As an initial matter, the dismissal order under review predates that partial vacatur. Since this is "a court of review, not a court of first view," *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1309 (11th Cir. 2020), it should reverse and allow the district court to address the effect of the *Tennessee* court's partial vacatur in the first instance.

In any event, the partial vacatur doesn't moot this civil action. First, the partial vacatur cannot moot this case while it remains possible that the partial vacatur will be overturned on appeal or that the defendants or intervenors will seek relief from the final judgment. Second, the partial vacatur did not include the Final Rule's overlapping ban against discriminating based on "sex characteristics" or "sex stereotypes," so it

does not fully remedy the harm that Plaintiffs seek to eliminate here. The district court may award Plaintiffs additional relief under the APA by granting Plaintiffs' request to vacate the Final Rule more broadly and by entering a declaratory judgment or injunctive relief prohibiting HHS from (1) interpreting Section 1557 to cover gender identity as applied to Plaintiffs, (2) prohibiting an overlapping reading of sex characteristics or sex stereotyping that would have the practical effect of protecting an individual on the basis of asserted gender identity, or (3) banning disparate impacts, whether on the basis of sex, gender identity, sexual orientation, race and ethnicity, or national origin. Third, Plaintiffs assert Spending Clause, First Amendment, and RFRA claims independent of the Final Rule's validity that would justify further relief.

Finally, although the district court's summary *sua sponte* dismissal dissolved the preliminary relief, this Court should reinstate that relief. It would be inequitable to allow the district court's summary dismissal to collaterally eliminate the preliminary relief protecting Plaintiffs without giving them an opportunity to brief whether it should remain in place. This Court should not allow the district court's perplexing departure from

established legal procedures and substance to deny Plaintiffs recourse for their injuries.

## ARGUMENT

### I. THE DISTRICT COURT'S SUMMARY DISMISSAL VIOLATED DUE PROCESS

A district court has an "independent obligation to confirm its jurisdiction." *Ala. Legis. Black Caucus*, 575 U.S. at 270. But when a federal court determines it lacks jurisdiction *sua sponte*, it must comport with "elementary principles of procedural fairness," allowing the plaintiff "an opportunity to" be heard on the jurisdictional question. *Id.* at 271.

District courts considering their jurisdiction *sua sponte* routinely satisfy procedural fairness by entering a show cause order and allowing the parties to brief the jurisdictional question identified by the court. *See, e.g.*, *Cruz v. Bd. of Elections of City of New York*, 396 F. Supp. 2d 354, 355 (S.D.N.Y. 2005) (issuing show cause order asking the parties to brief mootness); *cf. Thomas v. Crosby*, 371 F.3d 782, 802 (11th Cir. 2004) (Tjoflat, J., specially concurring) ("Where a circuit panel decides to raise an issue *sua sponte*, the preferred method of doing so is by requesting supplemental briefing from the parties and permitting oral argument, as was done here.").

By contrast, the district court here summarily, without notice, and without allowing Plaintiffs an opportunity to be heard on the question of mootness, dismissed the case as moot in an unreasoned docket entry. That was improper "in these circumstances." *Ala. Legis. Black Caucus*, 575 U.S. at 271. Just as "a plaintiff must have ample opportunity to present evidence bearing on the existence of jurisdiction," a plaintiff must have ample opportunity to dispute mootness. *See Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1232 (11th Cir. 2021); *see also Frey v. EPA*, 270 F.3d 1129, 1132 (7th Cir. 2001) ("We have warned that *sua sponte* dismissals without prior notice or opportunity to be heard are hazardous and that unless the defect is clearly incurable a district court should grant the plaintiff leave to amend, allow the parties to argue the jurisdictional issue, or provide the plaintiff with the opportunity to discover the facts necessary to establish jurisdiction." (quotation marks omitted)); *see also* 5B *Wright & Miller's Federal Practice and Procedure* § 1350 (4th ed.) (same). Here, the district court gave Plaintiffs no opportunity to dispute mootness.

*Alabama Legislative Black Caucus* controls the analysis. In that case, the district court raised the plaintiff's standing to sue *sua sponte*

after a full trial. The district court held that the plaintiff, a membership association, failed to establish associational standing to challenge newly drawn district lines on racial gerrymandering grounds. *See* 575 U.S. at 268–69. Unrebutted testimony described the plaintiff-association as having members in nearly every Alabama county, but the district court deemed this evidence insufficient after trial because the association did not specify whether it had members that resided in the challenged districts. *Id.* at 269.

The Supreme Court held that the district court's summary dismissal violated due process. "[A]t the very least," the Court said, the evidence submitted by the plaintiff raised "[a] common sense inference … strong enough to lead the Conference reasonably to believe that, in the absence of a state challenge or a court request for more detailed information, it need not provide additional information such as a specific membership list." *Id.* at 270. Although a court has "an independent obligation to confirm its jurisdiction, even in the absence of a state challenge," the Court held that "elementary principles of procedural fairness required that the district court, rather than acting *sua sponte*, give the Conference an opportunity to provide evidence of member residence." *Id.* at 270–71.

This case follows *a fortiori* from *Alabama Legislative Black Caucus*. The *sua sponte* dismissal in *Alabama Legislative Black Caucus* was improper even though the plaintiff bears the burden of proof to show standing. *See Bischoff v. Osceola County*, 222 F.3d 874, 878 (11th Cir. 2000). The dismissal here was all the more improper because it involved mootness. A determination of mootness cannot be made on the face of the complaint, but requires assessing intervening facts outside the record, where "the Government, not [Plaintiffs], bears the burden to establish that a once-live case has become moot." *West Virginia v. EPA*, 597 U.S. 697, 719 (2022). A summary *sua sponte* dismissal on the ground of mootness is thus improper.

In this case, the district court's conclusion was still more surprising and unlawful because the district court had already preliminarily concluded that Plaintiffs had standing to challenge the Final Rule and had entered injunctive declaratory relief and a stay of the Final Rule. Dkt. 41, at 13–14, 49. Under these circumstances, and given that HHS bears the burden on mootness, "[a]t the very least, the common sense inference is strong enough to lead [Plaintiffs] reasonably to believe that, in the

absence of a … court request for more detailed information, it need not provide additional information." *Ala. Legis. Black Caucus*, 575 U.S. at 270.

Indeed, under this Court's precedent, Plaintiffs may even be entitled to an evidentiary hearing to the extent mootness raises questions of witness credibility. When there are disputed material facts relevant to standing implicating questions of credibility, a district court "*must* hold an evidentiary hearing." *Bischoff*, 222 F.3d at 879 (emphasis in original). Here, not only did the district court not hold an evidentiary hearing—it cited no facts, provided no reasoning, and allowed Plaintiffs no opportunity to submit evidence at all, or even briefing.

This should not be a hard question. Every court of appeals that has considered an analogous summary *sua sponte* dismissal reversed the district court. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Ho v. Russi*, 45 F.4th 1083, 1086 (9th Cir. 2022); *Frey*, 270 F.3d at 1132; *Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 216 n.6 (3d Cir. 1988).

None of the rare exceptions noted in out-of-circuit caselaw applies here. For example, the Ninth Circuit has identified "only two

circumstances in which a district court may dismiss for lack of subject matter jurisdiction without providing notice and an opportunity to respond." *Russi*, 45 F.4th at 1086.

First, "the district court may dismiss a litigant's claims without notice and an opportunity to respond when parties have previously argued the issue of jurisdiction." *Id.* Here, Plaintiffs argued standing and *won* at the preliminary stage. And the parties never litigated mootness. Plaintiffs' only opportunity to address mootness was in a one-page status report filed before the change in presidential administration addressing whether the Court should enter a temporary stay, where Plaintiffs explained that the case would not become moot even after the Final Rule is repealed, and HHS took no issue with Plaintiffs' argument. Dkt. 60, at 2; Dkt. 61, at 1. "At the very least, the common sense inference" from this was "strong enough to lead [Plaintiffs] reasonably to believe that, in the absence of a … court request for more detailed information, [they] need not provide additional information." *Ala. Legis. Black Caucus*, 575 U.S. at 270.

Second, "the district court may dismiss a litigant's claim without notice where lack of jurisdiction appears on the face of the complaint and

is obviously not curable." *Russi*, 45 F.4th at 1086. Because the district court dismissed based upon mootness, which requires pointing to intervening facts outside the record, this exception is inapplicable. Nor would Plaintiffs' argument against mootness in this case be "totally implausible, attenuated, unsubstantial, frivolous, devoid of merit, or no longer open to discussion." *Apple v. Glen*, 183 F.3d 477, 479 (6th Cir. 1999) (per curiam). Plaintiffs' argument that the case remained live at the time of dismissal is not only substantial—it is correct. *See infra* Part II.B (pp. 47–51).

## II.    THE CIVIL ACTION IS LIVE

The district court has already preliminarily agreed that the Florida Plaintiffs had standing at the time the complaint was filed. Dkt. 41, at 14. That was correct. CMA also has standing. And the case is not moot.

### A.    PLAINTIFFS HAD STANDING

Standing is assessed "at the time the action commences." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000). At the time Plaintiffs filed suit, there is no question they had Article III standing.

"Government regulations that require or forbid some action by the

plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). This is one of those cases. Plaintiffs include covered entities that are directly regulated by the Final Rule.

The district court correctly concluded that "[t]he Florida Plaintiffs have standing." Dkt. 41, at 14. Florida AHCA and DMS filed declarations explaining they are covered entities subject to Part 92. *See* Dkt. 1, ¶¶ 167, 169; Ex. 1, Kniepmann Decl., Dkt. 1-1; Ex. 2, Sanders Decl., Dkt. 1-2. AHCA also administers Florida Medicaid and CHIP and so is regulated by the CMS Rule. Dkt. 1, ¶ 167. Plaintiffs also submitted a declaration from the Florida Agency for Persons with Disabilities ("APD"), a covered entity. Ex. B, Bailey Decl., Dkt. 12-2. Florida has broad authority to sue on behalf of its instrumentalities and has a proprietary interest in protecting its covered entities, including entities such as APD. Dkt. 1, ¶ 18; *Tennessee*, 104 F.4th at 588. The Final Rule would impose compliance costs on these covered entities. *See* 89 Fed. Reg. at 37,684–85, 37,689 (projecting costs). "[T]hose monetary costs are of course an injury." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025)

(quotation marks omitted).

The Final Rule also at least "arguably proscribes [Plaintiffs'] conduct." *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1137–38 (11th Cir. 2023). AHCA, for example, has a regulatory policy against reimbursing "any other procedures that alter primary or secondary sexual characteristics," Fla. Admin. Code r. 59G-1.050(7), which is arguably proscribed by Sections 101 and 207 of Part 92. DMS similarly has a longstanding coverage exclusion for gender transition drugs and surgeries from the state employee health-insurance plan, which is arguably proscribed by the Final Rule. Dkt. 1, ¶¶ 169–70; Sanders Decl., Dkt. 1-2. APD has a policy of separating dual-occupancy rooms in its residential living facilities on the basis of biological sex, regardless of an individual's gender identity, which is arguably proscribed by Section 206 of Part 92. Baily Decl. ¶¶ 31–41, Dkt. 12-2; *see also* 89 Fed. Reg. at 37,593 ("A covered entity *will* be in violation of this rule if they refuse to admit a transgender person for care or refuse to place them in facilities consistent with their gender identity, because doing so would result in more than *de minimis* harm." (emphasis added)).

Florida is also injured in its capacity as a sovereign. Florida has enacted laws that require separating private spaces in public buildings based on biological sex or providing single-occupant facilities. *See* Fla. Stat. § 553.865(5), (12). Florida has also enacted health-related spending laws and regulations limiting the use of public funds for puberty blockers, hormone and hormone antagonists, sex-reassignment surgeries, and "[a]ny other procedures that alter primary or secondary sexual characteristics," used to treat "gender dysphoria." Fla. Admin. Code r. 59G-1.050(7); *see* Fla. Stat. § 286.311. Florida has also enacted standards of medical care, and legislation limiting gender-transition care. *See* Fla. Stat. §§ 456.001, 456.52; Fla. Admin. Code r. 64B8-9.019, r. 64B15-14.014; *see also* Dkt. 1, ¶¶ 109–29.

Florida's laws and regulations on their face appear to conflict with the Part 92 Rules, including the Final Rule's prohibition on discriminating based on "sex characteristics," "sex stereotypes," "gender identity," as well as the CMS Rules, and Plaintiffs faced a "credible threat of enforcement" when they sued, *West Virginia*, 59 F.4th at 1137. At the time Plaintiffs filed suit, HHS intended to enforce the Final Rule against Florida. HHS said that "Florida must comply with the Rule." Dkt. 33, at 27.

Indeed, the United States specifically claimed that Florida's health-related spending restrictions conflict with the Part 92 Rules. Brief for the United States as *Amicus Curiae* at 26 n.10, *Dekker v. AHCA*, No. 23-12155 (11th Cir. filed Dec. 4, 2023, withdrawn Feb. 28, 2025), https://perma.cc/9UYG-SVPL. Florida's fear that it would be coerced to abandon its laws, and that its citizens would be encouraged to violate Florida law, was "not unfounded. It comes directly from the text of the" Final Rule—and from the representations of the United States before this Court. *Tennessee*, 104 F.4th at 588–89. The Part 92 Rules therefore injured Florida's sovereign "interest in enforcing [its] duly enacted laws without contradiction from the federal government." *Id.* at 595. Florida and its agencies therefore established a substantial likelihood of Article III standing to challenge the Part 92 Rules and the CMS Rule. *Id.*

Only one party must show standing for the suit to move forward, and Florida certainly had standing. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

But regardless, CMA also had standing. Membership organizations may "assert standing solely as the representative of its members." *Students for Fair Admissions, Inc.* ("*SFFA*") *v. President & Fellows of*

*Harvard Coll.*, 600 U.S. 181, 199 (2023) (quotation marks omitted). "To invoke it, an organization must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quotation marks omitted).

CMA satisfies this test. "[A]lmost all practicing physicians [a]re likely covered by the rule." 89 Fed. Reg. at 37,685. So are "[o]ffices of physicians," which are covered entities. *Id.* at 37,688. CMA submitted detailed declarations of members, including physician members who are covered entities and injured by the Final Rule and members who own and operate covered doctors' offices. CMA's members explain that they have policies and practices that arguably conflict with the Final Rule, and do not wish to comply with the Final Rule's requirements for sincerely held ethical and religious reasons. Dkt. 12, at 22 (citing declarations). As directly regulated entities, their standing is "easy to establish." *All. for Hippocratic Med.*, 602 U.S. at 382.

CMA's members also had standing through the compliance costs imposed by the Final Rule. Although the Final Rule says HHS might

respect religious objections, it does not promise that it will conclude that religious protections apply. 89 Fed. Reg. at 37,701–02 (45 C.F.R. § 92.302). Instead, it tells CMA's members that HHS cannot know whether they are protected under RFRA unless they submit to HHS a request for "assurance" of their religious liberty. *Id.* at 37,702. HHS estimates that the cost of each request will be $987.70, and HHS expects over 6,000 requests in the Final Rule's first year alone. *Id.* at 37,684. HHS thus concedes that its Final Rule will result in pocketbook injuries on thousands of religious doctors and clinics. Because even downstream pocketbook harms from a regulation "are of course an injury," *Diamond Alt. Energy*, 606 U.S. at 114, these costs independently demonstrate standing for CMA's members.

CMA has also submitted a detailed declaration establishing that the interests it seeks to protect are germane to its mission. Ex. 3, Dickerson Decl., Dkt. 1-3. Last, this suit does not require individual participation by CMA's members, as CMA seeks only "prospective relief," not monetary damages. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). CMA therefore had standing to challenge the Part 92 Rules.

Indeed, the Plaintiffs' standing to challenge the Final Rule is so clear that HHS didn't dispute Plaintiffs' standing in its opening brief on appeal from the preliminary injunction. *See* Brief for Appellants/Cross-Appellees, *Florida v. HHS*, No. 24-12826 (11th Cir. Jan. 2, 2025), ECF No. 26. Plaintiffs had standing.

### B. THE CASE WAS LIVE WHEN THE DISTRICT COURT IMPROVIDENTLY DISMISSED IT

The case remains live unless intervening events have made it "impossible for a court to grant *any effectual relief whatever* to the prevailing party." *Knox*, 567 U.S. at 307 (emphasis added) (quotation marks omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* at 307–08 (alteration accepted). "[T]he Government, not petitioners, bears the burden to establish that a once-live case has become moot." *West Virginia*, 597 U.S. at 719. The government must show that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 720. That is a "formidable burden." *FBI v. Fikre*, 601 U.S. 234, 241 (2024).

The only intervening events that might have affected the case when the district court entered a dismissal order—President Trump's

*Defending Women* and *Protecting Children* executive orders—came nowhere close to making further effective relief impossible. Those orders did not (and could not) eliminate the Final Rule, nor did they commit HHS to not enforcing the Final Rule. Nor did the executive orders eliminate Plaintiffs' need for a final judgment. The executive orders did not relieve covered entities from compliance obligations, including their obligation to file an assurance of compliance with the Final Rule to receive federal funds. 45 C.F.R. § 92.5; *see Grove City Coll.*, 465 U.S. at 574–75. That obligation effectively coerces compliance regardless of HHS's current enforcement priorities. It means that, if covered entities say they will comply with the Final Rule, but do not mean it, they risked civil liability under the False Claims Act, 31 U.S.C. § 3729(a)(1), and a civil suit could be brought by the United States *or by a private relator*, *id.* § 3730.[3] The threat of liability against covered entities shows that this case was live. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014)

---

[3] To be clear, Florida and its agencies aren't subject to the False Claims Act. *Vt. Agency of Nat. Res.*, 529 U.S. at 787–88. But CMA members are subject to suit, and covered entities located within Florida are subject to suit, implicating Florida's sovereign interest in ensuring that Florida residents follow its laws, not HHS's extralegal dictates.

("The credibility of that [enforcement] threat is bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency. Instead, the false statement statute allows 'any person' with knowledge of the purported violation to file a complaint.").

As a sovereign, Florida also faces uncertainty about the validity of its laws and regulations when the district court dismissed this case. The Final Rule claimed that laws such as Florida's are preempted as obstacles to the regulation. 89 Fed. Reg. at 37,535, 37,598. So did the United States. Brief for the United States as *Amicus Curiae*, *supra*, at 26 n.10 (*Dekker*, No. 23-12155). Florida's sovereign interest alone means that this civil action was live.

Nor did the President's executive orders require HHS to repeal the Final Rule. *Defending Women* does not direct HHS to repeal the Final Rule. *See* 90 Fed. Reg. at 8,615–18. And *Protecting Children* instructs HHS only to take "all *appropriate* actions to end the chemical and surgical mutilation of children … which *may* involve" Section 1557, allowing HHS considerable regulatory discretion. *See* 90 Fed. Reg. at 8,772 (emphases added). Regardless, executive orders are not "enforceable." *See id.* at 8,773. And HHS must follow its rules. *United States v. Nixon*, 418 U.S.

683, 694–96 (1974) ("So long as this regulation remains in force the Executive Branch is bound by it."). "What matters is not whether a defendant repudiates its past actions, but what repudiation can prove about its future conduct." *Fikre*, 601 U.S. at 244. Here, the executive orders do not repudiate the Final Rule.

Binding precedent controls here. In *Socialist Workers Party v. Leahy*, this Court held that the Florida Secretary of State's disavowal of enforcement authority under a particular election law did not prevent a legal challenge to the law in part because of "the very real probability that a subsequent Secretary of State will … again attempt to apply the [challenged] requirement to plaintiff-appellants." 145 F.3d 1240, 1246 (11th Cir. 1998). That same "very real probability," *id.*, was (and is) present here, where HHS had never disavowed its authority to enforce the Final Rule. Further, HHS's quadrennial about-faces on Section 1557 in 2016, 2020, and 2024 should alone demonstrate the "very real probability" of future enforcement at the time of the district court's dismissal order.

*FBI v. Fikre* similarly shows that this case was not moot. In *Fikre*, the Supreme Court agreed that a plaintiff's challenge to the government

placing him on a no-fly list was live, even though the government had already removed the plaintiff off the no-fly list and filed a "declaration" promising not to place the plaintiff back on the list based on the then-available information. 601 U.S. at 239–43. Here, by contrast, HHS has not repealed the Final Rule or even filed a declaration abjuring enforcement now or in the future.

Because the district court erred as a matter of law in holding this case was moot, this Court should reverse.

### C.   THIS CASE REMAINS LIVE

This is "a court of review, not a court of first view." *Compulife Software Inc.*, 959 F.3d at 1309. This Court therefore need not consider the *Tennessee* district court's subsequent partial vacatur of the Final Rule. On the facts that existed when the district court dismissed this case as moot, this case was very much alive.

If this Court nevertheless decides to address the *Tennessee* district court's subsequent partial vacatur of the Final Rule in the first instance, this Court should hold that the partial vacatur doesn't moot the case on numerous grounds.

As an initial matter, this case remains live because the partial vacatur may be overturned on appeal or reopened. The United States or any third-party that intervenes can appeal the *Tennessee* district court's judgment through December 22, 2025. *See* Fed. R. App. P. 4(a)(1)(B). Further, the United States could possibly move for relief from the final judgment on various grounds. Fed. R. Civ. P. 60(b). This means that it is far from "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," so the case is not moot. *West Virginia*, 597 U.S. at 720.

The United States has recently argued that a case in a similar posture is not moot. In *Alabama v. U.S. Secretary of Education*, a coalition led by Alabama challenged a similar 2024 Department of Education final rule "expanding the definition of discrimination on the 'basis of sex' to include discrimination based on gender identity." No. 24-12444, 2024 WL 3981994, at *1 (11th Cir. Aug. 22, 2024). The district court denied preliminary relief, Alabama appealed, and this Court entered an injunction pending appeal. *Id.* at *1–2. While the interlocutory appeal remained pending, a district court in Kentucky vacated the rule nationwide. *Tennessee v. Cardona*, 762 F. Supp. 3d 615 (E.D. Ky. 2025). This Court called

for supplemental briefing, and the United States agreed that Alabama's challenge was not moot because a third party sought to intervene to appeal the district court's final judgment, showing it was "not 'impossible' that this Court could grant plaintiffs 'effectual relief.'" Supplemental Brief for Appellees at 3, *Alabama*, No. 24-12444 (Aug. 22, 2025), ECF No. 113 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). If that case was not moot at that time according to the United States, then neither is this one now.[4]

Regardless, this case will remain live regardless of the partial vacatur's fate for several reasons.

First, Plaintiffs seek a broader vacatur of the Final Rule. Plaintiffs seek to vacate the redefinition of "sex" to include any form of discrimination on the basis of gender identity, whether express or disguised through labels such as "sex characteristics" or "sex stereotypes." Dkt. 1, ¶ 5 (quoting 45 C.F.R. § 92.101(a)(2)(i), (v)); *id.* ¶¶ 164, 221, 227; *id.* at 81 (Prayer for Relief (a)). The *Tennessee* Court did not vacate these portions of the

---

[4] Given the position of the United States in the *Alabama* case, the United States cannot possibly take the view that this case was moot when the district court dismissed it.

Final Rule, instead limiting vacatur "to the extent that" the Final Rule includes "gender identity" within the definition of "sex." *Tennessee*, 2025 WL 2982069, at *1, *11, *13. In particular, the *Tennessee* Court specified that it was vacating subparagraph (iv) of the Final Rule's definition, expanding sex discrimination to "gender identity," but conspicuously did *not* include subparagraphs (i) or (v) of that definition, which expands sex discrimination to "sex characteristics, including intersex traits" and "sex stereotypes." *Id.*

As history shows, HHS may accomplish the same goals though these alternative labels. District courts have concluded that "sex-stereotyping discrimination encompasses gender identity discrimination." *Franciscan All.*, 47 F.4th at 372–73. Indeed, a district court in New York has concluded that because HHS's 2016 Rule still prohibits stereotyping, it still *functionally* prohibits discriminating based on gender identity. *Walker v. Azar*, 480 F. Supp. 3d at 420; *Walker v. Kennedy*, 790 F. Supp. 3d at 141–42. HHS itself acknowledged that overlap in the Final Rule. 89 Fed. Reg. at 37,574. Plaintiffs seek broader relief against the Final Rule to prevent these types of claims, regardless of label. Dkt. 1, ¶¶ 56, 132, 156. Thus, vacatur of the "sex characteristics" and "sex stereotypes"

provisions are additional relief that the district court may still award Plaintiffs. Indeed, that further relief might prove necessary for the *Tennessee* Court's partial vacatur to collaterally deliver any meaningful relief at all to Plaintiffs.

Additionally, Plaintiffs challenge the Final Rule on the basis that it unlawfully purports to prohibit disparate impacts, Dkt. 1, ¶ 235, a claim that, if successful, would result in a broader vacatur of the Final Rule. This relief would include gender identity but would also extend to categories including sex, sexual orientation, race and ethnicity, and national origin. *See, e.g.*, 42 C.F.R. § 438.3(d)(4). This "potential relief remains available" to Plaintiffs, so the civil action is "not moot." *SunAmerica Corp.*, 77 F.3d at 1333.

Second, Plaintiffs seek not just vacatur but declaratory and injunctive relief. "[E]ven when the primary relief sought is no longer available, being able to imagine an alternative form of relief is all that's required to keep a case alive." *Dierlam v. Trump*, 977 F.3d 471, 476–77 (5th Cir. 2020). Alternative relief is easy to imagine here. Plaintiffs' Complaint seeks declaratory relief providing "that under any theory of Section 1557 and Title IX, [HHS] may not require covered entities to" have policies of

"allowing males into female restrooms" or "say[ing] that men can get pregnant and give birth." Dkt. 1, at 82 (Prayer for Relief (e)). If granted, this relief would go beyond vacatur of the Final Rule to prevent HHS from ever using Section 1557 in this manner against Plaintiffs, affording Plaintiffs durable relief against the whiplash of HHS's regulatory pendulum. *Cf. Franciscan All.*, 47 F.4th at 377 (recognizing that, whereas vacatur would only provide "relief from the 2016 Rule," an injunction would provide relief "from Section 1557 more broadly").[5] Further, because for purposes of standing and mootness this Court must assume that Plaintiffs prevail, "it does not matter how likely it is that [Plaintiffs] are entitled to" a declaration or injunction. *SFFA v. Univ. of Tex. at Austin*, 142 F.4th 819, 828 (5th Cir. 2025).

---

[5] The Fifth Circuit's decision in *Franciscan Alliance* erroneously held that APA claims challenging a repealed regulation were moot because "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." 47 F.4th at 374–75 (citing 5 U.S.C. § 706(2)(A)). On the contrary, the APA expressly authorizes "actions for declaratory judgments or writs of prohibitory or mandatory injunction," 5 U.S.C. § 703, and the archetypal APA pre-enforcement review case, *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), held that declaratory and injunctive remedies are available on APA claims, *id.* at 148, 155.

Third, and relatedly, Plaintiffs assert non-APA claims under the Spending Clause, the First Amendment, and RFRA, Dkt. 1, ¶¶ 287–312, which remain live. As the Fifth Circuit explained in *Franciscan Alliance*, a RFRA claim "challenges burdens placed on religious conduct" rather than "a particular regulation," so the vacatur or repeal of a regulation that gives rise to a RFRA claim does not render the claim moot unless the defendant demonstrates "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." 47 F.4th at 374, 376 (quotation marks omitted).

In *Franciscan Alliance*, HHS could not make this showing. The plaintiff brought a RFRA claim arising from threatened enforcement of the 2016 Rule, and the Fifth Circuit held that neither vacatur of the 2016 Rule nor its repeal in 2020 mooted the claim. *Id.* at 376–77. That analysis applies here. Just as HHS's cagey "repeated[] refus[al] to disavow enforcement against Franciscan Alliance" kept that RFRA claim live, *id.* at 376, so too HHS's cagey refusal to abjure enforcement against CMA's members keeps this RFRA claim live, whatever becomes of Plaintiffs' other claims.

The same analysis applies for First Amendment claims, as well as Spending Clause claims, which would authorize broader forward-looking injunctive and declaratory relief against HHS. A successful Spending Clause, First Amendment, or RFRA claim could result in declaratory relief or an injunction preventing HHS from pursuing Florida or CMA for alleged discrimination on the basis of "gender identity" whether expressly or repackaged through the use of labels such as "sex characteristics" or "sex stereotypes" under the Final Rule or Section 1557 generally. *See, e.g., Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 758 n.1 (2025) (noting that a RFRA claim resulted in an injunction against HHS enforcement of an ACA requirement). CMA's members could also rely on RFRA or First Amendment exemptions to defend private suits under Section 1557 or related claims.

This case is live.

## III.   THE COURT SHOULD REINSTATE THE PRELIMINARY RELIEF

This Court should also reinstate the preliminary injunction and stay. The district court never purported to dissolve this preliminary relief, either in its dismissal order, Dkt. 79, or its earlier orders closing the case, Dkt. 62, 71, 76. Even HHS did "not dispute that," because of the

district court's silence, the "preliminary injunction has therefore not been dissolved," at least through the date of the dismissal order. Dkt. 75, at 3.

Under this Court's precedents, however, "a preliminary injunction … cannot survive a final order of dismissal." *Cypress Barn, Inc. v. W. Elec. Co.*, 812 F.2d 1363, 1364 (11th Cir. 1987). Therefore, the district court's summary dismissal had the collateral effect of dissolving the preliminary relief. This Court, however, has power "to reinstate the preliminary injunction." *Georgia-Pac. Corp. v. Lieberam*, 959 F.2d 901, 908 (11th Cir. 1992); *Bryan v. Hall Chem. Co.*, 993 F.2d 831, 832 (11th Cir. 1993) (exercising this Court's power to "reinstate the preliminary injunction"). The same factors that apply to initial requests for preliminary relief also apply to requests to reinstate preliminary relief. *See, e.g., Georgia-Pac. Corp.*, 959 F.2d at 908–09; *Does 1-10 v. Univ. of Wash.*, 849 F. App'x 706, 707 (9th Cir. 2021); *Morning Star, LLC v. Canter, Tr. of Ctr. Schoen Fam. Tr.*, No. 22-56119, 2023 WL 5092764, at *1 (9th Cir. Aug. 9, 2023). Unless the district court's initial grant of preliminary relief was an abuse of discretion, this Court should reinstate it, since the district court never revisited its conclusion that the applicable factors warrant preliminary relief. *Cf. Bryan*, 993 F.2d at 834–35, 836–37 (reinstating preliminary

injunction that Eleventh Circuit had suspended pending appeal because district court's initial grant was not abuse of discretion).

Under any standard, Plaintiffs remain entitled to preliminary relief for the reasons the district court found. *See supra* Part II.A; Dkt. 41, at 19–47. It remains true that the challenged Final "Rule appears to be a dead letter in the Eleventh Circuit" under this Court's precedents, Dkt. 41, at 20; that implementing the Final Rule would irreparably harm Florida and its agencies because the Final Rule's requirements conflict with Florida law, *id.* at 29–31; and that the balance of harms favors preliminary relief for several reasons, including that the public interest requires a lawful rule, *id.* at 32–47. It also remains true that CMA's Florida members, previously protected by the relief, are irreparably harmed by irrecoverable monetary costs and the threatened loss of First Amendment freedoms. Dkt. 1, ¶¶ 185–215. Yet another reason to reinstate the preliminary relief is that the district court's summary dismissal without notice or hearing was based on a mistaken legal premise and violated Plaintiffs' right to be heard. At a minimum, the Court should reinstate the preliminary relief until the district court

allows the parties to brief whether the preliminary relief should be dissolved.

## CONCLUSION

For these reasons, this Court should reinstate the preliminary relief and reverse.

Dated: November 24, 2025

Respectfully submitted,

James Uthmeier
  *Attorney General*
Jeffrey DeSousa
  *Acting Solicitor General*

/s/ *Christine K. Pratt*
Christine K. Pratt*
  *Assistant Solicitor General*
FLORIDA OFFICE OF THE ATTORNEY
GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com

* *Counsel of Record for
Plaintiff-Appellant State of Florida*

/s/ *James R. Conde*
R. Trent McCotter
James R. Conde*
Nicholas Cordova
Walker Fortenberry**
BOYDEN GRAY PLLC
800 Connecticut Ave NW,
Suite 900
Washington, DC 20006
202-955-0620
jconde@boydengray.com

* *Lead Counsel and Counsel of
Record for Plaintiffs-Appellants
Florida Agency for Health Care
Administration and Florida
Department of Management
Services*

***Admitted only in Alabama;
practice supervised by D.C. Bar
Members.*

/s/ *Matthew S. Bowman*
Matthew S. Bowman*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 (fax)
mbowman@ADFlegal.org

Julie Marie Blake
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
(571) 707-4790 (fax)
jblake@ADFlegal.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE,
Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 (fax)
dcortman@ADFlegal.org

**\* Counsel of Record for**
*Plaintiff-Appellant Catholic Medical*
*Association*

Andrew T. Sheeran
  *General Counsel*
FLORIDA AGENCY FOR HEALTH
CARE ADMINISTRATION
2727 Mahan Drive, Mail Stop #3
Tallahassee, Florida 32308
(850) 412-3670
andrew.sheeran@
ahca.myflorida.com

*Counsel for Plaintiff-Appellant*
*Agency for Health Care*
*Administration*

Kristen Larson
  *General Counsel*
FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES
4050 Esplanade Way
Tallahassee, Florida 32399
(850) 922-2137
kristen.larson@dms.fl.gov

*Counsel for Plaintiff-Appellant*
*Florida Department of*
*Management Services*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 11,679 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.

Dated: November 24, 2025

/s/ *James R. Conde*
James R. Conde

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2025, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated:  November 24, 2025                    _/s/ James R. Conde_
                                              James R. Conde