# Ex. B

No.

# In the Supreme Court of the United States

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., PETITIONERS

*v.*

TEXAS MEDICAL ASSOCIATION, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

D. JOHN SAUER
*Solicitor General*
*Counsel of Record*
BRETT A. SHUMATE
*Assistant Attorney General*
SARAH M. HARRIS
*Deputy Solicitor General*
VIVEK SURI
JOSHUA S. HA
*Assistants to the Solicitor General*
MARK R. FREEMAN
DANIEL TENNY
KEVIN B. SOTER
*Attorneys*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

## QUESTION PRESENTED

Whether the Administrative Procedure Act, 5 U.S.C. 701 *et seq.*, authorizes courts, in Section 706(2), to enter universal vacatur of agency rules that courts have held unlawful and, if so, in what circumstances.

## PARTIES TO THE PROCEEDING

Petitioners (defendants-appellants below) are the U.S. Department of Health and Human Services; the Office of Personnel Management; the U.S. Department of Labor; the U.S. Department of Treasury; Robert F. Kennedy, Jr., Secretary of Health and Human Services; Scott Kupor, Director of the Office of Personnel Management; Scott Bessent, Secretary of the Treasury; and Keith Sonderling, Secretary of Labor.*

Respondents (plaintiffs-appellees below) are the Texas Medical Association, Tyler Regional Hospital, L.L.C., LifeNet, Inc., Air Methods Corp., Rocky Mountain Holdings, L.L.C., and East Texas Air One, L.L.C.

## RELATED PROCEEDINGS

United States District Court (E.D. Tex.):

*Texas Medical Ass'n* v. *United States Department of Health & Human Services*, No. 22-cv-450 (Aug. 24, 2023)

United States Court of Appeals (5th Cir.):

*Texas Medical Ass'n* v. *United States Department of Health & Human Services*, No. 23-40605 (Aug. 11, 2026)

---

* Secretary Kennedy, Director Kupor, Secretary Bessent, and Secretary Sonderling are automatically substituted for their predecessors. See Sup. Ct. R. 35.3. Dr. Adam Corley was a plaintiff-appellee below, but he passed away while the en banc proceedings were pending. C.A. Doc. 351.

**TABLE OF CONTENTS**

Page

Opinions below ... 1
Jurisdiction ... 1
Statutory provisions involved ... 1
Introduction ... 2
Statement ... 5
  A. Legal background ... 5
  B. Factual and procedural background ... 8
Reasons for granting the petition ... 10
  A. The decision below is wrong ... 11
    1. The APA preserves the equitable tradition of party-specific relief ... 12
    2. Section 706(2) does not authorize universal vacatur of agency rules ... 14
    3. The APA was not originally understood to authorize universal vacatur of agency rules ... 18
    4. Even if vacatur is an available remedy under the APA, it is subject to traditional equitable principles ... 20
    5. Arguments in favor of universal vacatur lack merit ... 21
  B. The decision below warrants review ... 24
Conclusion ... 30
Appendix A — Court of appeals en banc opinion (Aug. 11, 2026) ... 1a
Appendix B — Court of appeals panel opinion (Oct. 30, 2024) ... 50a
Appendix C — District court final judgment (Aug. 24, 2023) ... 74a
Appendix D — District court memorandum opinion and order (Aug. 24, 2023) ... 78a
Appendix E — Court of appeals order granting rehearing en banc (May 30, 2025) ... 124a
Appendix F — Statutory provision: 5 U.S.C. 706 ... 127a

**TABLE OF AUTHORITIES**

Cases: Page

*Abbott Laboratories* v. *Gardner*, 387 U.S. 136 (1967)........................................................ 13, 19
*Amoco Production Co.* v. *Gambell*, 480 U.S. 531 (1987).............................................................. 12
*Association of Air Medical Services* v. *U.S. Department of Health and Human Services*, No. 21-cv-3031, 2023 WL 5094881 (D.D.C. Aug. 9, 2023)........................................................... 26
*Arizona* v. *Biden*, 40 F.4th 375 (6th Cir. 2022)......... 3, 17, 28
*California* v. *Texas*, 593 U.S. 659 (2021)............................. 20
*Campos-Chaves* v. *Garland*, 602 U.S. 447 (2024)............... 17
*Cochise Consultancy, Inc.* v. *United States*, 587 U.S. 262 (2019)............................................................. 17
*Corner Post, Inc.* v. *Board of Governors of the Federal Reserve System*, 603 U.S. 799 (2024) ...... 14, 16, 23, 28
*DHS* v. *Regents of the University of California*, 591 U.S. 1 (2020) ................................................................. 29
*Data Marketing Partnership, LP* v. *United States Department of Labor*, 45 F.4th 846 (5th Cir. 2022)......... 11
*Dennis* v. *United States*, 341 U.S. 494 (1951)..................... 15
*eBay Inc.* v. *MercExchange, L.L.C.*, 547 U.S. 388 (2006)........................................................ 12, 21
*Federated Department Stores, Inc.* v. *Moitie*, 452 U.S. 394 (1981).............................................................. 21
*Fischer* v. *United States*, 603 U.S. 480 (2024) .................... 17
*Hecht Co.* v. *Bowles*, 321 U.S. 321 (1944) ............................ 12
*Lifelink Foundation, Inc.* v. *Kennedy*, No. 25-cv-2042, 2026 WL 2914221 (M.D. Fla. Sept. 29, 2026) ......... 24
*Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369 (2024)........................................................ 18, 22

Cases—Continued: Page

*Mallinckrodt Chemical Works* v. *Missouri*, 238 U.S. 41 (1915) .......... 15

*Massachusetts* v. *Mellon*, 262 U.S. 447 (1923).......... 15

*McLaughlin Chiropractic Associates, Inc.* v. *McKesson Corp.*, 606 U.S. 146 (2025) .......... 19

*Milner* v. *Department of the Navy*, 562 U.S. 562 (2011).......... 22

*Nken* v. *Holder*, 556 U.S. 418 (2009).......... 12

*SEC* v. *Chenery Corp.*, 332 U.S. 194 (1947).......... 15

*Starbucks Corp.* v. *McKinney*, 602 U.S. 339 (2024)....... 3, 12

*Summers* v. *Earth Island Institute*, 555 U.S. 488 (2009).......... 23

*Trump* v. *CASA, Inc.*, 606 U.S. 831 (2025).......... 2, 4, 11-13, 24-27

*Trump* v. *Hawaii*, 585 U.S. 667 (2018).......... 29

*United Steel* v. *MSHA*, 925 F.3d 1279 (D.C. Cir. 2019) .......... 22

*United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483 (2001) .......... 12

*United States* v. *Sineneng-Smith*, 590 U.S. 371 (2020).......... 23

*United States* v. *Texas*, 599 U.S. 670 (2023).......... 2, 3, 5, 11, 15, 16, 18-20, 23, 25, 28

*Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982).......... 27

*Weinberger* v. *Romero-Barcelo*, 456 U.S. 305 (1982)......... 12

*Winter* v. *Natural Resource Defense Council, Inc.*, 555 U.S. 7 (2009) .......... 20

Constitution, statutes, regulations, and rule: Page

U.S. Const., Art. III ........ 26
Administrative Procedure Act, 5 U.S.C. 551 *et seq.*,
5 U.S.C. 701 *et seq.* ........ 2
5 U.S.C. 551(13) ........ 16, 17, 22
5 U.S.C. 701(b)(2) ........ 16
5 U.S.C. 702 ........ 13, 17, 20, 27
5 U.S.C. 703 ........ 3, 13, 16-18, 24
5 U.S.C. 705 ........ 14
5 U.S.C. 706 ........ 3, 16, 18, 127a
5 U.S.C. 706(2) ........ 3, 4, 14, 16, 17, 22, 27, 29, 127a
5 U.S.C. 706(2)(A) ........ 2, 127a
No Surprises Act 2021, Pub. L. No. 116-260, Div. BB, Tit. I, 134 Stat. 1182, 2757
(42 U.S.C. 300gg–111 *et seq.*) ........ 5
42 U.S.C. 300gg–111(a) ........ 6
42 U.S.C. 300gg–111(a)(1)(C)(iv)(I) ........ 8
42 U.S.C. 300gg–111(a)(2)(B)(i) ........ 6, 7
42 U.S.C. 300gg–111(a)(3)(E) ........ 6
42 U.S.C. 300gg–111(a)(3)(E)(i) ........ 6
42 U.S.C. 300gg–111(b) ........ 6
42 U.S.C. 300gg–111(b)(1)(C) ........ 8
42 U.S.C. 300gg–111(c) ........ 6
42 U.S.C. 300gg–112(a)(3)(E) ........ 6
42 U.S.C. 300gg–131 ........ 6
42 U.S.C. 300gg–132 ........ 6
42 U.S.C. 300gg–135 ........ 6
28 U.S.C. 1391(e)(1) ........ 23
45 C.F.R.:
Section 149.110(b)(3)(iv)(A) ........ 8
Section 149.120(c)(3) ........ 8

Regulations and rule—Continued: Page

Section 149.130(b)(4)(i) .... 8
Section 149.140(a)(1) .... 7
Section 149.140(b)(1) .... 7
Section 149.140(b)(2)(ii) .... 7
Section 149.140(b)(2)(iv) .... 7
Sup. Ct. R. 10(c) .... 24

Miscellaneous:

*Administrative Procedure Act: Legislative History*, S. Doc. No. 248 79th Cong., 2d Sess. (1946) .... 18
Aditya Bamzai, *The Path of Administrative Law Remedies*, 98 Notre Dame L. Rev. 2037 (2023) .... 22, 28
William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153 (2023) .. 22, 23, 27, 28
92 Cong. Rec. 2159 (1946) .... 18
3 Kenneth Culp Davis, *Administrative Law Treatise* (1958) .... 13, 19
86 Fed. Reg. 36,872 (July 13, 2021) .... 5, 7
H.R. Rep. No. 615, 116th, 2d Sess. (2020) .... 6
H.R. Rep. No. 1980, 79th Cong., 2d Sess. (1946) .... 14, 18
John Harrison:
*Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. Reg. Bull. 37 (2020) .... 16, 18, 28
*Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. Reg. 119 (2023) .... 18
Louis L. Jaffe, *Judicial Control of Administrative Action* (1965) .... 19
Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997 (2023) .... 28

Miscellaneous—Continued: Page

S. Rep. No. 752, 79th Cong., 1st Sess. (1945)................ 18, 22

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020) .................................... 28

U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* (1947)........................ 19

*Webster's New International Dictionary of the English Language*:

(1927) ................................................................... 15

(2d ed. 1935) ....................................................... 15

# In the Supreme Court of the United States

No.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., PETITIONERS

*v.*

TEXAS MEDICAL ASSOCIATION, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

## OPINIONS BELOW

The opinion of the en banc court of appeals (App., *infra*, 1a-49a) is reported at 188 F.4th 359. The opinion of the court of appeals panel (App., *infra*, 50a-73a) is reported at 120 F.4th 494. The memorandum opinion and order of the district court (App., *infra*, 78a-123a) is available at 2023 WL 5489028.

## JURISDICTION

The judgment of the en banc court of appeals was entered on August 11, 2026. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are reprinted in the appendix to this petition. App., *infra*, 127a-128a.

## INTRODUCTION

This case presents the important question whether federal courts have the authority to universally vacate agency rules under the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*, 5 U.S.C. 701 *et seq.* Under that statute, reviewing courts are directed that they "shall" "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious," or "otherwise not in accordance with law." 5 U.S.C. 706(2)(A). The question is whether the authority to "set aside" agency actions allows federal courts to vacate agency rules as to everyone, including non-parties, and, if so, in what circumstances.

The answer is that the APA does not authorize such sweeping relief. Even if the APA authorized universal vacatur in some circumstances, universal vacatur would certainly not be an appropriate "default" remedy.

Two Terms ago, this Court rejected the practice of district courts issuing universal injunctions. *Trump* v. *CASA, Inc.*, 606 U.S. 831, 861-862 (2025). This Court explained that nationwide injunctions offend the "equitable tradition," under which courts can grant "complete relief" to parties before the court but cannot, as a rule, reach beyond them. *Id.* at 851-852. Further, "federal courts do not exercise general oversight of the Executive Branch" and may not "prevent[ ] the Government from enforcing its policies against nonparties." *Id.* at 859, 861. Universal relief also encourages forum-shopping, prompts emergency litigation, eviscerates class-action standards, and forces the government to win in every forum where it is sued. *Id.* at 849-850, 855-856.

Universal vacatur represents a "variation on th[at] theme." *United States* v. *Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment). The APA pro-

vides no "clear command from Congress" to justify a major departure from the established equitable tradition of limiting relief to the parties before the court. *Starbucks Corp.* v. *McKinney*, 602 U.S. 339, 346 (2024). To the contrary, Section 703 provides that "[t]he form of proceeding for judicial review," unless specially provided otherwise, consists of actions seeking traditional remedies like "injunction[s]" or "declaratory judgments." 5 U.S.C. 703. Section 706—which governs the "Scope of review" —is no exception. In particular, Section 706(2)'s direction to "set aside" relevant "agency action, findings, and conclusions" naturally refers to a court's duty, when resolving the parties' dispute, to disregard an unlawful rule. See *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring in the judgment). That "unremarkable" language, *Arizona* v. *Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring), does not create the extraordinary remedy of "vacating" a rule at all, much less facially rather than just as applied to the party challenging it.

Yet the lower courts have seized on those "two words in isolation" to assert a "new and far-reaching remedial power." *Texas*, 599 U.S. at 695, 697 (Gorsuch, J., concurring in the judgment) (internal quotation marks omitted). This case is but one example of that broad problem. Below, respondents—an association, a hospital, and four providers of air ambulance services—brought an APA suit to challenge regulations affecting how much they would be paid by insurers and patients for their medical and emergency services rendered out-of-network. App., *infra*, 85a-86a. The district court agreed that the challenged regulations violated the APA. *Id.* at 121a-123a. Thereafter, the district court, a panel of the Fifth Circuit, and the en banc court all agreed that universal "vacatur" was the "default" remedy as to any unlawful reg-

ulations, and they placed the burden on the *government* to prove that a different remedy was appropriate. *Id.* at 19a, 72a-73a, 118a. Thus, at the behest of a handful of plaintiffs, those regulations are erased from the books as to *everyone*.

This is no isolated occurrence. The practice of universal vacatur initially arose in the D.C. Circuit. The government had not historically challenged that practice in that forum, given that court's unique status. Because venue virtually always lies in the D.C. Circuit to challenge agency action, any precedent there—whether termed "vacatur" or declared "universal"—has nationwide effect as a practical matter, since other affected parties can usually sue there and obtain the benefit of favorable precedent. More recently, however, district courts and regional circuits across the country have followed suit, and have uncritically applied Section 706(2) to vacate agency rules universally. In so doing, those courts, whose decisions otherwise would *not* have nationwide effect, re-create many of the same problems posed by universal injunctions. There is no reason for anyone to bring a class-action suit in administrative litigation if the "default" remedy for any APA action is complete vacatur. App., *infra*, 118a. And if losing in even one district court means the challenged regulation is wiped off the books, the government must run the table in every court in which it is sued to ultimately prevail. Given the stakes, even a single loss forces the government to seek emergency relief, setting off a "fast and furious process of rushed, high-stakes, and low-information decisionmaking." *CASA*, 606 U.S. at 856 (alterations and internal quotation marks omitted).

This Court should return the lower courts to their proper role under the APA. To "set aside" unlawful

agency action in the course of judicial review is not to "nullify" it; it is a rule of decision that does not displace the traditional remedial limits on federal courts. *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring in the judgment). This case presents a good vehicle to make that clear. The en banc court identified no reason why universal relief was necessary to redress the parties' injuries, and its summary refusal to revisit its own precedent in light of *CASA* confirms that only this Court can resolve the propriety of universal vacatur. This Court should grant the petition for a writ of certiorari.

## STATEMENT

### A. Legal Background

1. Hundreds of health plans operate in the United States, covering millions of Americans. Most plans have their own networks of healthcare providers. In-network providers contract to charge lower rates for their services to patients covered by the relevant plan. Out-of-network providers are under no such contract and normally charge higher rates.

The phenomenon of "surprise medical billing" arises from the difference. When a covered patient receives care from an out-of-network provider, his health plan may decline to pay the provider or may pay an amount lower than the provider charged, generally leaving the patient responsible for the balance. That often-substantial sum comes as a "surprise" to the covered patient, who is frequently unaware that the provider was outside his health plan's network. See 86 Fed. Reg. 36,872, 36,874 (July 13, 2021).

2. In 2020, Congress enacted the No Surprises Act (Act) to respond to the growing problem of surprise medical billing. Pub. L. No. 116-260, Div. BB, Tit. I, 134 Stat. 2757 (42 U.S.C. 300gg–111 *et seq.*). The Act's aim

is to "tak[e] the consumer out of the middle" of surprise billing. H.R. Rep. No. 615, 116th, 2d Sess. 55 (2020). In general, where it applies, the Act caps a patient's share of liability to an out-of-network provider at an amount comparable to what he would have owed had he received care from an in-network provider. See 42 U.S.C. 300gg–131 (emergency services); 300gg–132 (out-of-network provider services at an in-network facility); 300gg–135 (air-ambulance services).

To calculate the amount patients should be charged for out-of-network services, the Act sets out formulas based on a "qualifying payment amount." 42 U.S.C. 300gg–111(a)(3)(E). In general, the qualifying payment amount is defined as "the median of the contracted rates recognized by the plan or issuer" as "the total maximum payment * * * under such plans or coverage" for "the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished," adjusted for inflation. 42 U.S.C. 300gg–111(a)(3)(E)(i). Put more simply, the qualifying payment amount is designed to approximate the amount an out-of-network provider would have received from a health plan had the provider been in-network.

The qualifying payment amount is insurer-specific; each insurer must calculate its own amount. 42 U.S.C. 300gg–111(a)(2)(B)(i). It is a key input for determining how much a patient pays for an out-of-network service, and for how much the insurer itself pays to the out-of-network provider after a statutory arbitration process. See 42 U.S.C. 300gg–111(a), (b), and (c). As a general matter, lower qualifying payment amounts favor patients and insurers, while higher amounts favor providers.

The Act affords significant discretion to the Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (collectively, the Departments) to fill in the details for calculating the qualifying payment amount. Through "rule-making," the Departments were directed to "establish * * * the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the qualifying payment amount." 42 U.S.C. 300gg–111(a)(2)(B)(i). The Departments were given six months to establish a methodology, which in turn meant insurers had six months to make the required calculations before the Act's effective date of January 1, 2022. *Ibid.*

In July 2021, the Departments issued an interim final rule to comply with that statutory mandate. See 86 Fed. Reg. 36,872. As relevant, the rule clarified three ambiguities left by the statute for qualifying-payment-amount calculations:

- The rule provided that the median "contracted rate" is to be calculated on a contract-by-contract basis, without requiring insurers to exclude a subset of contracted rates. See 45 C.F.R. 149.140(b)(1).
- The rule excluded from calculations any "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. 149.140(b)(2)(ii) and (iv).
- The rule excluded "single case agreement[s], "letter[s] of agreement," and other "similar [one-off] arrangement[s]" from calculations. 45 C.F.R. 149.140(a)(1).

The Act also requires a health plan to send a provider either an initial payment or notice of denial of payment "not later than 30 calendar days after the bill for such services is transmitted" by the provider. 42 U.S.C. 300gg–111(a)(1)(C)(iv)(I) and (b)(1)(C), 300gg–112(a)(3)(A). That response is part of the statutory process for determining what a health plan must pay the provider and involves a "baseball-style" arbitration system. App., *infra*, 55a. The Departments by rule specified that the 30-day clock starts once the plan "receives the information necessary to decide a claim for payment" for the services. 45 C.F.R. 149.110(b)(3)(iv)(A), 149.120(c)(3), 149.130(b)(4)(i).

**B. Factual And Procedural Background**

1. Respondents, plaintiffs below, are healthcare providers and air-ambulance providers. The healthcare providers are the Texas Medical Association (a trade association representing roughly 56,000 physicians and medical students) and Tyler Regional Hospital (a local hospital in Texas). D. Ct. Doc. 1, at 10-11 (Nov. 30, 2022). The air-ambulance providers are four business entities. 22-cv-453 D. Ct. Doc. 1, at 6 (E.D. Tex. Dec. 1, 2022).

In late 2022, the healthcare providers and the air-ambulance providers filed two separate suits in the United States District Court for the Eastern District of Texas. D. Ct. Doc. 1; 22-cv-453 D. Ct. Doc. 1. In the main, respondents claimed that the rule allows insurers to artificially deflate their qualifying-payment-amount figures, to the detriment of providers. Both suits (which the district court consolidated) thus challenged the rule's calculation provisions as contrary to law and arbitrary and capricious under the APA. D. Ct. Docs. 1, 23; 22-cv-453 D. Ct. Doc. 1. The air-ambulance provid-

ers also challenged the rule's 30-day deadline provision. 22-cv-453 D. Ct. Doc. 1, at 39-40. As a remedy, both suits asked the district court for an order "vacating" the challenged provisions of the rule. D. Ct. Doc. 1, at 34; see 22-cv-453 D. Ct. Doc. 1, at 44.

2. The district court granted summary judgment to respondents as to some (but not all) of their claims. App., *infra*, 121a-123a. As relevant here, the court held that the rule contravened the Act's definition of qualifying payment amount, as well as the Act's 30-day deadline requirement. *Ibid.*

The district court vacated these provisions of the rule in full, rejecting the government's argument that the APA does not authorize relief extending beyond the parties before the court. App., *infra*, 116a-120a. The court concluded that the "seriousness of the [rule's] deficiencies weigh[ed] heavily in favor of vacatur" and that universal vacatur of the challenged provisions would not be "unduly disruptive." *Id.* at 119a.

3. A panel of the Fifth Circuit reversed in part, holding that certain portions of the rule regarding the methodology for calculating the qualifying payment amount complied with the Act but that the rule contravened the Act's 30-day deadline requirement. App., *infra*, 73a. But the Fifth Circuit granted rehearing en banc, *id.* at 124a-126a, and the en banc court determined that two of the rule's three calculation provisions that had been upheld by the panel violated the Act by calculating contract rates on a contract-by-contract basis without requiring insurers to exclude a subset of contracted rates, *id.* at 8a-9a, and by excluding bonus and incentive-based payments, *id.* at 11a-12a.

The en banc court upheld the universal vacatur of the two calculation provisions that the court had found to be

unlawful as well as of the additional challenged provisions that had previously been found unlawful for reasons that were no longer at issue at the en banc stage. App., *infra*, 19a-20a. The court did not address the government's arguments that the APA's directive to "set aside" unlawful agency action does not include universal vacatur of rules, instead noting only that the Fifth Circuit "has interpreted this text to make vacatur the APA's default remedy." *Id.* at 19a. Neither did the "practical problems" highlighted by the government move the court. *Ibid.* In the court's view, the Departments could "exercise their enforcement discretion" to permit insurers to use their qualifying payment amounts calculated under the now-vacated rules "until new [amounts] are calculated consistent with the Act." *Id.* at 20a.

Judge Ho issued a concurring opinion. App., *infra*, 21a-24a. He explained that "universal vacatur" of agency rules "challenges our basic conception of the judicial power under Article III of the Constitution" in "provid[ing] relief for non-parties as well as parties." *Id.* at 21a. Judge Ho noted that universal vacatur under the APA "presents many of the same challenges as" universal injunctions. *Id.* at 22a. Nonetheless, because Fifth Circuit precedent went "the other way" on the issue, he concurred in the en banc court's judgment. *Id.* at 24a.

**REASONS FOR GRANTING THE PETITION**

According to the Fifth Circuit, universal vacatur of agency rules deemed unlawful by a district court is a "standard" remedy authorized by the APA. App., *infra*, 19a. That was error. Nothing in the APA's text, context, or history suggests that the statute vests courts with that "new and far-reaching remedial power."

*United States* v. *Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (internal quotation marks omitted). That has become especially clear in light of this Court's decision in *Trump* v. *CASA, Inc.*, 606 U.S. 831 (2025), which recently reaffirmed that the courts' traditional remedial role is to provide relief to the parties before them, nothing more. The Fifth Circuit instead holds that the APA's bare reference to "set[ting] aside" unlawful agency action—housed in the provision governing scope of *review* rather than form of *relief*, no less—makes universal vacatur a "standard" remedy. That holding ensures that the now-repudiated universal injunction functionally survives in a substantial number of cases. As in *CASA*, this Court's intervention is warranted to return the judicial power to its appropriate bounds.

### A. The Decision Below Is Wrong

The en banc court held that the APA authorized the district court to vacate certain regulatory provisions wholesale, thus rendering them void as to everyone—even parties not before any court. App., *infra*, 19a; see *Data Marketing Partnership, LP* v. *U.S. Department of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (describing APA vacatur as "formally nullify[ing] and revok[ing] an unlawful agency action"). The APA does not authorize that relief. Even if the APA did authorize nullification of agency action, that statute does not override traditional equitable principles that would govern such relief—including the principle that relief should ordinarily be party-specific, not universal by default.

### *1. The APA preserves the equitable tradition of party-specific relief*

In *CASA*, this Court explained that courts of equity traditionally lack power "to grant relief to nonparties." 606 U.S. at 844. The principle that relief must be limited to the parties before the court was well established "in the High Court of Chancery in England at the time of the founding," was recognized by "founding-era courts of equity in the United States," and was "consistently" reaffirmed by this Court's cases "[i]n the ensuing decades." *Id.* at 842-843. "Because the universal injunction lacks a historical pedigree," the Court continued, "it falls outside the bounds of a federal court's equitable authority." *Id.* at 847.

That background is relevant here because Congress ordinarily legislates in light of "established principles" of equity. *Starbucks Corp.* v. *McKinney*, 602 U.S. 339, 346 (2024). A "major departure from the long tradition of equity practice" should never "be lightly implied." *eBay Inc.* v. *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Instead, a "drastic departure from the traditions of equity practice" requires "plain" language or an "unequivocal statement." *Hecht Co.* v. *Bowles*, 321 U.S. 321, 329-330 (1944). The Court has "consistently" applied that rule "when interpreting a wide variety of statutes." *Starbucks*, 602 U.S. at 346; see, *e.g.*, *Nken* v. *Holder*, 556 U.S. 418, 433-436 (2009); *United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 496 (2001); *Weinberger* v. *Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Amoco Production Co.* v. *Gambell*, 480 U.S. 531, 542-544 (1987). Congress would have been fully aware of that rule when enacting the APA two years after *Hecht*.

Far from including a clear statement displacing the traditional equitable rule of party-specific relief, the APA repeatedly signals that Congress sought to preserve that rule. For example, Section 702, the provision that creates a right of action and waives sovereign immunity, states that "[n]othing herein" "affects other limitations" on "the power or duty of the court" to "deny relief on any other appropriate legal or *equitable* ground." 5 U.S.C. 702 (emphasis added). One appropriate equitable ground for denying relief is that the requested remedy is unnecessary to provide "complete relief *to the plaintiffs before the court*." *CASA*, 606 U.S. at 852. That almost always describes the supposed remedy of universal vacatur.

Section 703, the provision that governs remedies, leads to the same conclusion. Section 703 provides that the "form of proceeding for judicial review" is generally "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. 703. Because those remedies "are equitable in nature," "equitable defenses may be interposed." *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 155 (1967). One such equitable defense is that the relief sought is broader than necessary to provide complete relief to the parties.

Section 703, to be sure, allows a court to grant the party-specific relief of vacating agency orders. It does so through either a "special" review proceeding specified in a separate statute, or "any applicable form of legal action." 5 U.S.C. 703. The latter includes the traditional means of seeking judicial review of an adjudicatory order, such as a writ of "certiorari, mandamus, or prohibition," 3 Kenneth Culp Davis, *Administrative Law Treatise* § 23.02 (1958), for which a traditional rem-

edy would be vacatur. That sort of remedy was well-established before the APA as to adjudicatory orders. See *Corner Post, Inc.* v. *Board of Governors of the Federal Reserve System*, 603 U.S. 799, 830 n.2 (2024) (Kavanaugh, J., concurring) (collecting examples). But there is no such pre-APA tradition of actions to vacate agency rules. And while party-specific vacatur of an order is consistent with the principle that courts should provide relief only to the parties before them, universal vacatur of a rule is not.

Section 705, the provision dealing with interim relief, similarly contemplates only party-specific remedies. That provision states that, "*to the extent necessary to prevent irreparable injury*, the reviewing court * * * may issue all necessary and appropriate process to postpone the effective date of an agency action." 5 U.S.C. 705 (emphasis added). The italicized phrase makes clear that, consistent with traditional equitable practice, any preliminary relief should be tailored to redress the plaintiff's irreparable injury. A committee report thus explained that the authority granted by the provision now codified at Section 705 "is equitable" and that relief would "normally, if not always, be limited to the parties complainant." H.R. Rep. No. 1980, 79th Cong., 2d Sess. 43 (1946) (House Report).

***2. Section 706(2) does not authorize universal vacatur of agency rules***

The Fifth Circuit relied on Section 706(2), which provides that "[t]he reviewing court shall * * * set aside agency action, findings, and conclusions" found to be unlawful. 5 U.S.C. 706(2). But Section 706(2)'s directive to courts to "set aside" unlawful agency action means only that a court should disregard such action in the

party-specific matter before it. It does not bestow the power to universally vacate agency rules.

In both ordinary and legal usage, "set aside" means "[t]o put to one side; discard; dismiss" or "[t]o reject from consideration." *Webster's New International Dictionary of the English Language* 2291 (2d ed. 1935); see also *Webster's New International Dictionary of the English Language* 1928 (1927) ("set aside" means "[t]o leave out of account; to pass by, to omit, neglect"). To "set aside" unlawful provisions is thus to "disregard" the provisions "and proceed to decide the parties' dispute without respect to them." *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring in the judgment). Understood in that way, the APA's directive to "set aside" unlawful agency action affects only the parties before the court.

Although the phrase "set aside," in isolation, can also mean "vacate," that meaning does not fit in Section 706. When the APA was enacted, agency rules were regarded as "quasi-legislative" acts. *SEC* v. *Chenery Corp.*, 332 U.S. 194, 202 (1947). Courts and judges frequently refer to "set[ting] aside" unconstitutional legislation. See, *e.g.*, *Mallinckrodt Chemical Works* v. *Missouri*, 238 U.S. 41, 54 (1915) (referring to "set[ting] aside a state statute as repugnant to the Federal Constitution"); *Dennis* v. *United States*, 341 U.S. 494, 525 (1951) (Frankfurter, J., concurring in affirmance of the judgment) (referring to "set[ting] aside the judgment of those whose duty it is to legislate"). But that phrasing is no assertion of the power to vacate statutes; after all, courts "have no power *per se* to review and annul" statutes. *Massachusetts* v. *Mellon*, 262 U.S. 447, 488 (1923). Rather, it refers merely to a court's "negative power to disregard an unconstitutional enactment" when deciding the case before it. *Ibid.* Just as "a court treats an

unconstitutional statute as ineffective," so too in the APA context, a court "sets aside" an unlawful rule by "treat[ing] it as legally ineffective." John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. Reg. Bull. 37, 42 (2020) (Harrison). And just as courts do not issue "order[s] purporting to reverse or vacate" "statute[s]," *id.* at 43, neither should "set aside" be understood to direct courts to erase agency rules from the Code of Federal Regulations.

The rest of Section 706 confirms that the phrase "set aside" is an instruction to disregard unlawful agency action in the course of judicial review, not an authorization to universally vacate agency rules. Section 706 is captioned "Scope of review." 5 U.S.C. 706. "[O]rdinarily, when we think about the scope of a court's review," "we think about the court's decisional process leading up to [its] judgment." *Texas*, 599 U.S. at 696 (Gorsuch, J., concurring in the judgment). "Understanding 'set aside' as a command to disregard an unlawful rule in the decisional process fits perfectly within this design." *Ibid.* Understanding "set aside" to prescribe a remedy—when a different section, Section 703, addresses the topic—does not. Harrison 45.

Section 706(2), moreover, directs courts to set aside unlawful "agency action," 5 U.S.C. 706(2), a term defined to mean "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. 551(13); see 5 U.S.C. 701(b)(2). Whatever "set aside" means, that meaning must apply to "all categories of 'agency action.'" *Corner Post*, 603 U.S. at 830 (Kavanaugh, J., concurring). A court can disregard every form of "agency action" in the course of judicial review. But it

would make no sense for a court to vacate an agency's "failure to act." 5 U.S.C. 551(13), 706(2). Reading "set aside" to mean "disregard" is thus the only way to ensure that its meaning is "fixed" for all applications in the APA. See *Cochise Consultancy, Inc.* v. *United States*, 587 U.S. 262, 268 (2019).

The "neighboring words" with which "set aside" is "associated" further indicate that it prescribes a rule of decision. *Fischer* v. *United States*, 603 U.S. 480, 487 (2024). Section 706(2) uses the phrase "*hold unlawful* and set aside," and tells courts to take those steps as to agency actions that are "arbitrary," "capricious," "unsupported by substantial evidence," and so forth. 5 U.S.C. 706(2) (emphasis added). "Holding unlawful" such actions is what a court does as part of its decisional process, not what a court orders as a remedy. "Set aside" should be read similarly.

That interpretation of "set aside" make sense in light of the APA as a whole. Section 702 provides that only persons who "suffer[ed] legal wrong," were "adversely affected," or were "aggrieved" by "agency action" are "entitled to judicial review thereof." 5 U.S.C. 702. Interpreting the APA to authorize universal vacatur of rules would create a "mismatch in the statutory scheme," *Campos-Chaves* v. *Garland*, 602 U.S. 447, 459 (2024), in which the APA carefully limits the class of plaintiffs on the front end but allows relief to *everyone* ("aggrieved" or not) on the back end. That incongruity provides further reason to conclude that a court is not "entitled to 'set aside' agency action against persons not privy to the case before it." *Arizona* v. *Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring).

Similarly, Section 703 states that the "form[s] of legal action" for judicial review include "habeas corpus."

5 U.S.C. 703. Because "Section 706 applies in all the forms of proceeding contemplated by [S]ection 703," Harrison 46, any interpretation of "set aside" must make sense for habeas corpus proceedings. But even where an agency's decision to hold an individual in custody is based on its application of an unlawful regulation, no one thinks that a court deciding a habeas corpus petition challenging the detention "'vacates' [any] agency action along the way." *Texas*, 599 U.S. at 699 (Gorsuch, J., concurring in the judgment).

#### *3. The APA was not originally understood to authorize universal vacatur of agency rules*

This Court has looked to the APA's history to "underscore[ ]" the plain meaning of its text. *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369, 393 (2024). Here, such materials confirm that "set aside" in Section 706 provides a rule of decision, not a remedy. Members of Congress understood Section 703—not Section 706—as governing remedies. See, *e.g.*, *Administrative Procedure Act: Legislative History*, S. Doc. No. 248, 79th Cong., 2d Sess. 36-37 (1946); 92 Cong. Rec. 2159 (1946). Additionally, both committee reports on the legislation summarized the APA's scope-of-review provision as directing courts to "hold unlawful any action, findings, or conclusions" that are, among other things, "contrary to the Constitution." S. Rep. No. 752, 79th Cong., 1st Sess. 27 (1945) (Senate Report); House Report 44 (same). Far from viewing "set aside" to usher in an all-encompassing remedy, those reports did not deem those words worthy even to "appear in a paraphrase." John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 Yale J. Reg. 119, 125-126 (2023). The Attorney General's Manual, issued a year after the APA was enacted, likewise explained that the statute's judi-

cial-review provisions "constitute a general restatement of the principles" traditionally applied by courts. U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 93 (1947). It provided no hint that the statute created the novel remedy of universal vacatur of agency rules.

Contemporaneous sources confirm that the APA preserved traditional equitable principles, including the principle that relief should be party-specific. Professor Kenneth Culp Davis's seminal treatise described the "effect of the APA on forms of proceedings in the federal courts" as "very slight"; while his treatise discussed proceedings for "injunction[s]" and "declaratory judgment[s]," it nowhere mentioned proceedings for vacatur of agency rules. 3 Kenneth Culp Davis, *Administrative Law Treatise* § 23.02 (1958). Similarly, Professor Louis Jaffe considered the APA to have "affected the federal system of remedies" only "[p]ossibly a little"—and, even then, only insofar as the APA affected federal-question jurisdiction. Louis L. Jaffe, *Judicial Control of Administrative Action* 164-165 (1965). "These are not people who would have missed such a major development in their field." *Texas*, 599 U.S. at 699 (Gorsuch, J., concurring in the judgment).

Indeed, interpreting the APA to authorize universal vacatur of agency rules would be anachronistic. It is far from obvious that, when the APA was enacted, it was understood to permit pre-enforcement challenges to agency rules. Such challenges became common only after *Abbott Laboratories* v. *Gardner*, 387 U.S. 136 (1967), "revolutionized administrative law by more regularly allowing pre-enforcement challenges." *McLaughlin Chiropractic Associates, Inc.* v. *McKesson Corp.*, 606 U.S. 146, 157 (2025). Given that history, it makes little

sense to conclude that, when Congress enacted the APA, it meant to allow courts not only to consider pre-enforcement challenges to rules, but also to vacate such rules universally.

#### *4. Even if vacatur is an available remedy under the APA, it is subject to traditional equitable principles*

At a minimum, even if the Court were to hold that vacatur is a permissible remedy under the APA, it should treat vacatur as an equitable remedy subject to ordinary equitable principles. Nothing about the term "set aside" suggests that Congress intended to "overthrow the bedrock practice of case-by-case judgments with respect to the parties in each case" and authorize sweeping relief as a matter of course. See *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring) (internal quotation marks omitted). Rather, the APA expressly states that "[n]othing" in the statute "affects" the "power or duty of the court" to "deny relief on any * * * equitable ground." 5 U.S.C. 702. Courts should accordingly consider whether declaratory or injunctive relief in lieu of vacatur is appropriate and, if not, whether any vacatur remedy should be tailored rather than universal.

Three ordinary equitable principles are particularly relevant in considering the appropriate relief in an APA challenge to an agency rule. First, remedies "ordinarily operate with respect to specific parties," rather than "on legal rules in the abstract," *California* v. *Texas*, 593 U.S. 659, 672 (2021) (internal quotation marks omitted). Second, in fashioning equitable relief, courts ordinarily weigh equitable considerations that may make any particular relief inappropriate. This includes the power to withhold relief altogether even after success on the merits has been conclusively shown. See, *e.g.*, *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 32

(2009). Third, the party seeking equitable relief bears the burden of demonstrating that several factors are satisfied. See *eBay*, 547 U.S. at 391. None of this is reconcilable with treating universal vacatur as a "default" remedy, as the en banc court below did.

#### *5. Arguments in favor of universal vacatur lack merit*

According to the en banc court below, "the district court appropriately vacated the [Departments'] actions" because vacatur would "not result in all-out chaos." App., *infra*, 19a-20a. That reasoning confuses the effects of the district court's remedy in this particular case with the threshold question of whether that remedy is statutorily authorized. On that critical latter question, the en banc court adhered to prior court of appeals precedent without meaningfully reexamining it. More broadly, arguments propounded in favor of universal APA vacatur are unpersuasive.

*First*, advocates of universal vacatur often invoke the analogy between judicial review of agency action under the APA and appellate review (and vacatur) of trial-court judgments. See, *e.g.*, Resp. Br. at 40, *Texas*, *supra* (No. 22-58). But that comparison is just an analogy; it does not override the specific text identifying the remedies that are available in APA actions.

The appellate-review analogy in any event supports the government's position. Federal appellate courts, like all federal courts, provide relief only to the parties before them. "It is the generally accepted rule in civil cases that where less than all of the several co-parties appeal from an adverse judgment, a reversal as to the parties appealing does not necessitate or justify a reversal as to the parties not appealing." *Federated Department Stores, Inc.* v. *Moitie*, 452 U.S. 394, 399 n.4 (1981) (citation omitted). Nothing in the APA's text

"displace[s] the background law of judgments." Aditya Bamzai, *The Path of Administrative Law Remedies*, 98 Notre Dame L. Rev. 2037, 2040 (2023). Thus, even if "set aside" means "vacate," it would naturally be read only to authorize vacatur as to the parties bringing the APA challenge, not as to the whole world. Reinforcing the point, the APA defines "agency action" to include "the whole *or a part* of an agency rule." 5 U.S.C. 551(13) (emphasis added). A court satisfies its obligation to "set aside" unlawful "agency action," 5 U.S.C. 706(2), by setting aside the action in part—*i.e.*, only as to the parties.

*Second*, advocates of universal vacatur have cited the D.C. Circuit's precedents, under which "[t]he ordinary practice is to vacate unlawful agency action." *United Steel* v. *MSHA*, 925 F.3d 1279, 1287 (2019). But the D.C. Circuit's practice cannot override either the text of the APA or the historical understanding that the APA adheres to "existing law concerning the scope of judicial review." Senate Report 44. This Court has a duty to exercise "independent judgment" as to the "best reading" of the law. *Loper Bright*, 603 U.S. at 399-400. It has "no warrant" to adopt a different reading "on the ground that other courts have done so." *Milner* v. *Department of the Navy*, 562 U.S. 562, 576 (2011).

What is more, that the D.C. Circuit has engaged in such a practice is particularly unilluminating. It often makes little practical difference, from the government's perspective, whether the D.C. Circuit "vacates" a challenged rule as to all parties. "[R]eview of agency action was often exclusive to the D.C. Circuit," William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 182 (2023), and regardless venue is almost always proper to sue the government there, see 28 U.S.C. 1391(e)(1). Thus, precedent from that circuit

"that a rule [is] unlawful" often "ha[s] the practical effect of vacating it," Baude & Bray 182, because usually any future party may sue the government in that circuit and obtain the benefit of binding circuit precedent. Because disputes about the meaning of "set aside" historically have had limited practical import in the D.C. Circuit, it is unsurprising that the government has not persistently raised that remedial defense in that court. The judges on that court thus properly adhered to the "principle of party presentation," *United States* v. *Sineneng-Smith*, 590 U.S. 371, 375 (2020), in not sua sponte questioning a remedy that the government itself typically had not challenged. The lack of meaningful debate on this point is reflected in the D.C. Circuit's opinions, none of which provides the "careful[ ] reason[ing]" that would "merit respectful consideration" from this Court. *Texas*, 599 U.S. at 701 (Gorsuch, J., concurring in the judgment). Tellingly, however, when regional circuit courts started universally vacating rules too, the government promptly objected, starting during the George W. Bush Administration in *Summers* v. *Earth Island Institute*, 555 U.S. 488 (2009). See Gov't Br. at 40-43, *Summers*, *supra* (No. 07-463). In any event, the lack of dispute in the D.C. Circuit "is much easier to explain than how the [APA], right on its face, created a novel remedial superpower that escaped everyone's attention for decades." Baude & Bray 182.

*Third*, Justice Kavanaugh has suggested that APA vacatur is necessary to afford meaningful relief to some classes of plaintiffs, such as unregulated but adversely affected parties. *Corner Post*, 603 U.S. at 827 (Kavanaugh, J., concurring). But the APA authorizes courts to grant "declaratory judgments" and "writs of prohibitory or mandatory injunction," 5 U.S.C. 703, and

courts can fashion those remedies as needed to provide the plaintiff with "complete relief," *CASA*, 606 U.S. at 852; see also *Lifelink Foundation, Inc. v. Kennedy*, No. 8:25-cv-2042, 2026 WL 2914221, at *22 (M.D. Fla. Sept. 29, 2026) (discussing "non-vacatur options" for providing relief to unregulated parties). For instance, a court could grant an unregulated party a declaration that a rule is invalid, rather than vacatur of the rule. The critical difference is that such a broad declaratory remedy would be appropriate only where actually necessary to provide "complete relief," *CASA*, 606 U.S. at 852, while universal vacatur has become the "default" in every case, even where wholly unnecessary to redress the plaintiff's injuries, App., *infra*, 19a.

Regardless, if a traditional equitable remedy cannot provide complete relief to an unregulated party, it does not follow that Section 706(2)'s "set aside" language must do so. As this Court has recently explained, "complete relief" to any party—regulated or unregulated—is "not a guarantee," but rather is "the maximum a court can provide." *CASA*, 606 U.S. at 853-854. No one would suggest an unregulated party adversely affected by a statute would be entitled to a vacatur of that statute or even a universal injunction against its enforcement. There is no indication that Congress changed those rules of the road when it comes to agency rules either.

**B. The Decision Below Warrants Review**

This case presents "an important question of federal law that has not been, but should be, settled by this Court." Sup. Ct. R. 10(c). For over a decade, the Executive Branch has contended that the APA does not authorize universal vacatur. See, *e.g.*, Gov't Br. at 40-44, *Texas*, *supra* (No. 22-58); Gov't Br. at 40-43, *Summers*, *supra* (No. 07-463). Yet this Court has at most "as-

sumed" that the APA authorizes universal vacatur, *Texas*, 599 U.S. at 721 n.7 (Alito, J., dissenting), and in recent years has expressly reserved the question, *CASA*, 606 U.S. at 847 n.10. Justice Gorsuch, joined by Justices Thomas and Barrett, has observed that, "given the volume of litigation under the APA, this Court will have to address [the issue] sooner or later." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring in the judgment). The Court should do so in this case.

1. "The question whether Congress has granted federal courts the authority to universally enjoin the enforcement of an executive or legislative policy plainly warrant[ed]" this Court's review. *CASA*, 606 U.S. at 839-840 (collecting cases). The same goes for the question of whether the APA authorizes universal vacatur.

That form of relief creates significant problems analogous to those previously engendered by the practice of universal injunctions. Like the universal injunction, universal vacatur "circumvent[s] Rule 23's procedural protections," *CASA*, 606 U.S. at 849, because class actions become "essentially irrelevant in administrative litigation" if the APA expressly permits a single plaintiff to "secure a remedy that rules the world," *Texas*, 599 U.S. at 699 (Gorsuch, J., concurring in the judgment). By a similar token, universal vacatur "end-run[s]" the ordinary rule that "nonmutual offensive issue preclusion is unavailable against the United States." *CASA, Inc.*, 606 U.S. at 852 n.13. As compared to universal injunctions, these problems are even more targeted to the federal government when it comes to universal vacatur, because the federal government is always on the receiving end of an APA challenge.

Additionally, like universal injunctions, universal vacatur naturally "incentivize[s] forum shopping." *CASA*,

606 U.S. at 855. Universal vacatur also creates the same "asymmetri[es]" as universal injunctions did. *Ibid.* Whereas a plaintiff "must win just one suit to secure sweeping relief," the government "must win everywhere" to preserve its rule from vacatur. *Ibid.* This case illustrates the point. Before respondents filed their complaints, the Departments had already been sued in a challenge to the rule's exclusion of single-case agreements in the United States District Court for the District of Columbia. See *Association of Air Medical Services* v. *U.S. Department of Health & Human Services*, No. 21-cv-3031, 2023 WL 5094881 (Aug. 9, 2023). The Departments prevailed in that challenge. Nonetheless, because the district court below found that court's analysis "unpersuasive," it vacated that portion of the rule. App., *infra*, 113a.

Like universal injunctions, universal vacatur also subverts the Article III hierarchy. Ordinarily, a district court's opinion has no binding precedential effect at all, even in the same district or for the same judge. A court of appeals' published opinion is controlling precedent in the relevant circuit, but not in other circuits. And this Court's decisions constitute controlling precedent throughout the Nation. Universal vacatur upends that system, imbuing the orders of courts of first review with the type of nationwide effect usually reserved for the precedents of the court of last resort.

Universal vacatur has harmful consequences for the courts themselves. A forum-shopped, asymmetrical loss will often force the government to "proceed to the court of appeals for an emergency stay," and the "loser" on appeal will subsequently "seek a stay from this Court." *CASA*, 606 U.S. at 856. That "process forces courts to resolve significant and difficult questions of

law on a highly expedited basis and without full briefing." *Ibid.* The sweeping remedy of universal vacatur also needlessly encourages "[r]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches." *Valley Forge Christian College* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (alteration omitted). This Court's decision in *CASA* was a significant step in stemming these problems; but "there will be no fundamental reset of the judicial role if every national injunction gets relabeled 'universal vacatur.'" Baude & Bray 183.

If anything, the deleterious effects of universal vacatur may be more difficult to mitigate than those of the now-discredited universal injunction. Even defenders of the universal injunction recognized that such a remedy was not appropriate "in the typical case." *CASA*, 606 U.S. at 900 (Sotomayor, J., dissenting). As construed by the court of appeals, however, universal vacatur is the "default" remedy in an APA case. To be sure, the court of appeals below allowed that, if vacatur were overly "disruptive," a different remedy might be appropriate. App., *infra*, 20a. But the necessity of such a caveat only confirms that the Fifth Circuit's default rule is wrong. One reason why universal vacatur cannot be categorically *required* in APA cases is that Section 702 directs reviewing courts to "deny relief" if there is an "appropriate * * * equitable ground" for doing so. 5 U.S.C. 702. But under *CASA*, that ground for denying relief would properly apply in *all* cases where party-specific relief would be sufficient. The court of appeals failed to explain why universal relief is an appropriate equitable remedy by default.

2. The absence of a circuit conflict should not preclude review. The en banc court's failure to explain its continued adherence to providing universal relief under Section 706(2) is unfortunately emblematic of courts of appeals and district courts across the country. That the en banc court declined the government's express invitation to revisit post-*CASA* its precedents declaring vacatur the "default" remedy for APA violations confirms that this is a question only this Court can resolve. App., *infra*, 19a.

The question presented does not require further percolation. Several judges and scholars have detailed the arguments against reading the APA to authorize universal vacatur. See, *e.g.*, *Texas*, 599 U.S. at 693-704 (Gorsuch, J., concurring in the judgment); *Arizona*, 40 F.4th at 396-397 (Sutton, C.J., concurring); Harrison 41-46; Bamzai 2041; Baude & Bray 180-183. Other judges and scholars have responded to those arguments. See, *e.g.*, *Corner Post*, 603 U.S. at 826-843 (Kavanaugh, J., concurring); Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1122 (2020); Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997, 2001 (2023).

3. This case is a good vehicle for considering the question presented. In entering vacatur, the en banc court below never explained why more limited relief would not have been sufficient to make the parties before it whole. App., *infra*, 19a-20a. Instead of considering a more tailored remedy, the court merely declared vacatur the "default" under the APA and placed the onus on the government to exercise its "enforcement discretion" to ensure that the complete erasure of the

rule's calculation provisions would "not result in all-out chaos." *Ibid.*

The only question presented in this case, moreover, is whether Section 706(2) authorizes courts to universally vacate rules that they have held unlawful and, if so, in what circumstances. As a result, the parties could devote the entirety of their briefs to that important issue. Cf. Tr. of Oral Argument at 119, *Texas*, *supra* (No. 22-58) (question from Justice Alito noting lack of adequate briefing on APA vacatur in a multi-issue case). This Court, for its part, could proceed directly to that issue; because the government has not asked the Court to consider the merits, there would be no risk that a merits decision would moot the remedial question. Cf. *DHS* v. *Regents of the University of California*, 591 U.S. 1, 36 n.7 (2020) ("Our [resolution of the merits] makes it unnecessary to examine the propriety of the nationwide scope of the injunctions."); *Trump* v. *Hawaii*, 585 U.S. 667, 711 (2018) ("Our disposition of the case makes it unnecessary to consider the propriety of the nationwide scope of the injunction.").

**CONCLUSION**

The petition for a writ of certiorari should be granted.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*
BRETT A. SHUMATE
*Assistant Attorney General*
SARAH M. HARRIS
*Deputy Solicitor General*
VIVEK SURI
JOSHUA S. HA
*Assistants to the Solicitor General*
MARK R. FREEMAN
DANIEL TENNY
KEVIN B. SOTER
*Attorneys*

OCTOBER 2026

## APPENDIX

### TABLE OF CONTENTS


Page

Appendix A — Court of appeals en banc opinion (Aug. 11, 2026) .......... 1a
Appendix B — Court of appeals panel opinion (Oct. 30, 2024) .......... 50a
Appendix C — District court final judgment (Aug. 24, 2023) .......... 74a
Appendix D — District court memorandum opinion and order (Aug. 24, 2023) .......... 78a
Appendix E — Court of appeals order granting rehearing en banc (May 30, 2025) .......... 124a
Appendix F — Statutory provision: 5 U.S.C. 706 .......... 127a

## APPENDIX A

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 23-40605

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.; DR. ADAM CORLEY,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; ROBERT F. KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; SCOTT KUPOR, DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT, IN HIS OFFICIAL CAPACITY; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HIS OFFICIAL CAPACITY; KEITH SONDERLING, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, IN HIS OFFICIAL CAPACITY,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES

---

LIFENET, INCORPORATED; AIR METHODS CORPORATION; ROCKY MOUNTAIN HOLDINGS, L.L.C.; EAST TEXAS AIR ONE, L.L.C.,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; ROBERT F. KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF

HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; SCOTT KUPOR, DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT, IN HIS OFFICIAL CAPACITY; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HIS OFFICIAL CAPACITY; KEITH SONDERLING, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, IN HIS OFFICIAL CAPACITY,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES

Filed: Aug. 11, 2026

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CV-450, 6:22-CV-453

Before ELROD, *Chief Judge*, JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

PER CURIAM:*

The No Surprises Act ("NSA" or "the Act") mitigates unexpected medical bills from out-of-network healthcare providers, especially in emergencies. The Act directs insurers and healthcare providers to negotiate reimbursement rates via an "independent dispute resolution process," 42 U.S.C. § 300gg-111(c), rather than leaving patients responsible for the (potentially stagger-

* Joined by ELROD, *Chief Judge*, and JONES, SMITH, RICHMAN, WILLETT, HO, DUNCAN, ENGELHARDT, and WILSON, *Circuit Judges*. Judge SOUTHWICK concurs in Parts I and III. Judge OLDHAM concurs in part.

ing) full balance of their treatment. That negotiation process centers on the "qualifying payment amount," or QPA.

This case concerns the methods used to calculate the QPA. The Act provides that the QPA is "the median of the contracted rates recognized by" an insurance plan "as the total maximum payment . . . for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." *Id.* § 300gg-111(a)(3)(E)(i)(I). Or, in plain English: The QPA is the median of the total maximum rates in an insurer's contract for an item or service that a provider provides and furnishes, sorted by specialty and geographic region. The NSA authorized the Departments of Health and Human Services, Labor, and Treasury ("the agencies") to refine the methods used to calculate the QPA via rulemaking. *Id.* § 300gg-111(a)(2)(B).

Plaintiffs[1] challenged three aspects of the agencies' rulemaking. Plaintiffs claimed that the agencies' rules were contrary to the NSA and arbitrary and capricious. The district court ruled for plaintiffs. A panel of our court reversed, and we granted en banc rehearing. *See Tex. Med. Ass'n v. HHS*, 120 F.4th 494 (5th Cir. 2024), *reh'g en banc granted, opinion vacated*, 138 F.4th 961 (5th Cir. 2025).

This opinion proceeds in four parts. Part I considers whether insurers can include so-called "ghost rates" in the QPA. Part II considers whether insurers may ex-

---

[1] After en banc argument in this case, plaintiffs filed a suggestion of death as to Dr. Adam Corley. Unfortunately, he passed away on February 25, 2026.

clude bonus and incentive payments from the QPA. Part III discusses whether insurers may exclude from the QPA one-off agreements for things like air ambulances. A majority of the en banc court agrees with plaintiffs on the first two issues but disagrees on the third. Finally, Part IV discusses the proper remedy.

I

Plaintiffs' first argument concerns the rates included in the QPA calculation. We (A) discuss the relevant background, (B) show why the agencies' rule contravenes the plain text of the NSA, and (C) respond to the agencies' counterarguments.

A

The NSA defines the QPA as the "median of the contracted rates" for an "item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). In July 2021, the agencies promulgated the so-called July Rule. *See* Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021). The July Rule is an interim-final rule, meaning that the agencies promulgated it without notice and comment. *See id.* at 36,917-18. This rule required that insurers treat "each contracted rate for a given item or service" as a "single data point when calculating a median contracted rate . . . regardless of the number of claims paid at that contracted rate." *Id.* at 36,889. In other words, insurers were to include in the QPA calculation each rate that appeared on the face of their contracts with providers.

This instruction was critical. When insurers and providers negotiate reimbursement rates for various items

or services, insurers often present providers with form contracts that include a default fee schedule for all covered services. From there, providers negotiate the rates for services that they plan to provide but leave untouched the rates for services they do not provide (or at least do not plan to provide). As a result, contracts between insurers and providers often include non-negotiated "ghost rates" for services that providers do not actually provide. For example, an OB/GYN might choose not to deliver babies. So that provider's fee schedule could include an unnegotiated ghost rate for various obstetrical services. Because providers have no economic incentive to negotiate rates for services they never plan to provide, the ghost rates can be quite low (in some cases, as low as $0).

A little over a year after the agencies promulgated the July Rule, in August 2022, the agencies released a set of Frequently Asked Questions ("August FAQs"). In FAQ 14, the agencies recognized that the July Rule had instructed insurers to factor "each contracted rate" into the QPA calculation. But the agencies now directed insurers to exclude one set of ghost rates: $0 rates. The agencies had been "informed" that some provider-insurer contracts contained $0 as a reimbursement rate for items and services that providers were "not equipped to furnish." So, the agencies directed that insurers "should not include $0 amounts in calculating median contracted rates." The August FAQ nonetheless allowed insurers to continue including non-$0 ghost rates in the QPA.

In sum, the NSA sets the QPA as the "median of contracted rates" for an "item or service that is provided by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The

agencies' rules direct insurers to include all rates appearing on the face of provider-insurer contracts—except $0 rates.

B

The July 2021 Rule was contrary to law, and the purported correction in the August FAQs only underscores that conclusion.

The July Rule required that insurers treat "each contracted rate for a given item or service" as a "single data point when calculating a median contracted rate . . . *regardless of the number of claims paid at that contracted rate*." 86 Fed. Reg. at 36,889 (emphasis added). By instructing insurers to use "each contracted rate," the Rule required insurers to count the rate for each service that appeared on the face of the default fee schedules—regardless of whether the provider negotiated for them and regardless of whether the provider ever provided or furnished that service. That renders the July Rule unlawful because the Act limits the QPA to an "item or service that *is provided* by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). Likewise, the statute limits the QPA to rates for items and services that are "provided in the geographic region in which the item or service *is furnished*." *Id.* (emphasis added). If the provider submitted no claims and received no payments for a particular item or service—say, obstetrics not performed by a gynecologist—then that item or service was neither "provided by a provider" nor "furnished."[2] Yet those items and services *were* included in the QPA under the July Rule.

---

[2] "Provided by a provider" is the sort of phrase only a legislative staffer could love. It is reminiscent of the Americans with Disabil-

Placeholder rates of $0 were the clearest example. Ghost rates of $0 were technically a "contracted rate"—they appeared in the form contracts, even though the parties did not negotiate them. But it is undisputed that no provider ever agreed to provide any item or service for $0. *See post*, at 41 (Haynes, J., concurring in part and dissenting in part) (agreeing on this point). By requiring insurers to include $0 ghost rates in the QPA, the July Rule was arbitrary, capricious, and otherwise contrary to law.

The agencies' subsequent clarification that insurers exclude $0 rates only emphasizes that the July Rule was contrary to law. From the combination of the July Rule and August FAQs, $0 ghost rates must be excluded from the QPA—but below-market and concededly unnegotiated $1 ghost rates must be included. This distinction does not persuade. If a $0 ghost rate must be excluded because it's obvious that a particular provider did not contract to provide anything for free, the same must be true for a below-market non-$0 (*e.g.*, $1) ghost rate. Either the provider contracted for the rate, or he did not. If non-negotiated ghost rates must be excluded from the QPA, as the August FAQ appeared to concede, then all ghost rates must be excluded.[3]

---

ities Act, which defines an "employee" as "an individual employed by an employer": "That surely qualifies as a mere nominal definition that is completely circular and explains nothing." *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 444 (2003) (quotation omitted).

[3] The agencies now insist that the July Rule excluded $0 rates all along. But the record belies that proposition. *See, e.g.*, 86 Fed. Reg. at 36,889 (July Rule mandating that "each contracted rate" factor into the QPA calculation); 45 C.F.R. § 149.140(a)(1) (defining "contracted rate" as the "amount" that an insurer "has contractu-

The inclusion of ghost rates in the QPA calculation is no minor problem. One survey, for example, found that 68% of primary care professionals have contracts with rates for services they perform fewer than twice annually, and 57% of respondents had contracts with rates for services that they never provide. Indeed, even the agencies acknowledge this practice. In the August FAQs, they reported that some insurers "offer[] most providers the same fee schedule for all covered services, and then it is up to the providers to negotiate increases to the rates for the services that they are most likely to bill." Thus, the ultimate provider-insurer contract will contain "modifications made only to certain service codes based on the negotiations"—in other words, many non-negotiated ghost rates. Yet the whole point of the QPA is to generate a reimbursement rate that "reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. The July Rule and August FAQs, however, instruct insurers to calculate the QPA with non-negotiated ghost rates.

The agencies' error has upended the NSA's dispute-resolution process. Congress intended the QPA to serve as a focal point of provider-insurer negotiations as to which party would cover the balance of a patient's bill. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). Because the agencies directed insurers to include non-negotiated ghost rates, the resulting QPAs were artificially low. How do we know? For one, the number of arbitrations dwarfed the agencies' expectations by a factor of *84*.

ally agreed to pay . . . for covered items and services"); ROA.11468 (August FAQs acknowledging that some providers "even accept[] $0 as their *rate* for codes they do not utilize" (emphasis added)). Regardless, it is undisputed that the agencies required insurers to include non-zero-dollar ghost rates (*e.g.*, $1) in the QPA calculation.

For two, providers prevailed in over 80% of arbitrations. And for three, arbitrators selected a reimbursement rate higher than the QPA in a whopping 85% of arbitrations. These statistics underscore that the agency's inclusion of artificially low reimbursement rates is contrary to the statutory text.

C

The agencies' counterarguments are unpersuasive.

As to statutory text, the agencies rely on the requirement that insurers use contracted rates for items or services "provided by a provider in the *same or similar specialty*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The same-or-similar-specialty qualifier, the agencies argue, eliminates non-negotiated ghost rates. But providers in the same or similar specialties may not (and in fact, often do not) provide overlapping services. For example, "an obstetrician-gynecologist's contract will likely include rates for delivery services, regardless of whether she ever performs deliveries." Am. Med. Ass'n Amicus Br. at 11; *see also id.* ("Specialists like orthopedists typically focus on only certain parts of the body—yet an orthopedist's contract will likely cover far more than that particular orthopedist's specialty."). So it is true that the same-or-similar-specialty requirement will eliminate *some* ghost rates—say, for a neurosurgeon who does not provide podiatry services. But the July Rule remains unlawful because it still includes rates for services that a provider does not provide.

The agencies also contend that providers need only make a service "available," and that they do so by contracting with insurers for the relevant rates. But the fact that a provider did not object to a ghost rate does not mean that ghost-rated service is "available." As the

agencies acknowledge, many fee schedules include non-negotiated rates for services that providers are "not equipped to furnish." That admission contradicts the plain language of the statute, which requires that "the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). So even if the NSA requires that providers only make a service "available," the July Rule and August FAQs still include rates for services that are indisputably unavailable.

The agencies next argue that the phrase "provided by a provider" cannot be limited to services that providers perform but rather encompasses items or services that providers could perform in the future. But this argument does not fix the fundamental problem with the agencies' action: The rules still require providers to include rates for items and services as low as $1. No provider would negotiate a reimbursement rate of $1 for, say, brain surgery that he has never provided but may happen to provide down the road. As the district court put it, the rules instruct insurers to include rates for items or services that "are not provided, never have been provided, and never will be provided." So even assuming that "provided by a provider" includes services a provider has never provided but could theoretically provide in the future, the agencies' rules still include rates that the statute precludes.

Relatedly, the agencies say it is impracticable to figure out whether a provider actually provides a service. What is the relevant time period, they ask, for whether a provider has provided or will provide a service? That is a fair question, and it is one the agencies could have answered had they sought notice and comment to "ensur[e] that the QPA reflect[ed] market rates under typ-

ical contract negotiations." *See* 86 Fed. Reg. at 36,889. Instead, the July Rule was an interim-final rule, meaning the agencies promulgated it without notice and comment. *Id.* at 36,917-18; *see* 5 U.S.C. § 553(b)(4)(B) (allowing agencies to eschew notice and comment upon a showing of "good cause"). So it is awkward, to say the least, for the agencies now to complain that they do not have sufficient information from providers.

II

Plaintiffs' next argument concerns whether insurers may exclude certain bonus and incentive payments from the QPA calculation. We (A) explain the agencies' error and then (B) address the agencies' counterarguments.

A

The NSA requires that each contracted rate in the QPA calculation reflect the "total maximum payment" "under such plans or coverage" for an item or service. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Translated to plain English, that means that each contracted rate that factors into the QPA calculation is the highest possible amount in a provider-insurer contract for an item or service. In implementing this mandate, the July Rule required insurers to exclude "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). Plaintiffs contend that this rule contravenes the plain text of the NSA and artificially deflates the QPA calculations.

We agree. The word "total" means "[o]f, pertaining to, or referring to the whole of a thing, specified or implied, or the entire number of things concerned; not partial." *Total*, WEBSTER'S NEW INTERNATIONAL DIC-

TIONARY 2675 (2d ed. 1934; 1950) ("WEBSTER'S SECOND"); *see also id.* ("Comprising or constituting a whole or the sum of all parts, items, instances, etc.; entire[.]"). And "maximum" means "[t]he greatest quantity or value attainable in a given case" or "the highest point or degree." *Id.* at 1517. That means the "total maximum payment" specified by § 300gg-111(a)(3)(E)(i)(I) is the whole, entire payment and the sum of all payments from the insurer to the provider for the given item or service. If some of the providers' payments come in the form of bonuses or incentives or other adjustments, they nonetheless must be included in the QPA for the relevant item or service. The agencies' decision to exclude these payments means that the providers are receiving less than the "total maximum payment" specified by the statute.

B

Again, the agencies' counterarguments are unpersuasive.

The agencies first contend that excluding bonus and incentive payments makes the QPA better reflect the amount of money that an insurer reimburses a provider for a given item or service. As the agencies' brief put it, bonus and incentive payments "are rarely tied to specific contracted rates for particular items and services" and are usually paid "as an annual lump sum." *See also* 86 Fed. Reg. at 36,894 (making a similar point).

It might be true that bonus and incentive payments are sometimes unconnected to an item or service—but it's also true that such payments sometimes *are* connected. *See* TMA En Banc Br. at 39 (collecting examples). Moreover, in the statutory section describing the agencies' rulemaking authority, Congress instructed that the agencies "shall take into account payments that

. . . are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B). Bonus and incentive payments fall within this text. So the agencies cannot ignore or exclude them. *Contra post*, at 42 (HAYNES, J., concurring in part and dissenting in part).

The agencies again complain that it is infeasible or impractical to include bonus and incentive payments in the QPA. To the agencies, "[i]t is unclear how it would be possible to calculate the impact of bonus and incentive payments on the rate for a particular item or service when the provider and plan have agreed to rates established on a fee-for-service model." And again, this is the sort of question that the agencies could have figured out in notice and comment. If the providers were given a chance to explain whether and to what extent bonus and incentive payments could be tied to items and services, then the agencies could have made rational decisions to include or exclude such payments from the QPA. But the agencies cannot promulgate the July Rule without input from providers and then complain that "[i]t is unclear how it would be possible" to include the providers' total maximum payments in the QPA.

III

Plaintiffs' third and final challenge relates to the agencies' exclusion of one-off, case-specific agreements from the "contracted rates" used for the QPA calculation. On this question, we agree with the agencies. We (A) discuss the statutory text and the July Rule, (B) explain why the former does not prohibit the latter, and (C) respond to plaintiffs' contrary arguments.

A

The NSA requires that insurers calculate the QPA based on the "contracted rates recognized" by a health plan "under such plans or coverage" within an insurance market. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). In promulgating the July Rule, the agencies considered whether one-off, single-case agreements constitute "contracted rates" within the meaning of § 300gg-111(a)(3)(E)(i)(I). Single-case agreements between providers and insurers are prevalent in the air ambulance industry. Air ambulances assist critically ill patients who need emergency care and have few options. Air ambulance providers often fall outside a patient's insurance network and often bill insurers for one-off ambulance services.

The July Rule excised the rates used in one-off agreements from the QPA calculation: "[S]olely for purposes of the definition of contracted rate, a single case agreement, letter of agreement, or other similar arrangement . . . does not constitute a contract, and the rate paid under such an agreement should not be counted among the plan's or issuer's contracted rates." 86 Fed. Reg. at 36,889. Or, put differently, "[t]he term 'contracted rate' refers only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage and excludes rates negotiated with other providers and facilities." *Id.* To the agencies, this approach "most closely align[ed] with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." *Id.*

The panel decision rejected plaintiffs' challenges to this definition of "contracted rates." *Tex. Med. Ass'n*, 120 F.4th at 506. Plaintiffs did not seek en banc rehear-

ing on the question in their joint en banc petition, and the agencies did not mention it in their response. Rather, the air ambulance plaintiffs raised it in their supplemental en banc brief. In their view, single-case agreements are contractual arrangements to pay an agreed rate for a provider's service, so they fall within the meaning of "contracted rate."

B

The NSA does plainly cover single-case agreements such as the bills sent by air ambulances. The statute applies to "contracted rates." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). As used in the context of a contract, a "rate" is "[a] fixed relation of quantity, amount, or degree between two things; a ratio; proportion; also, a charge, payment, or price fixed according to a ratio, scale, or standard; as, a *rate* of ten cents a yard for cloth; the *rate* of exchange; the control of railroad *rates*." WEBSTER'S SECOND, *supra*, at 2065.

That is, the word *rate* connotes a per-unit price for *multiple* units. It's possible for a car-buyer to walk into the dealership and ask, "what is the *rate* for new Ram 3500s?" But the more common way to ask that question —at least for someone who's buying one and only one pickup truck—is to say, "what is the *price* for a new Ram 3500?" The word *rate* does not most naturally fit one-off, single-use agreements such as the bills associated with air ambulances.

Further, even if one-off agreements were somehow contracted rates, they are not rates "recognized" "under" an insurer's plan or coverage. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The whole reason for single-case, ad hoc agreements is that they arise in emergency situations when insurers pay out-of-network providers at ex-

ceedingly high rates apart from any generally applicable health plan; if the insurers were paying "under" the health plan, no single-case agreement would be necessary. Thus, the agencies' exclusion of single-case agreements from the rates contracted to under a health plan does not conflict with the statutory text.

This conclusion fits with the context and structure of the NSA. As the district court put it, the QPA serves to approximate the "median rate the insurer would have paid for the service if provided by an in-network provider or facility." But single-case agreements involve out-of-network providers' performing emergency services that result in exorbitant, "surprise" charges to unwitting patients. That the *No Surprises* Act would incorporate such surprise rates into the QPA makes little sense. The point of the QPA is to "reflect[] market rates under typical contract negotiations." 86 Fed. Reg. at 36,889; *see also supra*, Part I. Out-of-network charges for emergency care do not factor into this calculus.

What's more, Congress directed insurers to use rates recognized at a specific point in time: January 31, 2019. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). That directive is difficult to square with single-use agreements that apply to one and only air ambulance trip. Does the NSA apply only to air ambulance trips that occurred on January 31? Or what if the air ambulance trip occurred on December 1, but the provider sent the bill (read: contract) on January 31? Would everyone agree that air ambulance trips that were neither taken nor billed on January 31, 2019, are excluded? The most logical answer is that "contracted rates" refers to generally applicable rates in provider-insurer contracts that existed on January 31, 2019.

C

The air ambulance plaintiffs raise several counterarguments. None is availing.

First, plaintiffs point to supposedly contradictory interpretations within the agencies' rulemaking. The agencies elsewhere recognize that a "single case agreement between a health care facility and a plan or issuer . . . constitutes a contractual relationship" for the purposes of defining participating emergency facilities and participating health care facilities under the Act. 45 C.F.R. § 149.30. But the "contractual relationship" provision defines which health care facilities are "participating" for the purposes of the Act. *See* 42 U.S.C. § 300gg-111(b)(2)(A)(i). Indeed, that whole subsection is concerned with the scope of the NSA's protections—"Coverage of non-emergency services performed by nonparticipating providers at certain participating facilities." *Id.* § 300gg-111(b). Whether a facility has a "contractual relationship" such that it is "participating" for the purposes of the Act says nothing about which "contracted rates" fit into the QPA calculation. *See id.* § 300gg-111(a)(3)(E)(i)(I).[4]

The air ambulance plaintiffs also accuse the agencies of engaging in *post hoc* rationalizations. Of course, agencies have long been forbidden from promulgating a

---

[4] Likewise, plaintiffs point to an inherent contradiction in including rates for items or services regardless of the number of claims paid at that rate but excluding single-case agreements. We agree —and thus vacate the parts of the July Rule that require insurers to include ghost rates. *See* Part I, *supra.* In both contexts—rates for services that providers do not provide, and rates for single-case agreements—neither number represents the negotiated market transaction that the QPA is meant to approximate.

rule on one basis and then defending it on another when haled into court. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943). But the agencies did not do so here. They justified the exclusion of single-case agreements on the grounds that the term "contracted rate" refers only to rates negotiated with providers "under generally applicable terms" of an insurer's plan or coverage. 86 Fed. Reg. at 36,889. That is exactly the argument made here, which is that single-case agreements are neither generally applicable nor "under" the terms of a plan.

Plaintiffs also argue that the agencies' interpretation of "under" is wrong because if insurers are not paying providers "under" an insurance plan, then they are violating their fiduciary obligations to all other plan beneficiaries. But a plan may permit single-case agreements in the context of emergency care. That is a different question from whether an insurer's reimbursement to a provider in that context is a "contracted rate" "under" the plan. *See Tex. Med. Ass'n*, 120 F.4th at 506 n.11.

The air ambulance plaintiffs' arbitrary-and-capricious arguments likewise fail. While in-network rates for emergency services may be "comparatively rare," that does not mean high out-of-network rates fall within § 300gg-111(a)(3)(E)(i)(I). The whole point of the QPA is to approximate market rates for *in*-network services. "[M]any providers of air ambulance services . . . do not participate in insurer networks and have little incentive to do so." 86 Fed. Reg. at 36,923. In fact, "provider avoidance of insurance network participation combined with aggressive collection practices has been described as a business strategy of some providers of air ambulance services." *Id.* Because the air ambulance business model is built on avoiding in-network contracts, we can-

not say it was arbitrary or capricious to exclude them from a scheme built on in-network contracts.

IV

Finally, the question of remedy. The Administrative Procedure Act ("APA") provides that the "reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law." 5 U.S.C. § 706. Our court has interpreted this text to make vacatur the APA's default remedy. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). "While vacatur does not fall in the standard list of remedies found in most casebooks . . . , vacatur fits the standard definition of a remedy, and the Supreme Court recognizes it as such." Benjamin B. Johnson, *A History of Vacatur*, 135 YALE L.J. 761, 771 (2026) (collecting examples). In accordance with our precedent, the district court appropriately vacated the agencies' actions.

In this case, however, the agencies and the insurers insist that vacatur will create a host of practical problems. Not least among them is the considerable time it will take insurers to calculate new QPAs. The agencies also contend that, while the new QPA process is ongoing, American citizens could lose the protection of the NSA's ban on balance billing.

The APA, however, does not embrace a too-big-to-vacate principle. And administrative agencies cannot survive judicial review simply by making mistakes that are so colossal that the sky will fall if a court reviews them.

Further, vacatur will not result in all-out chaos. As the district court observed, agencies "can exercise their enforcement discretion to allow insurers to continue using their existing QPAs until new QPAs are calculated

consistent with the Act." That way, patients will not be saddled with the balance billing of pre-NSA times. Indeed, the agencies have been exercising enforcement discretion while their appeal from the district court has been pending, so they are more than capable of preventing immediate chaos.

* * *

The judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and the case REMANDED for further proceedings consistent with this opinion.

JAMES C. HO, *Circuit Judge*, concurring:

I concur. I write separately because the Government has asked us to revisit whether the universal vacatur of an agency rule is even lawful—let alone the default rule—under the Administrative Procedure Act. *See*, *e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (plurality opinion) ("vacatur of an agency action is the default rule in this Circuit"); *Data Mktg. P'ship, LP v. U.S. Dept. of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (same).

**I.**

Vacatur of an agency order is uncontroversial. No one disputes our authority to relieve a party of the burdens of an adverse order. And such relief implicates none of the dangers typically associated with universal relief.

Universal vacatur of agency rules, by contrast, provides relief for non-parties as well as parties. And that challenges our basic conception of the judicial power under Article III of the Constitution.

"[F]ederal courts do not exercise general oversight of the Executive Branch." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). We "do not possess a roving commission to publicly opine on every legal question" or "exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). "It is not the role of the judiciary to check the excesses of the other branches, any more than . . . the excesses of any other American citizen." *A.A.R.P. v. Trump*, 137 F.4th 391, 392 (5th Cir. 2025) (Ho, J., concurring).

Under a proper and limited understanding of the judicial power, it is nothing more than the authority to

"determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction." *Muskrat v. United States*, 219 U.S. 346, 361 (1911). "[O]ur job is simply to decide those legal disputes over which Congress has given us jurisdiction." *A.A.R.P.*, 137 F.4th at 392 (Ho, J., concurring).

Universal vacatur challenges this foundational vision of the judicial power. In fact, universal vacatur presents many of the same challenges as the universal injunctions condemned in *CASA*. *See, e.g.*, Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997, 1999 (2023) ("In functional terms . . . a vacatur can have roughly the same effects as a nationwide injunction."); *United States v. Texas*, 599 U.S. 670, 694-95 (2023) (Gorsuch, J., concurring in the judgment) (same).

To begin with, universal remedies "take the judicial power beyond its traditionally understood uses" by "permitting district courts to order the government to act or refrain from acting toward nonparties." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). They "prevent[] legal questions from percolating through the federal courts, encourag[e] forum shopping, and mak[e] every case a national emergency." *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring). *See also CASA*, 606 U.S. at 855-56 (same). And they "operate asymmetrically: A plaintiff must win just one suit to secure sweeping relief. But to fend off such an injunction, the Government must win everywhere." *Id.* at 855.

**II.**

Three members of the Supreme Court have made clear that the arguments against universal vacatur "war-

rant careful consideration." *Texas*, 599 U.S. at 693 (Gorsuch, J., concurring in the judgment).

The asserted authority for universal vacatur is section 706 of the APA. 5 U.S.C. § 706. But as a leading scholar has noted, "section 706 . . . does not direct courts to give universal remedies"—indeed, it "does not address remedies at all." John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. Reg. Bull. 37, 37 (2020). It says only that courts can "'hold unlawful and set aside' agency action," meaning that "courts are not to follow the agency action in deciding the case." *Id.* "The APA addresses remedies, not in section 706, but in section 703." *Id.* And section 703 includes "forms of action including habeas corpus, declaratory and injunctive proceedings, and civil or criminal enforcement proceedings"—not vacatur. *Id.* at 45.

Justice Gorsuch has similarly observed that "§ 706 . . . does not say anything about 'vacating' agency action ('wholesale' or otherwise)." *Texas*, 599 U.S. at 695 (Gorsuch, J., concurring in the judgment). Section 703 —"where the APA most clearly discusses remedies"—only "authorizes aggrieved persons to bring 'any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus.' Conspicuously missing from the list is vacatur." *Id.* at 698 (Gorsuch, J., concurring in the judgment). It is not "apparent why Congress would have listed most remedies in § 703 only to bury another (and arguably the most powerful one) in a later section addressed to the scope of review." *Id.* If Congress "meant to overthrow the 'bedrock practice of case-

by-case judgments with respect to the parties in each case' and vest courts with a 'new and far-reaching' remedial power, it surely chose an obscure way to do it." *Id.* at 695 (quoting *Arizona*, 40 F.4th at 396 (Sutton, C. J., concurring)).

* * *

That said, I recognize that our circuit precedent goes the other way, and that there is not presently interest to revisit that precedent. *See also*, *e.g.*, *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("[T]he APA authorizes vacatur of agency rules."). I am accordingly content to concur.

ANDREW S. OLDHAM, *Circuit Judge*, concurring in part:

The Administrative Procedure Act makes it difficult —some would say impossible—for agencies to make law without notice and comment. In this case, however, the defendant agencies skipped it and promulgated an interim-final rule without public input. When it turned out that the unnoticed rule had problems, the agencies tried to fix them through an informal FAQ document. That piled error on error. On these grounds, I concur that the agencies' actions were unlawful.

# I

## A

The No Surprises Act ("NSA" or "the Act") alleviates unexpected medical bills from out of-network healthcare providers. The Act directs insurers and healthcare providers to negotiate reimbursement rates via an "independent dispute resolution process," 42 U.S.C. § 300gg-111(c), rather than leaving patients responsible for the balance of their treatment. That negotiation process revolves around the "qualifying payment amount," or QPA. The QPA approximates the amount that the provider would have received from the patient's insurance plan had the provider been in-network. A patient's cost-sharing amount is calculated as a portion of the QPA. Then, the provider and insurer negotiate over the remainder.

This case is about the methods used to calculate the QPA. The NSA defines the QPA as "the median of the contracted rates recognized by" an insurance plan "as the total maximum payment . . . for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the [same] geographic region." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Or, as the per curiam puts it: "The QPA is the median of the total maximum rates in an insurer's contract for an item or service that a provider provides, sorted by specialty and geographic region." *Ante*, at 2-3. The NSA authorized the Departments of Health and Human Services, Labor, and Treasury to establish a methodology for calculating the QPA via rulemaking. 42 U.S.C. § 300gg-111(a)(2)(B).

In July 2021, the agencies promulgated the so-called July Rule. *See* Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021). Promulgated as an interim-final rule, the agencies enacted the July Rule without notice and comment. *See id.* at 36,917-18. The July Rule directed insurers to treat "each contracted rate for a given item or service" as a "single data point when calculating a median contracted rate . . . regardless of the number of claims paid at that contracted rate." *Id.* at 36,889. Thus, "insurers were to include in the QPA calculation each rate that appeared on the face of their contracts with providers." *Ante*, at 4.

This instruction had significant effect. When insurers and providers negotiate reimbursement rates for various items or services, insurers often present providers with form contracts that include a default fee schedule for all covered services. From there, providers negotiate the rates for services that they plan to provide but leave untouched the rates for services they do not provide (or at least plan to provide). As a result, contracts between insurers and providers often include non-negotiated "ghost rates" for services that providers do not actually provide. The per curiam provides a helpful example: an OB/GYN who chooses not to deliver babies. That pro-

vider's fee schedule could include unnegotiated ghost rates for various obstetrics services that could be provided by an OB/GYN, but are never provided by this OB/GYN. Because the OB/GYN in question did not negotiate such rates, they could be as low as $0. *Ante*, at 4.

Just over a year after promulgating the July Rule, the agencies in August 2022 released a set of Frequently Asked Questions ("August FAQs"). In FAQ 14, the agencies pointed out that the July Rule had directed insurers to factor "each contracted rate" into the QPA calculation. *See* 86 Fed. Reg. at 36,889. But the agencies now instructed insurers to exclude $0 ghost rates. The agencies had been "informed" that some provider-insurer contracts contained $0 as a reimbursement rate for items and services that providers were "not equipped to furnish." ROA.11469 n.29. So, they directed that insurers "should not include $0 amounts in calculating median contracted rates." *Ibid.*

Even with $0 rates gone, the inclusion of other artificially low rates disrupted the NSA's statutory framework. The QPA serves as the linchpin of provider-insurer negotiations as to who must cover the balance of a patient's bill. *See* 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I). But including non-negotiated ghost rates made the resulting QPAs artificially low. The low QPAs gave providers a systemic advantage. Negotiations repeatedly failed; the number of arbitrations exceeded the agencies' expectations by a factor of 84; providers prevailed in over 80% of arbitrations; and arbitrators selected a reimbursement rate higher than the QPA in an astounding 85% of arbitrations. *Ante*, at 8.

B

Plaintiffs sued the agencies under the Administrative Procedure Act ("APA"). They claimed that the July Rule and August FAQs violated the NSA's terms and were arbitrary and capricious.

The district court agreed. While the NSA commanded that insurers include rates for services "provided by a provider," 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I), the July Rule "allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided," ROA.13208. Thus, the district court vacated the July Rule and FAQ 14. A panel of our court reversed, and the full court granted rehearing. *See Tex. Med. Ass'n v. HHS*, 120 F.4th 494 (5th Cir. 2024), *reh'g en banc granted, opinion vacated*, 138 F.4th 961 (5th Cir. 2025). After oral argument, the court asked for supplemental briefing on the agencies' rulemaking procedure.

II

The agencies committed a series of errors in promulgating the July Rule and August FAQs. I (A) recount the substantive error in the July Rule and (B) explain why the agencies could not remedy the substantive error in the July Rule with an informal FAQ document. Then I (C) address the agencies' counterarguments.[1]

---

[1] Two additional questions are before the en banc court: whether the agencies unlawfully directed insurers to exclude incentive payments from the "contracted rates" used to calculate QPAs, and whether the agencies unlawfully directed insurers to exclude single-case agreements. Resolving this case on procedural grounds would have obviated the need to address these challenges.

A

The agencies chose to promulgate the July Rule as an interim-final rule. That meant it was final on the day it was promulgated. *See* 5 U.S.C. §§ 553(b)(4)(B), 704. And as a legislative (or "substantive") rule, it constituted "final agency action" subject to judicial review under the APA. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Under the longstanding *Chenery* principle, the Rule must stand or fall on the grounds the agency gave for it in July 2021. *SEC v. Chenery*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."). As the Supreme Court has explained, it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *accord DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020).

The grounds the agency gave for the July Rule were contrary to law. *See* 5 U.S.C. § 706(2)(A). The per curiam opinion correctly explains why. *Ante*, at 5-8. In short, because the July Rule told insurers to include $0 ghost rates in the QPA calculation, it was contrary to the NSA.

B

That much is common ground. Even the agencies concede that the QPA cannot include $0 ghost rates. So, the simplest way to resolve this case is to ask: Could the agencies use the August FAQs to amend the July Rule and exclude $0 ghost rates?

The answer is a resounding "no." That's because an administrative agency cannot fix a substantive error in

a formal legislative rule through an informal FAQ document. I (1) start with an overview of legislative and interpretive rules, and then (2) turn to this case.

1

Start with four uncontroversial legal premises.

First, the definition of a legislative rule. Legislative rules "bind[] the public and courts in a manner indistinguishable from a statute." Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretative Rules*, 52 Admin. L. Rev. 547, 552 (2000) (citing KENNETH DAVIS & RICHARD PIERCE, ADMINISTRATIVE LAW TREATISE 233 (3d ed. 1994)). Legislative rules are "promulgated pursuant to legislative authority delegated to the agency by Congress." *St. Mary's Hosp., Inc. v. Harris*, 604 F.2d 407, 409 (5th Cir. 1979). And legislative rules carry the force and effect of law. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 301-03 (1979). A legislative rule "modifies or adds to a legal norm based on the agency's own authority." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997).

Second, labels do not matter. This court is "not bound by an agency's classification of its action." *Mock v. Garland*, 75 F.4th 563, 580 (5th Cir. 2023). That is, we do not care if the agency calls its legislative rule something like a "guidance document" or an "interpretative" rule or an FAQ document. If the agency issues any document—including the most informal-looking Word document that could have been drafted over a weekend on a laptop from the beach—it is still a legislative rule if it determines "rights and obligations" or has "legal consequences." *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441, 451 (5th Cir. 2019) ("*EEOC*"); *see also United States v. Texas*, 809 F.3d 134, 171 (5th Cir. 2015),

*aff'd by an equally divided Court*, 579 U.S. 547 (2016) (per curiam). For example, the Government in *EEOC* presented a document as mere "enforcement guidance." 933 F.3d at 437. And in the agency's defense, the "guidance" document did not look particularly formal; it wasn't promulgated in the Federal Register, and to the contrary, was just a Word document that had been printed to PDF. No matter—this court held it was a legislative rule. *See id.* at 442. Regardless of the label, the Word document bound the agency "and its staff to a legal position." *Id.* at 441.

Third, legislative rules by definition must meet the strictures of notice-and-comment rulemaking. *See* 5 U.S.C. § 553(b). As this court recently put it: "If a rule is legislative in nature, it must pass through notice and comment." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 241 (5th Cir. 2023) ("*FTI*"). Or as the Supreme Court has explained, the process of notice and comment is what defines a legislative rule and gives it the force and effect of law. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

Fourth, and perhaps most relevant here, substantive changes to Legislative Rule A can be made only through a subsequent Legislative Rule B. As this court explained in *FTI*:

> "[I]f a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment to the first; and, of course, an amendment to a legislative rule must itself be legislative." This is consistent with the approach recommended by Judge Williams of the D.C. Circuit, who stated that a rule is properly considered legislative when it "effectively amends a prior legislative rule."

58 F.4th at 241 (first quoting *Clean Water Action v. EPA*, 936 F.3d 308, 314 n.11 (5th Cir. 2019); then quoting *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)). In *FTI*, for example, the FAA issued Legislative Rule A, which governed the standards pilots must meet to earn their airline transport pilot certificates. Then, the FAA issued a "policy memorandum" to amend the certificate standards. This court held that the FAA could not amend Legislative Rule A through anything other than a subsequent Legislative Rule B. *See id.* at 244. Because the "policy memo" did not meet the requirements for a legislative rule—most particularly, notice and comment under § 553—this court held it invalid and set it aside. *Id.* at 246.

Our sister circuits agree that substantive changes to a legislative rule require another legislative rule. Take the First Circuit's decision in *New Hampshire Hospital Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018). There, HHS promulgated a legislative rule telling hospitals how to calculate the maximum reimbursement they could obtain if they treated certain low-income patients. *Id.* at 68. But HHS subsequently amended the methodology, this time in a "Frequently Asked Questions" document. *Ibid.* The FAQs told hospitals that a certain class of payments counted toward their reimbursement cap. *Ibid.* The First Circuit held that, because "the FAQs announced a new policy on a matter of some considerable import," they were a legislative rule that had to go through notice and comment. *Id.* at 74. What's more, two other circuits agreed that the FAQs' amendment to the reimbursement methodology was a legislative rule that required notice and comment. *See Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 623

(4th Cir. 2018); *Children's Health Care v. Ctrs. for Medicare & Medicaid Servs.*, 900 F.3d 1022, 1027 (8th Cir. 2018).

All that is to say, it's black-letter law that if any agency is going to make substantive changes to a legislative rule, it must use notice-and-comment rulemaking to do so. *See also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (observing that "APA rulemaking would . . . be required if [the purported policy statement] adopted a new position inconsistent with any of the Secretary's existing regulations" because changes to legislative rules can be accomplished only through subsequent legislative rules); *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 753 (D.C. Cir. 2001) (emphasizing that an agency has the power to correct its mistakes "so long as it follows certain procedures" in § 553, since allowing "an agency [to] correct errors in rules merely by announcing a change would be inconsistent with" that statute).

2

It is undisputed that the July Rule was a legislative rule. That means the agencies could only amend it through another legislative rule. FAQ 14 purported to amend the July Rule. But because FAQ 14 did not go through notice and comment, FAQ 14 was a legal nullity. This conclusion rests on four points.

First, the July Rule is obviously a formal legislative rule. It was promulgated as an interim-final rule in the Federal Register. It purports to comply with 5 U.S.C. § 553(b)(4)(B). And it was final and binding—as a legislative rule that carried the force of law—on the day it was issued. All of that is undisputed.

Second, the legislative July Rule can be amended or changed only through another legislative rule. That is the teaching of *FTI*, our sister circuits' precedents, and *Guernsey Hospital*. The parties cite no authority, and we are aware of none, that could allow an agency to amend a legislative rule through a non-legislative, informal, FAQ document.

Third, FAQ 14 is a legislative rule—even though it purported merely to answer frequently asked questions. Under *FTI*, FAQ 14 amended the July Legislative Rule —so it had to be a legislative rule. (FAQ 14 could not amend the July Legislative Rule otherwise.) And FAQ 14 spoke in binding, authoritative terms and required insurers to exclude $0 ghost rates notwithstanding the contrary instructions in the July Rule. Because the FAQ spoke in such force-of-law terms, we must treat FAQ 14 as a legislative rule—regardless of its FAQ label. *See EEOC*, 933 F.3d at 442.

Lest there be any doubt, consider the text and context of FAQ 14 itself. In the FAQ document, the agencies first identified an oversight in the legislative July Rule. The agencies had recently been "informed" that some provider-insurer contracts left $0 rates in the fee schedule for services or items that a provider did not (and in some circumstances *could not*) provide. ROA.11469 n.29. So, despite the July Rule directing insurers to calculate the QPA using all contracted-for ghost rates, *see* 86 Fed. Reg. at 36889, FAQ 14 instructed insurers to exclude $0 rates from their QPA calculations, ROA.11469 n.29. Here's that directive:

the contracted rates the plan or issuer has for the same anesthesia services with other providers in specialties that do not bill for those services. Similarly, an anesthesiologist's contract may also include contracted rates for other services the anesthesiologist does not provide (for example, dermatology services) that are identical to the contracted rates the plan or issuer has with other providers in specialties who similarly do not bill for those services.[29]

To the extent contracted rates for a service code vary based on only certain provider specialty types, the plan or issuer must calculate a separate median contracted rate for each provider specialty for which the rates differ. For example, if a plan's or issuer's contracted rates for a given anesthesia service are clustered at one rate for anesthesiologists and at another rate for all other provider specialties because those providers do not provide and bill for anesthesia services, the plan or issuer must calculate one median contracted rate for the anesthesia service code for anesthesiologists, and one separate median contracted rate for the same anesthesia service code for all other provider specialties. In this example, the plan or issuer would not be expected to calculate separate median contracted rates for the anesthesia service code for each of the other specialties, such as psychiatry or cardiology, because the plan or issuer does not have contracted rates for anesthesia services that vary based on those provider specialties.

The Departments understand that some natural variation in contracted rates is likely to occur as part of the contracting process. A plan or issuer may have established contracted rates for service codes that vary across providers for reasons that are not based on provider specialty. For the purpose of identifying provider specialties for which QPAs must be separately calculated, a plan's or issuer's contracted rates for an item or service are considered to vary based on provider specialty if there is a material difference in the median contracted rates for a service code between providers of different specialties, after accounting for variables other than provider specialty. Plans and issuers whose median contracted rates for a service code are not materially different between providers of different specialties are not required to calculate median contracted rates separately for each provider specialty when determining the QPA. For this purpose, whether a material difference exists depends on all the relevant facts and circumstances.

The Departments recognize that plans and issuers (reasonably and in good faith) may have not understood the July 2021 interim final rules to require the calculation of separate median contracted rates when the plan's or issuer's contracting process unintentionally results in contracted rates that vary based on provider specialty. Accordingly, the Departments will not require a plan or issuer (to the extent not already in compliance) to calculate a QPA as described in this guidance with respect to items and services furnished prior to the date that is 90 days after publication of these FAQs. HHS encourages states to take a similar approach to enforcement and will not consider a state to be failing to substantially enforce the requirements relating to the calculation of a QPA because the state takes such an approach. The Departments will monitor plans' and issuers' compliance with the July 2021 interim final rules, as interpreted in this guidance, and are continuing to monitor contracting practices that affect the calculation of the QPA, to determine whether additional guidance is needed.

---

[29] The Departments have been informed that some plans and issuers enter $0 in their fee schedule for covered items and services that a provider or facility is not equipped to furnish. In the Departments' view, $0 does not represent a contracted rate in these cases. Therefore, plans and issuers should not include $0 amounts in calculating median contracted rates.

There it is in black and white: the Federal Government identified an issue with the July Legislative Rule and then tried to "clarif[y]" it by countermanding the July Legislative Rule with a footnote in FAQ 14. HHS En Banc Br. at 24. Under *Guernsey Hospital*, *FTI*, *New Hampshire Hospital Ass'n*, *Syncor*, and *Clean Water Action*, the agencies' maneuver was invalid. The only way to fix the $0 ghost rate problem was through another legislative rule that satisfied § 553.[2]

Fourth, the August FAQ did not even purport to satisfy § 553. It obviously did not go through notice and comment. And it identified no "good cause" for dispensing with notice and comment. 5 U.S.C. § 553(b)(4)(B). Thus, the agencies could not circumvent the APA's notice-and-comment procedure. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

C

The agencies' counterarguments are unavailing. The agencies (1) rewrite the history of this litigation and (2) argue that party-presentation principles preclude holding the August 2022 FAQ unlawful. I would reject both contentions.

---

[2] Moreover, FAQ 14 must be a legislative rule because it determined rights and obligations and bound the agencies to a new legal position. *See EEOC*, 933 F.3d at 442. Those instructions affected the rights of insurers and providers alike. After all, the QPA serves as a linchpin of the insurer-provider independent dispute resolution process. These determinations also were binding on the agencies. In telling insurers which rates to include and exclude, FAQ 14 foreclosed agency discretion. *See Texas*, 809 F.3d at 171. Thus, FAQ 14 amounted to a legislative rule—and it could be issued only in accordance with the APA. *See* 5 U.S.C. § 553.

After conceding—both in the text of FAQ 14 and in its submissions to the en banc court—that the July Rule erroneously required $0 ghost rates in the QPA, the agencies now want to backtrack from that candor. In supplemental briefing, the agencies now argue that the July Rule excluded ghost rates all along. That 180 is counterfactual, illogical, and otherwise unpersuasive.

First, the counterfactual. The July Rule mandated that "each contracted rate" factor into the QPA calculation. 86 Fed. Reg. at 36,889. The July Rule defined "each contracted rate" as the "amount" that an insurer "has contractually agreed to pay . . . for covered items and services." 45 C.F.R. § 149.140(a)(1). As the agency itself acknowledged, many of these "contracted rate[s]" include $0 ghost rates. *See* ROA.11468 (agencies acknowledging that some providers "even accept[] $0 as their *rate* for codes they do not utilize" (emphasis added)). The agencies have litigated this entire case on the ground that the July Rule required the QPA to include $0 ghost rates. *See, e.g.*, HHS En Banc Reply Br. at 4 (characterizing the July Rule as instructing insurers to "look to the rates appearing on the face of a health plan's contracts"); HHS En Banc Br. at 24 n.7 (citing the August FAQs—not the July Rule—as the "the Departments' instruction . . . regarding the appropriate treatment of '$0' placeholder rates"); *see also ante*, at 7 n.3 (sharing this understanding of the agencies' earlier position). So the agencies cannot now turn around and say that by *including* $0 ghost rates, the July Rule somehow *excluded* them. *See, e.g.*, *Michigan*, 576 U.S. at 758-59 (holding agency must defend its action on the ground it provided for the action in the first place).

Second, the illogical. The agencies try to manufacture a distinction between two different kinds of ghost rates. In the agencies' revisionist history, there is a meaningful distinction between $0 ghost rates and below-market, unnegotiated $1 ghost rates. On the agencies' telling, $0 ghost rates must be excluded from the QPA—but below-market and concededly unnegotiated $1 ghost rates must be included. The theory appears to be that it's "obvious" that the gynecologist did not negotiate for and agree to a $0 ghost rate for obstetrics, but the same provider *must* be held to a $1 "agreed-to rate" for obstetrics. HHS Supp. En Banc Br. at 10.

Respectfully, this distinction is untenable. The Act requires providers and insurers to consider their "contracted rates" in setting the QPA. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). If a $0 ghost rate is out because it's obvious that a particular provider did not contract for that rate, so too for a below-market non-$0 (*e.g.*, $1) ghost rate. "Either the provider contracted for the rate, or he did not." *Ante*, at 6. If the QPA must exclude ghost rates, as the agencies now appear to concede, then the agencies must exclude all ghost rates.[3]

Third, the otherwise unpersuasive. The agencies also resist the conclusion that FAQ 14 was a legislative rule at all. They instead claim that it was an interpretive rule "advising the public of [the agencies'] construction of the

---

[3] For the same reason, I would reject the agencies' contention that plaintiffs lack standing to bring a notice-and-comment challenge because FAQ 14 modified the QPA calculation to their benefit. True, FAQ 14 excludes $0 ghost rates, and that helps plaintiffs. But it's equally true that FAQ 14 harms plaintiffs by allowing or requiring insurers to include non-$0 ghost rates in the QPA.

existing substantive law." HHS Supp. En Banc Br. at 11 (citation modified).

But again, that cannot be squared with what the agencies actually said. In the August FAQs, the agencies said they had been newly "informed" about the existence of $0 placeholder rates. *See* ROA.11469 n.29. The agencies recognized that the July Rule required those rates to be included in the QPA. Then the agencies changed the status quo and directed insurers to exclude ghost rates. So, it is inconceivable that FAQ 14 was clarifying the agencies' earlier rule; the agencies apparently were not even aware that the plain text of the July Rule encompassed $0 rates. And it is equally inconceivable that FAQ 14 did not "intend[] to speak with the force of law." HHS Supp. En Banc Br. at 12 (quotation omitted). FAQ 14 unequivocally stated that "plans and issuers should not include $0 amounts in calculating" the QPA. ROA.11469 n.29. That is undeniably mandatory language.

2

Perhaps recognizing their APA problems, the agencies pound the party-presentation table. This assertion misses the mark too.

First, the agencies argue that "the parties have agreed throughout this case that the [July Rule] does not in fact incorporate $0 rates into the QPA methodology." HHS Supp. En Banc Br. at 5 (citation modified). But plaintiffs have always argued that the July Rule's inclusion of all ghost rates, including $0 rates, was unlawful. In their complaint, for example, plaintiffs pointed out that the July Rule's definition of "contracted rates" artificially lowered the QPA because "contracted rates" included *all non-negotiated rates*, including when pro-

viders "sometimes accept '$0 as their rate.'" ROA.47 (quoting ROA.11468). Plaintiffs maintained this stance throughout the litigation. *See* TMA En Banc. Br. at 23 ("The July Rule's inclusion of ghost rates is unlawful."); *id.* at 35 ("The Departments' belated decision in the August FAQs to exclude only $0 rates merely highlights the unreasonableness of including all other ghost rates."); *see also* TMA Supp. En Banc Br. at 4 ("[P]laintiffs have squarely presented the issue of whether the Departments' inclusion of ghost rates—of any amount—in QPA calculations is contrary to law.").

Second, the agencies point out that plaintiffs' complaint did not mention "notice and comment." HHS Supp. En Banc Br. at 6. That is true but irrelevant. Party-presentation principles do not allow parties to stipulate to the law. *See, e.g.*, *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024). And if the parties cannot bind us to a legal proposition by affirmatively stipulating to it, they certainly cannot bind us by omitting an antecedent legal argument through neglect or forfeiture.

To illustrate, imagine that a party sues to enjoin the enforcement of a congressional statute because it violates, say, the First Amendment. Could that party waive an argument that the statute failed to pass through bicameralism and presentment? *See* U.S. Const. art. I § 7. Of course not. That's a legal argument—a procedural defect—fairly encompassed within the overarching substantive claim. Indeed, courts often raise non-jurisdictional, procedural defects *sua sponte*. *See Castro v. United States*, 30 F.4th 240, 245-46 (5th Cir. 2022) (collecting examples). Thus, we cannot duck an antecedent legal argument just because the parties did not brief it. De-

ciding the case otherwise would improperly allow the parties to stipulate to the law.

These principles demonstrate why the procedural deficiencies in FAQ 14 are properly before this court. Plaintiffs brought a claim for vacatur of the July Rule and August FAQ 14. To resolve that challenge to the substance of the agencies' actions, we would have to accept an antecedent point—that FAQ 14, which modified the July Rule, was validly promulgated. But plaintiffs cannot stipulate that the agency action promulgating FAQ 14 was permissible. And if plaintiffs could not affirmatively stipulate away the agencies' procedural violations, they certainly could not insulate those violations from judicial review by neglect or forfeiture.

What's more, even if plaintiffs' opening briefs didn't raise the procedural argument, their supplemental en banc brief sure does. That's ample grounds for this court to decide on the supplementally briefed issue. The Supreme Court often invites parties to file supplemental briefs on arguments that lurk within parties' claims. *See United States v. Sineneng-Smith*, 590 U.S. 371, 380-82 (2020) (collecting a slew of examples from 2015 to 2020 alone). And the Supreme Court has, for better or worse, spotted a supposedly "winning" issue, asked for supplemental briefing, and ruled on it, notwithstanding the fact that the prevailing party had advocated a "contrary" position below and had waived its new position three times in the district court. *Trump v. Illinois*, 146 S. Ct. 432, 438 (2025) (Alito, J., dissenting).[4] There are

---

[4] I can think of no principled reason for saying the party-presentation principle applies differently in the Supreme Court and the inferior federal courts. The adversarial requirements of a "Case" or "Controversy" do not loosen the higher up the Judicial

persuasive reasons to think the *Illinois* Court transgressed the limits on party presentation and reached an erroneous merits outcome to boot. *See id.* at 438-45 (ALITO, J., dissenting); *id.* at 445-46 (GORSUCH, J., dissenting). But given that the prevailing party advanced the opposite position below, the agencies' argument here easily fails: Plaintiffs have maintained that the July Rule unlawfully included $0 rates from the outset of this litigation. So the procedural issue is not just antecedent to the substantive argument plaintiffs first raised; it is entirely consistent with it.

Altogether different questions are presented when a court *sua sponte enlarges* the parties' claims. *See Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam) (reversing the Fourth Circuit because it "*sua sponte* addressed a much broader" question than the one presented); *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam) (reversing the Fourth Circuit for granting habeas relief "on a claim that [petitioner] never asserted and that the State never had the chance to address"); *Sineneng-Smith*, 590 U.S. at 378-79 (recounting that the Ninth Circuit "named three organizations" to file amicus briefs and permitted, but did not require, the parties to file briefs "limited to responding to any and all amicus/amici briefs" (emphasis omitted)). But my would-be solution does the opposite. By holding FAQ 14

---

Branch you go. U.S. CONST. art. III § 2. If anything, raising "new" legal arguments is "most justified at the circuit court level." Amanda Frost, *The Limits of Advocacy*, 59 DUKE L.J. 447, 512 (2009). Unlike the Supreme Court, the inferior federal courts do not have discretionary dockets; we cannot wait for the proper vehicle to tee up a legal argument. *See ibid.* Given plaintiffs' claim encompassed a notice-and-comment argument, and all parties have briefed it, this court may decide this case on those grounds.

procedurally invalid, I would not reach plaintiffs' substantive challenges to the agencies' rulemaking.

*

Procedural checks are the principal barrier standing between the American people and the unelected bureaucrats of our Fourth Branch. The agencies in this case cast aside that barrier. So, I would hold their action was unlawful and remand with instructions to follow the APA's venerable notice-and-comment procedure. I respectfully concur in part.

HAYNES, *Circuit Judge*, joined by STEWART, GRAVES, HIGGINSON, DOUGLAS, and RAMIREZ, *Circuit Judges*, concurring in part and dissenting in part:

I concur in the majority opinion's decision that the July Rule is not unlawful because it excludes from the "qualifying payment amount" (or "QPA") one-off, case-specific agreements. Then, to the extent the majority opinion concludes that provisions of the July Rule relating to the calculation of the QPA are unlawful, I agree that this case should be remanded to the district court, instead of vacating the July Rule.[1] However, I do respectfully dissent from the majority opinion's conclusions that the July Rule is unlawful because, when calculating the QPA, it includes contracted rates regardless of whether claims have been paid at that rate and excludes bonus or other incentive-based compensation. I would reach the opposite conclusion in both respects.

I discuss below, *first*, the inclusion of contracted rates regardless of payment at that rate and, *second*, the exclusion of bonus or other incentive-based compensation.

**I.**

Plaintiffs challenge the July Rule's inclusion of contracted rates in the QPA calculation regardless of payment. Specifically, they challenge the requirement that "the rate negotiated under a contract constitutes a . . . contracted rate regardless of the number of claims paid at that contracted rate." Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872, 36,889 (July 13, 2021). They say that this provision conflicts with the

[1] As well, anything in my panel opinion that is not discussed by the majority opinion should be considered correct.

No Surprises Act's requirement that insurers include in the QPA calculation rates for services that are "provided by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). I disagree.

The July Rule does not conflict with the Act in this respect. By using the term "provided," *id.*, the Act requires only that a given service be available. Our court has explained that "[t]o 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired to.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (en banc) (alterations adopted) (quoting *Provide*, American Heritage Dictionary). So, the Act does not require that a service must have previously been performed by a provider to be included in the QPA calculation. This makes sense because, at the time contracts are negotiated, no one knows for certain how many times a particular service will be performed. A provider may not provide services that it did expect to provide, and, conversely, a provider may provide services that it did not expect to provide. Providers must only make services available, and it is of no moment that a provider may not have submitted claims nor received payments for a particular service. As a result, the July Rule's requirement that negotiated rates constitute contracted rates "regardless of the number of claims paid," 86 Fed. Reg. at 36,889, does not conflict with the Act's requirement that providers must make these services available, *see* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). That ends the matter, and Plaintiffs' challenge on this score should fail.

The July Rule reasonably attempts to include in the QPA calculation contracted rates only for services that providers make available. Consequently, Plaintiffs' re-

maining concerns about the possible inclusion of rates for services that a provider does not, and never intends to, provide are unfounded. As a preliminary matter, the Act itself requires that the QPA be calculated based on contract rates for services provided, not by just any provider, but "by a provider in the same or similar specialty." *Id.* So, the rates agreed to by providers outside a particular specialty, who have no incentive to negotiate those rates, are irrelevant. As for the remaining concern that some providers within a particular specialty will not negotiate rates for services that they do not intend to provide, the agencies' subsequent guidance is significant. The agencies clarified in a set of Frequently Asked Questions that "plans and issuers should not include $0 amounts" when calculating QPAs. The reason for that is because the agencies learned that when "a provider or facility is not equipped to furnish" a particular service, the provider-insurer contracts will often include $0 as the reimbursement rate for that service. That exclusion essentially extinguishes the likelihood that a given QPA would include rates for services that a provider would never provide. Additionally, it is important to keep in mind the context in which the July Rule applies. In that vein, Plaintiffs fail to respond to the agencies' point that the risk of unnegotiated rates for services within a provider's specialty working their way into a contract is especially low in the emergency medical context at which the Act is directed.

Practical realities only reinforce the fact that Plaintiffs' challenge fails. Plaintiffs' reading of the Act is unworkable. For instance, they cannot explain how those responsible for calculating the QPA could accurately determine with certainty which in-specialty services the thousands of providers across the country would *never*

—even in emergency circumstances—perform. Instead, to conduct the relevant inquiry, health plans need only to consider the four corners of a plan's 2019 contracts; they need not "scour data beyond their plan contracts to attempt to determine how many claims a given provider may have submitted for that particular service over the course of any given period of time (where no such period of time is specified in the statute)."

**II.**

Plaintiffs next challenge the July Rule's exclusion of bonus and incentive-based compensation from the QPA calculation. The relevant provision instructs insurers to "exclude" from the QPA "risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." 86 Fed. Reg. at 36,894. Plaintiffs say that this conflicts with the Act's phrase "total maximum payment," as used in the definition of the QPA, 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Again, I disagree.

The July Rule's exclusion of bonus and incentive-based compensation does not conflict with the Act. In fact, there can be no conflict because the Act expressly provides the agencies with authority to determine how to handle these payment adjustments. The Act clarifies that the "*rulemaking* shall *take into account* payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis." *Id.* § 300gg-111(a)(2)(B)(iv) (emphasis added).[2] The Act directs the

---

[2] I am unconvinced by Plaintiffs' alternative assertion that the delegation provision mentions only non-fee-for-service incentives and does not grant the agencies discretion to exclude fee-for-service incentives. What do they mean by fee-for-service incentives?

agencies to consider bonus or incentive-based compensation when engaging in rulemaking. Congress could have made the subject of the sentence "such methodology," rather than "such rulemaking," if it wanted to. But it did not. Instead, Congress simply told the agencies to figure out how to handle incentive payments. That they did. The agencies considered them and concluded that they should not be a factor in the QPA calculation. If "total maximum payment" was read to mean that incentive-based payments must be included, the Act would contradict itself. That is not the best reading of the statute.

Once again, the practical realities simply reinforce this reading. Incentive payments serve purposes that are distinct from compensating providers for units of service rendered to individual patients. Including such payments in the QPA calculation would skew the calculation, making it less likely to reflect market rates for "item[s] or service[s]," as Congress intended. *See id.* § 300gg-111(a)(3)(E)(i)(I). But what is more, this process would inevitably be complicated, expensive, time-consuming, and lead to inconsistencies among plans. Then, on top of all that, Plaintiffs' theory fails to account for the fact that not all incentive adjustments *increase* payment amounts. Some decrease them (e.g., penalties).

* * *

---

Plaintiffs give an example: an insurer pays "a bonus of X amount per vaccine administered if the provider administers at least Y vaccines to its insureds." But such an incentive is not a pure "fee-for-service" payment because it is tied to factors unrelated to the administration of each particular service (i.e., whether the provider has performed that specific service Y number of other times to other patients).

In the end, when it comes to the inclusion of contracted rates regardless of payment at that rate and the exclusion of bonus or other incentive-based compensation, I would reverse the district court.

**APPENDIX B**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 23-40605

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.; DR. ADAM CORLEY,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; KIRAN AHUJA, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HER OFFICIAL CAPACITY; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, IN HER OFFICIAL CAPACITY,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES

---

LIFENET, INCORPORATED; AIR METHODS CORPORATION; ROCKY MOUNTAIN HOLDINGS, L.L.C.; EAST TEXAS AIR ONE, L.L.C.,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH

AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; KIRAN AHUJA, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HER OFFICIAL CAPACITY; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, IN HER OFFICIAL CAPACITY, DEFENDANTS-APPELLANTS

Filed: Oct. 30, 2024

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CV-450, 6:22-CV-453

Before SOUTHWICK, HAYNES, and DOUGLAS, *Circuit Judges*.

HAYNES, *Circuit Judge*:

A group of healthcare providers and air-ambulance providers challenge certain agency rules regarding the No Surprises Act (the "Act"), which Congress enacted to protect patients from surprise medical bills.[1] The majority of provisions at issue concern how to calculate the "qualifying payment amount" or "QPA," which helps to determine patients' and insurers' obligations to out-of-

[1] In a related appeal before this court, the same Plaintiffs challenged the same district court's vacatur of other rules promulgated by the Departments related to the Act. *See generally Tex. Med. Ass'n v. HHS*, 110 F.4th 762 (5th Cir. 2024). That case affirmed, but it addressed different issues.

network providers under the Act. The others involve deadlines and disclosure requirements.

The district court held several provisions unlawful and vacated them. The defendant agencies appealed as to only certain provisions. They also contend that the district court erred by vacating, rather than remanding, the provisions that it held unlawful. Plaintiffs challenged the district court's holding that the disclosure provisions are not arbitrary and capricious.

For the reasons that follow, we REVERSE the district court's vacatur of the QPA-calculation provisions, AFFIRM the district court's vacatur of the deadline provision, and AFFIRM the district court's holding that the disclosure requirements are not arbitrary and capricious.

## I. Background

We begin by providing relevant information about the Act; then we turn to the procedural history of this case.

### A. Statutory Background

Congress passed the Act to protect patients from surprise medical bills in situations where they have no choice over whether their provider is in-network. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 2758-890 (2020).[2] Before the Act, when

---

[2] The relevant statutory provisions are codified in three places: (1) the Public Health Services Act, enforced by the Department of Health and Human Services ("HHS"); (2) the Internal Revenue Code, enforced by the Department of the Treasury; and (3) the Employee Retirement Income Security Act ("ERISA"), enforced by the Department of Labor. To be consistent with the Parties' briefs and a related decision by a panel of this court, we cite to the

an out-of-network healthcare provider furnished medical care to a patient, the patient's insurer could refuse to pay or unilaterally determine what amount to pay. This sometimes left patients responsible for so-called "balance bills," the amounts of which could be staggering. For example, Air Methods Corp., a Plaintiff in this case, charged an average price of $49,800 per air-ambulance transport in 2016, an increase of 283 percent from a decade earlier. But even less extreme examples can be devastating. The House Committee on Education and Labor found that nearly 40 percent of adults "are unable to cover a $400 emergency expense, yet the average surprise balance bill by emergency physicians in 2014 and 2015 was an estimated $620 *greater* than the Medicare rate for the same service." H.R. Rep. No. 116-615, pt. 1, at 52 (2020) (emphasis added) (footnote omitted). Therefore, in circumstances where a patient has no choice over his or her provider,[3] the Act aims to cap the patient's share of liability to out-of-network providers at an amount comparable to what the patient would have owed had the patient received care from an in-network provider.

---

Public Health Services Act provisions. The parallel statutory codifications are found at I.R.C. § 9816(c) and 29 U.S.C. § 1185e (ERISA).

[3] The Act applies in the following circumstances: (1) when an insured patient receives emergency care from an out-of-network provider, *see* 42 U.S.C. § 300gg-131; (2) when an insured patient receives certain nonemergency services at an in-network facility but is nevertheless treated by an out-of-network provider, such as an anesthesiologist or radiologist, *see id.* § 300gg-132; and (3) when an insured patient is transported by an out-of-network air-ambulance provider, *see id.* § 300gg-135.

The Act also permits the provider to seek further compensation from the patient's health plan. Congress determined that a relevant consideration in calculating both the patient's and the health plan's liability would be the QPA. 42 U.S.C. § 300gg-111(a)(3)(E)(i). The Act defines the QPA as

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such issuer that are offered within the same insurance market . . . as the plan or coverage) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region in which the item or service is furnished.

*Id.* § 300gg-111(a)(3)(E)(i)(I). The definition also incorporates adjustments for inflation each year. *Id.* § 300gg-111(a)(3)(E)(i)(II).

Although the QPA is a factor in determining the respective payment obligations of both patients and health plans, it is used differently in these two determinations. For patients, the QPA plays a primary role in determining the cost-sharing responsibility. A patient's responsibility is calculated as if the total cost of the service was no greater than the QPA, and as if the services had been provided by an in-network provider. *Id.* § 300gg-

111(a)(1)(C)(ii)-(iii), (3)(H)(ii), (b)(1)(A)-(B).[4] For example, if the QPA for a given service is $1,000 and the patient's plan requires a coinsurance payment of 20 percent for that service, the patient's responsibility would be capped at $200 (if the deductible had been met).

For health plans, the QPA factors into their payment obligations as follows. When a provider submits a bill for an out-of-network service to the health plan, the plan must respond within thirty days by issuing either an initial payment or a notice of denial of payment; if the provider is dissatisfied with the plan's response, the provider may initiate a thirty-day period of open negotiation. *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C), (c)(1)(A). If the dispute remains unresolved, the plan and provider may proceed to an independent dispute resolution process ("IDR"), where an arbitrator determines how much the plan is required to pay the provider. *Id.* § 300gg-111(c)(1)(B), (4)(A). The Act uses "baseball-style" arbitration, meaning the provider and the health plan each offer a payment amount, along with their justification, and the arbitrator is required to select one of the two offers. *Id.* § 300gg-111(c)(5)(A)(i). The QPA is one factor that the arbitrator is to consider when choosing an offer. *Id.* § 300gg-111(c)(5)(B)(i)(II), (B)(ii), (C)(i)-(ii). The arbitrator's decision is binding on the parties and not subject to judicial review, except under circumstances described in the Federal Arbitration Act. *Id.* §§ 300gg-111(c)(5)(E)(i), 300gg-112(b)(5)(D). Once a final amount has been identified, the health plan must pay the provider that amount, offset by the patient's cost-

---

[4] Separate provisions of the Act create a parallel process applicable to air-ambulance providers. *See* 42 U.S.C. § 300gg-112.

sharing obligation and any amounts already paid by the plan. *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D).

The Act directs the Departments[5] to establish through rulemaking the methodology for health plans to determine the QPA and the information health plans must share with providers regarding QPA determinations. *Id.* § 300gg-111(a)(2)(B). In July 2021, the Departments promulgated an interim final rule (the "Rule"). Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36,872 (July 13, 2021).[6] As relevant here, the Rule set the methodology for determining the QPA, *id.* at 36,888-98, and the information insurers must disclose to providers about their QPA calculations, *id.* at 36,898-99. The Rule also added that the thirty-day statutory deadline for health plans to provide an initial payment or notice of denial "begins on the date the plan or issuer receives the information necessary to decide a claim for payment for such services." *Id.* at 36,900.

The Departments invoked § 553(b) of the Administrative Procedure Act ("APA"), *see* 5 U.S.C. §§ 551-59, which permits an agency to bypass the APA's notice and comment procedures for good cause. 86 Fed. Reg. at 36,917. They explained that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final rules in place until after

---

[5] The "Departments" include HHS, the Office of Personnel Management, the Department of Labor, and the Department of the Treasury. We use "Departments" interchangeably with Defendants in this opinion. The other Defendants are the respective secretaries of each Department in their official capacities.

[6] The Rule has been codified in part at 45 C.F.R. § 149.140 (HHS regulations), 26 C.F.R. § 54.9816-1T (tax regulations), and 29 C.F.R. § 2590.716-1 (ERISA regulations).

a full public notice and comment process has been completed." *Id.*

### B. Procedural Background

Plaintiffs[7] sued the Departments under the APA, alleging that provisions of the Rule violated the Act's unambiguous terms and were arbitrary and capricious. The district court consolidated the lawsuits.

Both sides moved for summary judgment. The district court held certain provisions of the Rule lawful and others unlawful. The district court vacated the provisions of the Rule that it held unlawful and entered final judgment. Shortly after the district court's decision, the Departments exercised their enforcement discretion to permit insurers to temporarily continue using their existing QPAs. *FAQs about Consolidated Appropriations Act, 2021 Implementation Part 62* at 6-7 (Oct. 6, 2023). The Departments timely appealed the district court's judgment as to certain QPA calculation provisions and the thirty-day deadline provision. Plaintiffs timely cross-appealed the district court's judgment upholding the disclosure provision.

## II. Jurisdiction & Standard of Review

The district court had jurisdiction over this APA suit under 28 U.S.C. § 1331. We have jurisdiction over the district court's final judgment under 28 U.S.C. § 1291.

We review a district court's grant or denial of summary judgment de novo, *Data Mktg. P'ship, LP v. Dep't*

---

[7] Plaintiffs include Texas Medical Association, Tyler Regional Hospital, L.L.C., Dr. Adam Corley, LifeNet, Incorporated, Air Methods Corp., Rocky Mountain Holdings, L.L.C., and East Texas Air One, L.L.C.

*of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022), and its vacatur of a challenged rule for abuse of discretion, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

**III. Discussion**

We first address the various challenges to the Rule before turning to the question of the proper remedy.

Pursuant to the APA, the Departments' Rule must be "set aside" if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2262 (2024), the Supreme Court overturned *Chevron*[8] and held that the APA "incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." The Court recognized, however, that the "statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263. "[S]ome statutes expressly delegate to an agency the authority to give meaning to a particular statutory term," while "[o]thers empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* (internal quotation marks and citations omitted). "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court fulfills its role "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those

---

[8] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

boundaries." *Id.* (alterations adopted) (internal quotation marks and citations omitted).

On the question of reasoned decision-making, "[t]he petitioner has the burden of proving that the agency's determination was arbitrary and capricious." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* Although the reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given," courts are to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (quotations omitted).

**A. The QPA Calculation Provisions**

We first address Plaintiffs' challenges to the provisions concerning how to calculate the QPA. Pursuant to *Loper Bright*, we must first determine the boundaries of the Departments' delegated authority in this area. 144 S. Ct. at 2263. The Act directs the Departments to "establish through rulemaking . . . the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the qualifying payment amount." 42 U.S.C. § 300gg-111(a)(2)(B)(i). That is a fairly broad delegation of authority. But because the Act contains a definition of QPA, the Departments' methodology must

be consistent with that definition. In the subsections below, we consider whether the Rule's QPA calculation provisions operate within those bounds.

### *1. Including rates regardless of the number of claims paid at that rate*

The Rule instructs that "the rate negotiated under a contract constitutes a . . . contracted rate regardless of the number of claims paid at that contracted rate." 86 Fed. Reg. at 36,889.

The district court held that this provision conflicts with the Act because the Act requires insurers to include in the QPA calculation rates for services that are "provided by a provider." *See* 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). According to the district court, the Rule permits insurers to include rates for services that certain providers have never performed and never would perform. At the heart of this issue is Plaintiffs' concern that because they are not incentivized to negotiate rates for services they will not perform, unnegotiated rates will result in an inaccurate QPA.

Based on the plain meaning of "provide," the Act contains no requirement that a service must previously have been performed by a provider for that rate to be included in the QPA calculation. As we have previously explained, "[t]o 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (en banc) (quoting *Provide*, AMERICAN HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=available (last visited Nov. 26, 2019)). Accordingly, the Act requires only that a given service be "available," *id.* (quotation

omitted), regardless of whether, or how many times, it has actually been performed.

Additionally, the Act reasonably addresses concerns about the QPA's inclusion of rates for services that a given provider would never perform. It states that the QPA is "the median of the contracted rates recognized by the plan or issuer . . . for the same or a similar item or service that is provided *in the same or similar specialty and provided in the geographic region in which the item is furnished*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).[9] This ensures that the QPA for a given service excludes rates from providers outside of the same specialty and geographic area.[10]

Plaintiffs argue that even providers in the same or similar specialty might not provide the same services. But Plaintiffs do not suggest how to otherwise draw and police the line separating the within-specialty services each provider might perform sometime in the future from those that they would never perform. Limiting the field of comparison rates to those agreed upon by providers in the same specialty and geographic area is a

---

[9] Plaintiffs argue that this is an impermissible post-hoc justification raised for the first time in litigation. But we can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43. Here, we can reasonably discern the Departments' path from the text of the Act itself.

[10] Also, after being "informed that some plans and issuers enter $0 into their fee schedule for covered items and services that a provider or facility is not equipped to furnish," the Departments clarified that "plans and issuers should not include $0 amounts" when calculating QPAs. *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55* at 17 n.29 (Aug. 19, 2022).

reasonable way of ensuring that services that a provider is unlikely to provide are not included in the QPA calculation.

For these reasons, we conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious. We therefore REVERSE the district court's vacatur of this provision.

***2. Excluding case-specific agreements***

The next provision of the Rule that Plaintiffs challenge is the exclusion from the QPA calculation of ad hoc, case-specific agreements.

The Rule recognizes "that plans and issuers sometimes enter into special agreements with providers and facilities that generally are not otherwise contracted to participate in any of the networks of the plan or issuer." 86 Fed. Reg. at 36,889. It clarifies that "solely for purposes of the definition of contracted rate, a single case agreement, letter of agreement, or other similar arrangement . . . does not constitute a contract, and the rate paid under such agreement should not be counted among the plan's or issuer's contracted rates." *Id.* Rather, "[t]he term 'contracted rate' refers only to the rate negotiated with providers and facilities that are contracted to participate in any of the networks of the plan or issuer under generally applicable terms of the plan or coverage and excludes rates negotiated with other providers and facilities." *Id.* The Departments stated that such an approach "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." *Id.*

The district court concluded that this provision conflicts with the Act's definition of QPA. It reasoned that

case-specific agreements are "'contracted rates recognized by' an insurer 'under such plans or coverage' . . . because they are contracts to pay a specific rate for an air ambulance transport for the insurers' beneficiaries, participants, or enrollees" (quoting 24 U.S.C. § 300gg-111(a)(3)(E)(i)(I)).

We disagree and hold that this provision of the Rule does not conflict with the Act. Even assuming arguendo that case-specific agreements constitute "contracted rates," as Plaintiffs contend, that does not end the matter. To be included in the QPA calculation, the Act requires that "contracted rates" must be "recognized by the plan or issuer . . . *under such plans or coverage* . . . on January 31, 2019." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added).[11] The most natural reading of that language is that it excludes rates *not* previously agreed to under a plan. So, at the very least, we cannot say that the Departments' choice to exclude such agreements *conflicts* with the Act.

Plaintiffs next argue that the Rule's exclusion of single-case agreements is arbitrary and capricious because of an alleged inconsistency regarding what constitutes a contractual relationship. They argue that the

[11] Plaintiffs assert that case-specific agreements are necessarily made "under" an insurer's plan because if the plan did not authorize such agreements, the insurers would be violating ERISA. Under ERISA, plan administrators are allowed to make payments only "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). But whether a plan *permits* case-specific agreements is a separate question from whether a "contracted rate[]" was "recognized by the plan or issuer . . . under such plans or coverage . . . on January 31, 2019," such that it should be included in the QPA calculation. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Act defines "participating emergency facilit[ies]" and "participating health care facilit[ies]" to mean facilities that have "a contractual relationship with" the insurer. 42 U.S.C. § 300gg-111(a)(3)(F)(ii), (b)(2)(A)(i). Under the Rule, "a single case agreement between a health care facility and a plan or issuer . . . constitutes a contractual relationship." 86 Fed. Reg. at 36,882. According to Plaintiffs, if a single-case agreement constitutes a contractual relationship in *that* context, case-specific agreements must constitute contracted rates in the QPA context.

We do not agree. The definition of "contractual relationship" is used to determine whether the Act's surprise billing protections apply to a given facility in the first place. When a facility has a "contractual relationship" with an insurer, whether through a single case agreement or otherwise, the Act's surprise billing protections apply. That inquiry is wholly separate from whether a "contracted rate[]" was "recognized by the plan or issuer . . . under such plans or coverage . . . on January 31, 2019," and therefore must be included in the QPA calculation. 42 U.S.C. § 300gg-111(a)(3)(E)(i). Accordingly, we disagree that there is an internal inconsistency that renders this provision arbitrary and capricious.

We also conclude that the Departments reasonably explained their approach to case-specific agreements. The Departments stated in the Rule that their approach "most closely aligns with the statutory intent of ensuring that the QPA reflects market rates under typical contract negotiations." 86 Fed. Reg. at 36,889. Including in the QPA calculation one-off rates agreed to by in-

surers and out-of-network providers would preserve the very market distortion that the Act seeks to cure.

We therefore conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious. Accordingly, we REVERSE the district court's vacatur of this provision.

### *3. Excluding bonus and incentive payments*

The next provision of the Rule at issue is its instruction to "exclude" from rates used to calculate the QPA "risk sharing, bonus, or penalty, and other incentive-based and retrospective payments or payment adjustments." 86 Fed. Reg. at 36,894. The Departments explained that doing so would be

> consistent with how cost sharing is typically calculated for in-network items and services, where the cost-sharing amount is customarily determined at or near the time an item or service is furnished, and is not subject to adjustment based on changes in the amount ultimately paid to the provider or facility as a result of any incentives or reconciliation process.

86 Fed. Reg. at 36,894.

The district court held that this provision of the Rule conflicts with the Act. It reasoned that the phrase "total maximum payment," as used in the definition of QPA, 42 U.S.C. § 300gg-111(a)(3)(E)(i), "requires insurers to calculate QPAs using the 'entire,' 'highest possible' payment that a provider could receive for an item or service under the contract rate."

Again, we disagree. The Act itself grants the Departments discretion on whether to include such adjustments. For example, it expressly delegates rulemaking author-

ity regarding how to treat "account payments that are made by such plan or issuer, respectively, that are not on a fee-for-service basis." 42 U.S.C. § 300gg-111(a)(2)(B). It further states that the QPA calculation methodology "*may* account for relevant payment adjustments that take into account quality or facility type . . . that are otherwise taken into account for purposes of determining payment amounts with respect to participating facilities." *Id.* (emphasis added).

We therefore conclude that this provision is neither inconsistent with the Act nor arbitrary and capricious. Accordingly, we REVERSE the district court's vacatur of this provision.

**B. The Deadline Provision**

Moving on from the QPA-calculation provisions, we turn now to the Rule's deadline provision.

The Act states that the insurers shall send to the provider either an initial payment or notice of denial of payment "not later than 30 calendar days after the bill for such services is transmitted by such provider." 42 U.S.C. § 300gg-112(a)(3)(A). The Rule, however, states that the thirty-day clock starts on the date that the plan or issuer receives "the information necessary to decide a claim for payment for such services, commonly known as a 'clean claim' under many existing state laws." 86 Fed. Reg. at 36,900.

The district court held unlawful this provision of the Rule on the basis that it contradicts the Act's unambiguous terms. The district court also noted that this provision "turns a firm 30-day deadline essential to an efficient process into an indefinite delay at the mercy of the insurer."

We agree that this provision of the Rule conflicts with the Act. First, it is important to note that the Act does not expressly delegate to the Departments rulemaking authority over the Act's deadlines, unlike it does for setting the methods of calculating the QPA. *See* 42 U.S.C. §§ 300gg-111(a)(2)(B); 300gg-112(a)(3)(A). Instead, the Departments support this provision by pointing to the statute's general delegation of authority to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this subchapter." 42 U.S.C. § 300gg-92.

That general delegation of authority does not give the Departments license to alter the Act's unambiguous terms. It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

The Departments argue that the Rule's deadline provision is lawful because its additional requirements align with the industry's understanding of "bill." But imposing additional requirements on the term "bill" is not the only way in which the Rule's deadline provision departs from the plain language of the Act. It also changes the event that starts the thirty-day clock from when the *provider transmits* the bill, 42 U.S.C. § 300gg-112(a)(3)(A), to when the "*plan or issuer receives* the information necessary," 86 Fed. Reg. at 36,900 (emphasis added).[12] The Departments' argument about indus-

---

[12] That distinction is significant here. As Plaintiffs point out, the Rule does not require the plan or issuer to inform the provider of the date on which it receives the necessary amount of information (nor does it meaningfully define what constitutes the necessary amount of information). As a result, providers would have no guaranteed

try practice cannot cure such a blatant departure from the Act's plain language.[13]

We therefore conclude that the Rule's deadline provision conflicts with the Act and AFFIRM the district court's vacatur of this provision.

**C. Disclosure Requirements**

Plaintiffs briefed the district court's upholding of the Rule's disclosure requirements, with which they disagree.[14] They argue that this provision is neither reasonable nor reasonably explained. In their view, the Rule should also require insurers to disclose information such as the number of contracted rates used to calculate the QPA, the number of times each rate was paid, and the types of providers that agreed to each rate.

The Act grants the Departments considerable discretion in this area. It states that the Departments "shall establish . . . the information [an insurer] . . . shall share with" a provider. 42 U.S.C. § 300gg-111(a)(2)(b)(ii).

The Rule requires insurers to provide, among other things: (1) "a statement certifying that . . . each QPA shared with the provider or facility was determined in compliance with" the Rule; (2) upon request, "whether the QPA includes contracted rates that were not set on a fee-for-service basis . . . and whether the QPA . . . was determined using underlying fee schedule rates or

---

way of knowing when the thirty-day clock started, and by extension, whether the plan or issuer has complied with the deadline.

[13] We express no opinion on the merits of the Departments' industry practice argument as to the meaning of "bill."

[14] While they called themselves cross-appellants, they did not even call any portion of their briefing the cross-appeal, which is a questionable approach. We will, nonetheless, address it.

a derived amount"; (3) "if a related service code was used to determine the QPA for a new service code . . . which related service code was used"; (4) "if an eligible database was used to determine the QPA . . . which database was used"; and (5) upon request, whether the contracted rates "include risk-sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 86 Fed. Reg. at 36,898-99.

The Rule also provides the following explanation for requiring these specific disclosure requirements:

> The Departments recognize that providers, emergency facilities, and air ambulance providers subject to the surprise billing rules need transparency regarding how the QPA was determined. This information is also important in informing the negotiation process. In addition, IDR entities are directed by statute to consider the QPA when selecting an offer submitted by the parties through the IDR process. Therefore, to decide whether to initiate the IDR process and what offer to submit, a provider, emergency facility, or provider of air ambulance services must know not only the value of the QPA, but also certain information on how it was calculated.

86 Fed. Reg. at 36,898. It further explains that "[t]he Departments seek to ensure transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on plans and issuers." *Id.* The Departments therefore require "that plans and issuers make certain disclosures with each initial payment or notice of denial of payment, and . . . provide additional information upon request." *Id.* Finally, despite invoking the good cause exception to the notice and comment requirements, the Rule states that

the Departments "seek comment on these disclosure requirements and on what additional information a plan or issuer should be required to share with a provider or facility about the QPA." *Id.* at 36,899.

Plaintiffs offer multiple theories for why the Rule's disclosure requirements are arbitrary and capricious. First, they argue that the lack of additional disclosure requirements dooms the complaint process by which providers can notify the Departments that an insurer's QPA may not satisfy the Act's definition of QPA. But the Act places the responsibility for auditing QPA calculations on the Departments rather than the providers. It requires the Departments to establish a process to audit a sample of plans each year and adds that the Departments *may* conduct an audit upon receipt of a "complaint or other information . . . that involves the compliance of the plan or coverage." 42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II). The permissive language regarding the Departments' response to such complaints undercuts Plaintiffs' argument that the disclosure provision is arbitrary and capricious on this basis. We therefore agree with the district court's conclusion that "it is the permissive language of the Act rather than the [] Rule causing Plaintiffs the alleged harm here."

Second, Plaintiffs assert that the lack of additional disclosure requirements hinders the purpose of the Act's IDR process and is therefore unreasonable. The Departments clearly recognized the relevance to the IDR process of "certain information on how [the QPA] was calculated." 86 Fed. Reg. 36,898. They therefore sought "to ensure transparent and meaningful disclosure about the calculation of the QPA" while also balancing the need for disclosures against "the administrative bur-

dens on plans and issuers." *Id.* That Plaintiffs would balance those competing aims differently than the Departments does not mean the Departments acted unreasonably in selecting which information must be disclosed. The Departments acted "within a zone of reasonableness," and it is not the duty of a court to "substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423.

Finally, Plaintiffs contend that the Departments' "paltry explanation" of the disclosure requirements makes them arbitrary and capricious. Plaintiffs fault the Departments for failing to consider a disclosure system under which insurers would be required "to disclose everything (or virtually everything) underlying their calculations." But, as discussed above, the Departments reasonably explained that they sought to balance the benefits of disclosure against its administrative burdens. We therefore conclude that the Departments' explanation "conform[s] to minimal standards of rationality." *Luminant Generation Co. v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) (quotation omitted).

For these reasons, we hold that the Rule's disclosure requirements are not arbitrary and capricious and AFFIRM the district court's decision to uphold them.

* * *

Our holdings on Plaintiffs' various challenges to the Rule are summarized as follows. We conclude that the provisions of the Rule related to QPA calculations are lawful and therefore REVERSE the district court's holdings as to those provisions. We further conclude that the Rule's deadline provision is unlawful and therefore AFFIRM the district court's holding as to that pro-

vision. Finally, we conclude that the Rule's disclosure requirements are lawful and therefore AFFIRM the district court's holding as to those provisions.

**D. The Proper Remedy**

We now turn to the proper remedy for the unlawful deadline provision. The Departments argue that remand, rather than vacatur, is the proper remedy for any provisions of the Rule that we hold unlawful.

We have previously explained that remand is the proper remedy for unlawful agency action when two conditions are met: (1) there is a "serious possibility that the agency will be able to correct the rule's defects on remand," and (2) "vacating the challenged action would produce disruptive consequences." *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (internal quotation marks and citation omitted); *see also Tex. Med. Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. 2024).

The first condition has not been met. The Departments do not explain how they would correct the deadline provision's defects on remand, let alone contend that they even could. Regardless, we fail to see how they would be able to do so. The Rule's deadline provision is defective because it is an impermissible attempt to "rewrite clear statutory terms to suit [the Departments'] own sense of how the statute should operate." *Util. Air Regul. Grp.*, 573 U.S. at 328.

But even if the first condition could be satisfied, the second cannot. Vacating the deadline provision of the Rule will not produce disruptive consequences; rather, it will retain the Act's more workable statutory deadline. *See supra* at 17 n.11 (explaining logistical difficulties with the Rule's deadline).

Finally, the Departments argue that any relief should apply only to Plaintiffs. While party-specific vacatur is definitely appropriate in other situations, we conclude it is not the appropriate thing to do in this case. As Plaintiffs point out, party-specific vacatur would result in one deadline for Plaintiffs and another (unlawful) deadline for all other entities. That would conflict with Congress's instruction to establish "one" IDR process for all participants. 42 U.S.C. § 300gg-111(c)(2)(A); *see also Tex. Med. Ass'n*, 110 F.4th at 780 (rejecting party-specific vacatur for same reason).

We therefore hold that the district court did not abuse its discretion by vacating the Rule's deadline provision.

**IV. Conclusion**

For the reasons explained, we REVERSE the district court's vacatur of the QPA calculation provisions, AFFIRM the district court's vacatur of the deadline provision, and AFFIRM the district court's holding as to the disclosure provisions.

**APPENDIX C**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

---

Case No. 6:22-cv-450-JDK
Lead Consolidated Case

TEXAS MEDICAL ASSOCIATION, ET AL., PLAINTIFFS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., DEFENDANTS

---

Case No. 6:22-cv-453-JDK

LIFENET, INC., ET AL., PLAINTIFFS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., DEFENDANTS

---

Filed: Aug. 24, 2023

---

**FINAL JUDGMENT**

---

Pursuant to the Court's Memorandum Opinion and Order granting-in-part Plaintiffs' Motions for Summary Judgment and denying-in-part Defendants' Cross-Motion for Summary Judgment (Docket No. 62), and for the reasons stated therein, the Court hereby enters Fi-

nal Judgment in favor of Plaintiffs Texas Medical Association; Tyler Regional Hospital, LLC; Dr. Adam Corley; LifeNet, Inc.; East Texas Air One, LLC; Rocky Mountain Holdings, LLC; and Air Methods Corporation, and against Defendants United States Department of Health and Human Services, United States Department of Labor, United States Department of the Treasury, United States Office of Personnel Management, and the current heads of those agencies in their official capacities, Xavier Becerra, Janet Yellen, Martin J. Walsh, and Kiran Ahuja as follows:

The Court **ORDERS** that the following are **VACATED**:

(1) 86 Fed. Reg. 36,872, at 36,889, the phrase "regardless of the number of claims paid at that contracted rate";

(2) 45 C.F.R. § 149.140(a)(8)(iv), 26 C.F.R. § 54.9816-6T(a)(8)(iv), and 29 C.F.R. § 2590.716-6(a)(8)(iv), from "or at the option" to "on behalf of the plan";

(3) 45 C.F.R. § 149.140(a)(12), 26 C.F.R. § 54.9816-6T(a)(12), and 29 C.F.R. § 2590.716-6(a)(12), from "as identified" to "practice"; (4) 45 C.F.R. § 149.140(a)(15)(ii)(B), 26 C.F.R. § 54.9816-6T (a)(15)(ii)(B), and 29 C.F.R. § 2590.716-6(a)(15)(ii)(B), from "(or the administering entity" to "if applicable)";

(5) 45 C.F.R. § 149.140(b)(1), 26 C.F.R. § 54.9816-6T(b)(1), and 29 C.F.R. § 2590.716-6(b)(1), from "(or the administering entity" to "if applicable)"; (6) 45 C.F.R. § 149.140(b)(2)(i), 26 C.F.R. § 54.9816-6T(b)(2)(i), and 29 C.F.R. § 2590.716-6(b)(2)(i), from "(or the administering entity" to "if applicable)";

(7) 45 C.F.R. § 149.140(b)(2)(iv), 26 C.F.R. § 54.9816-6T(b)(2)(iv), and 29 C.F.R. § 2590.716-6(b)(2)(iv), in their entirety;

(8) 45 C.F.R. § 149.140(b)(3)(i), from "If a plan or issuer" to "for the service code" and "as applicable"; 26 C.F.R. § 54.9816-6T(b)(2)(iv); 26 C.F.R. § 54.9816-6T(b)(3)(i), from "If a plan has" to "for the service code" and "as applicable"; 29 C.F.R. § 2590.716-6(b)(2)(iv); 29 C.F.R. § 2590.716-6(b)(3)(i), from "If a plan or issuer" to "for a service code" and "as applicable";

(9) 45 C.F.R. § 149.130(b)(4)(i), 26 C.F.R. § 54.9817-1T(b)(4)(i), and 29 C.F.R. § 2590.717-1(b)(4)(i), from "For purposes of this paragraph (b)(4)(i), the 30-calendar-day period begins" to "decide a claim for payment for the services";

(10) 45 C.F.R. § 149.140(a)(1), 26 C.F.R. § 54.9816-6T(a)(1), and 29 C.F.R. § 2590.716-6(a)(1), from "Solely for purposes of this definition a single case agreement" to "or enrollee in unique circumstances, does not constitute a contract";

(11) 5 C.F.R. § 890.114(a), insofar as it requires compliance with the foregoing provisions;

(12) FAQs 14 and 15 of *FAQs About Affordable Care Act and Consolidated Act,2021 Implementation Part 55* (Aug. 19, 2022); and

(13) The portion of *Technical Guidance for Certified IDR Entities*, CTRS. FOR MEDICARE & MEDICAID SERVS., at 2-3 (Aug. 18, 2022) (answering whether "multiple qualified IDR items or services be submitted together"), which require air ambulance service reimbursement disputes to undergo more

than one IDR process (as set forth in 45 U.S.C. § 300gg-111(c)).

Further, the Court hereby enters Final Judgment in favor of Defendants and against Plaintiffs as follows:

(1) Plaintiffs' request for a declaration that the Departments acted unlawfully in promulgating the disclosure requirements of 45 C.F.R. § 149.140(d) or requesting vacatur of that section is **DENIED**; and

(2) Plaintiffs LifeNet, Inc.; East Texas Air One, LLC; Rocky Mountain Holdings, LLC; and Air Methods Corporation's request that the Court vacate 45 C.F.R. § 149.140(a)(7)(ii)(B), 26 C.F.R. § 54.9816-6T(a)(7)(ii)(B), and 29 C.F.R. § 2590.716-6(a)(7)(ii)(B) is **DENIED**.

All relief not expressly granted herein is **DENIED**. Any pending motions are **DENIED** as **MOOT**. The Clerk of Court is instructed to close these consolidated cases.

So **ORDERED** and **SIGNED** this **24th** day of **August, 2023.**

/s/ JEREMY D. KERNODLE
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

**APPENDIX D**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

---

Case No. 6:22-cv-450-JDK
Lead Consolidated Case

TEXAS MEDICAL ASSOCIATION, ET AL., PLAINTIFFS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., DEFENDANTS

---

Filed: Aug. 24, 2023

---

**MEMORANDUM OPINION AND ORDER**

---

In these consolidated cases, Plaintiff healthcare providers challenge several rules issued by the Defendant Departments in implementing the No Surprises Act (the "Act").

The Act established an arbitration process for resolving payment disputes between certain out-of-network providers and group health plans and health insurers. *See Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs. (TMA I)*, 587 F. Supp. 3d 528 (E.D. Tex. 2022), *appeal dismissed*, 2022 WL 15174345 (5th Cir. Oct. 24, 2022); *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs. (TMA II)*, 2023 WL 1781801, at *11 (Feb. 6, 2023),

*appeal filed*, No. 23-40217 (5th Cir. Apr. 6, 2023). The Act also directed the Departments to issue regulations to govern the arbitration proceedings. *E.g.*, 42 U.S.C. § 300gg-111(c)(2)(A).

This is not the first challenge by Plaintiffs. In prior cases, the Court concluded that the Departments improperly restricted arbitrators' discretion and unlawfully tilted the arbitration process in favor of the qualifying payment amount, or "QPA." *See TMA I*, 587 F. Supp. 3d at 542; *TMA II*, 2023 WL 1781801, at *11. The QPA is typically the median rate the insurer would have paid for the service if provided by an in-network provider or facility. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The net effect of prioritizing the QPA was to favor insurers at the expense of Plaintiff providers. *See TMA II*, 2023 WL 1781801, at *13. Recently, the Court held that the Departments unlawfully bypassed the Administrative Procedure Act's ("APA") notice-and-comment requirement in issuing rules relating to the administrative fee and the grouping of claims in the arbitration process. *See generally Tex. Med. Ass'n v. U.S. Dept. of Health & Hum. Servs.*, 2023 WL 4977746 (E.D. Tex. Aug. 3, 2023).

Now, Plaintiffs challenge the Departments' regulations governing how insurers calculate the QPA. Plaintiffs argue that the regulations permit insurers to artificially depress the QPA in conflict with the Act, again tilting the arbitration process in insurers' favor and resulting in unacceptably low payments to providers. Plaintiffs also claim that the Departments' disclosure requirements are insufficient and prevent effective review of insurers' calculations. The Air Ambulance Plaintiffs additionally challenge a regulation that extends the

deadline for insurers to make an initial payment determination, a rule requiring two separate arbitration proceedings to adjudicate a single air transport, and other air-ambulance-specific QPA calculation rules.

For the reasons discussed below, the Court concludes that certain challenged portions of the July 1, 2021 Rule and subsequent guidance conflict with the Act and must be set aside under the APA. Specifically, all but one regulation pertaining to the calculation of the QPA violate the plain text of the Act. Likewise, the regulations extending the deadline for making an initial payment determination and requiring two proceedings for one air transport conflict with the Act and are unlawful. The Departments, however, reasonably explained the other challenged regulations, and the Court therefore finds these regulations are not arbitrary and capricious.

Accordingly, the Court **GRANTS in part** Plaintiffs' motions for summary judgment (Docket Nos. 25, 26) and **DENIES in part** Defendants' cross-motion for summary judgment (Docket No. 41).

**I.**

In the No Surprises Act, Congress established an independent dispute resolution ("IDR") process for resolving payment disputes between out-of-network providers and insurers, requiring arbitrators to consider the QPA, among other factors, in determining the proper payment amount. The Act also includes a detailed definition of the QPA and directs the Departments to issue rules establishing the methodology for determining QPAs. Citing the Act, the Departments issued an interim final rule and related guidance regarding the QPA that are the subject of these consolidated cases.

**A.**

Congress enacted the No Surprises Act in 2020 to address "surprise medical bills." Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (2020). Generally, the Act limits the amount an insured patient will pay for emergency services furnished by an out-of-network provider and for certain non-emergency services furnished by an out-of-network provider at an in-network facility. 42 U.S.C. §§ 300gg-111, 300gg-131, 300gg-132.[1]

The Act also addresses the payment of these out-of-network providers by group health plans or health insurers (collectively, "insurers"). In particular, the Act requires insurers to reimburse out-of-network providers at a statutorily calculated "out-of-network rate." *Id.* § 300gg-111(a)(1)(C)(iv)(II), (b)(1)(D). In states with an All-Payer Model Agreement or specified state law, the out-of-network rate is the rate provided by the Model Agreement or state law. *Id.* § 300gg-111(a)(3)(K). In states without a Model Agreement or specified state law, the out-of-network rate is either the amount agreed to by the insurer and the out-of-network provider or an amount determined through the IDR process. *Id.*

Claims submitted to IDR proceed as follows. When an insured receives certain out-of-network medical services, insurers must first issue an initial payment or notice of denial of payment to the provider within thirty days after the provider submits a bill for that service.

---

[1] The Act amended three statutes: the Public Health Service Act ("PHSA") (administered by the Department of Health and Human Services), the Employee Retirement Income Security Act ("ERISA") (administered by the Department of Labor), and the Internal Revenue Code (administered by the Department of the Treasury). For ease of reference, this Opinion cites to the PHSA.

*Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C). If the provider disagrees with the insurer's determination, then the provider may initiate a thirty-day period of open negotiation with the insurer regarding the claim. *Id.* § 300gg-111(c)(1)(A). If the parties cannot resolve the dispute through negotiation, they may then proceed to IDR arbitration. *Id.* § 300gg-111(c)(1)(B).

The IDR process is a "baseball-style" arbitration. The provider and insurer each submits a proposed payment amount and explanation to the arbitrator. *Id.* § 300gg-111(c)(5)(B). The arbitrator must then select one of the two amounts, "taking into account the considerations specified in subparagraph (C)." *Id.* § 300gg-111(c)(5)(A)-(B). Subparagraph (C) in turn requires the arbitrator to consider the QPA and five "additional circumstances. . . . " *Id.* § 300gg-111(c)(5)(C)(ii).

As noted above, the QPA is typically the median rate the insurer would have paid for the service if provided by an in-network provider or facility. *Id.* § 300gg-111(a)(3)(E)(i). The Act defines QPA as:

> the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor or all such coverage offered by such insurer that are offered within the same insurance market . . . ) as the total maximum payment (including the cost-sharing amount imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage, respectively, on January 31, 2019, for the same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the same geographic region in which the item or service is furnished. . . .

*Id.* § 300gg-111(a)(3)(E)(i)(I). The QPA for any item or service is calculated only once and is then adjusted annually for inflation. *Id.* § 300gg-111(a)(3)(E)(i)(II).

Finally, the Act requires the Secretaries of Health and Human Services, Labor, and the Treasury (collectively, the "Departments"), to "establish through rulemaking. . . . [:]"

> (i) the methodology the group health plan or health insurance issuer offering group or individual health insurance coverage shall use to determine the [QPA], differentiating by individual market, large group market, and small group market;
>
> (ii) the information such plan or issuer, respectively, shall share with the nonparticipating provider or nonparticipating facility, as applicable, when making such a determination;
>
> (iii) the geographic regions applied for purposes of this subparagraph, taking into account access to items and services in rural and underserved areas, including health professional shortage areas, as defined in section 254e of this title; and
>
> (iv) a process to receive complaints of violations of the requirements described in subclauses (I) and (II) of subparagraph (A)(i) by group health plans and health insurance issuers offering group or individual health insurance coverage.

*Id.* § 300gg-111(a)(2)(B).

The Act implements a parallel IDR process for determining payments to out-of-network providers of air ambulance services, which largely incorporates by refer-

ence the aforementioned IDR process. *Id.* § 300gg-112(b)(4)(A) (citing *id.* § 300gg-111(c)(4)).

**B.**

On July 1, 2021, the Departments issued the interim final rule, or "July Rule," at issue here. Requirements Related to Surprise Billing: Part I, 86 Fed. Reg. 36,872 (July 13, 2021) (to be codified at 45 C.F.R. § 149). The July Rule implemented several of the Act's provisions regarding the QPA and the IDR process more generally, including (1) the methodology for insurers to calculate the QPA, 45 C.F.R. §§ 149.140(a)(1), (a)(8)(iv), (a)(12), (b)(2)(iv); (2) the information insurers must disclose to providers about their QPA calculations, *id.* § 149.140(d)(2); 86 Fed. Reg. at 36,898, 36,933; and (3) an explanation of the insurer's 30-day deadline to provide a payment or denial of payment, *id.* § 149.130(b)(4)(i).

In August 2022, the Departments answered a series of "frequently asked questions" related to various provisions in the July Rule. *FAQs about Affordable Care Act and Consolidated Appropriations Act, 2021 Implementation Part 55*, DEP'T OF LAB. (Aug. 19, 2022), https://www.cms.gov/files/documents/faqs-part-55.pdf ("August FAQs"). Two FAQs are at issue here. FAQ 14 acknowledged that the July Rule allows insurers to include rates for services that "providers do not provide" in calculating the QPA. August FAQs at 17. And FAQ 15 interprets the July Rule as permitting third-party administrators of self-insured group health plans to calculate the QPA using rates within all plans governed by the administrator, as opposed to using only the rates of the self-insured group health plan itself. *Id.* at 18.

On August 18, 2022, the Departments issued informal technical guidance for IDR entities, which restricted

how "multiple qualified IDR items or services" may be grouped—or "batched"—together in a single IDR proceeding. *Technical Guidance for Certified IDR Entities*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Aug. 18, 2022), https://www.cms.gov/files/document/TA-certified-independent-dispute-resolution-entities-August-2022.pdf ("August Technical Guidance"). In subsequent phone calls with IDR entities, the Departments clarified that the August Technical Guidance requires them to mandate two separate IDRs for each air ambulance transport: one for each of two Healthcare Common Procedure Coding System ("HCPCS") codes that apply to any such transport. *See* Docket No. 26, Ex. C ¶ 3-7; Ex. D ¶ 2-4.

**C.**

Plaintiffs are healthcare providers[2] and air ambulance providers.[3] All Plaintiffs challenge the QPA-calculation methodology promulgated in the July Rule and as interpreted in the August FAQs as contrary to the Act's unambiguous terms and as arbitrary and capricious. Docket No. 25 at 17-27; Docket No. 26 at 20-28.

---

[2] The healthcare-provider Plaintiffs are the Texas Medical Association, a trade association representing more than 56,000 Texas physicians and medical students; Dr. Adam Corley, a Tyler, Texas physician; and Tyler Regional Hospital, LLC, a hospital in Tyler, Texas. Docket No. 1 ¶¶ 22-24. The Texas Medical Association, Dr. Corley, and Tyler Regional Hospital were also plaintiffs in previous cases. *See TMA I*, 587 F. Supp. 3d at 536; *TMA II*, 2023 WL 1781801, at *7 n.6.

[3] The Air Ambulance Plaintiffs are LifeNet, Inc.; East Texas Air One, LLC; Rocky Mountain Holdings, LLC; and Air Methods Corporation. LifeNet, Inc. and East Texas Air One, LLC were also plaintiffs in a prior lawsuit. *See TMA II*, 2023 WL 1781801, at *7 n.6.

All Plaintiffs also challenge the July Rule's QPA disclosure requirements as neither reasonable nor reasonably explained. Docket No. 25 at 27-30; Docket No. 26 at 10. And finally, the Air Ambulance Plaintiffs bring four additional challenges to: the July Rule's interpretation of the Act's 30-day deadline for initial payment or notice of denial, the requirement of two separate IDR processes for each air ambulance transport, the exclusion of case-specific contracted rates from the QPA calculation, and the reliance on widely disparate geographic regions in calculating the QPA for air ambulance services. Docket No. 26. Plaintiffs seek vacatur of these challenged provisions under the APA.

Defendants are the Departments responsible for promulgating the July Rule and subsequent guidance—the Departments of Health and Human Services, Labor, and the Treasury, along with the Office of Personnel Management and the current heads of those agencies in their official capacities. Docket No. 1 ¶¶ 25-32. Together, the Departments contend that the July Rule, August FAQs, and August Technical Guidance are consistent with the Act, are the result of reasoned decision-making, and are not arbitrary and capricious. Docket No. 41.

Both sides now move for summary judgment under Federal Rule of Civil Procedure 56. Docket Nos. 25, 26, 41. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136

F.3d 455, 458 (5th Cir. 1998). On April 19, 2023, the Court heard oral argument on the cross motions. Docket No. 57.

Both sides agree that the Court can determine Plaintiffs' APA challenges as a matter of law.

**II.**

The APA requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court reviews an agency's statutory interpretation under the two-step *Chevron* framework. *See generally Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014 (5th Cir. 2019) (discussing *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)); *see also City of Arlington v. FCC*, 569 U.S. 290, 306-07 (2013). The first step determines "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. If the statute is ambiguous, however, the Court proceeds to step two: "asking whether the agency's construction is 'permissible.'" *Sw. Elec. Power Co.*, 920 F.3d at 1014 (quoting *Chevron*, 467 U.S. at 843).

In determining whether Congress has unambiguously spoken through a statute, the Court applies all the "traditional tools of construction," including "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (quoting *Chevron*, 467 U.S. at 843 n.9); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting)); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020). "[W]here a statute's text is clear, courts

should not resort to legislative history" and "should not introduce ambiguity through the use of legislative history." *Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018) (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (plurality opinion)).[4]

The APA's "arbitrary and capricious standard" is "deferential," requiring only "that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). "A court may not substitute its own policy judgment for that of the agency." *Id.* "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* (collecting cases). The Court "should uphold a decision of less than ideal clarity if the agency's path may be discerned." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 513-14 (2009).

**A.**

Below the Court addresses Plaintiffs' various challenges to the QPA-calculation methodology set forth in the July Rule and the August FAQs.

---

[4] The parties and various amici discuss the Act's legislative history, *see, e.g.*, Docket No. 56 at 28 (citing S. 1266, 116th Cong. (2019); H.R. 4223, 116th Cong (2019)), but such statements of intent do not override the statute's text. *Hammack v. Baroid Corp.*, 142 F.3d 266, 271 (5th Cir. 1998) ("[T]heories of underlying intent or purpose cannot trump statutory language."); *see also, e.g.*, Brief of Emergency Dep't Practice Mgmt. Ass'n as Amicus Curiae, Docket No. 38, Ex. 2 (Letter from 152 Members of Congress to Defendant Departments).

**1.**

Plaintiffs first argue that "[t]he July Rule tells insurers to *include* rates in QPA calculations that the plain text of the [Act] requires them to *exclude*." Docket No. 25 at 18 (emphasis in original). The Act requires insurers to calculate the QPA based on "contracted rates" "for the same or a similar item or service *that is provided* by a provider in the same or similar specialty *and provided* in the geographic region in which the item or service is furnished. . . . " 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). But, Plaintiffs complain, the Departments interpreted "contracted rates" in the July Rule broadly to allow insurers to include "ghost rates" in calculating the QPA—rates for items or services that providers have no intention to provide. Docket No. 25 at 19 (citing August FAQs at 17 (FAQ 14)). Plaintiffs argue that these ghost rates are generally below fair market value because providers have no incentive to robustly negotiate them. Docket No. 25 at 23.

The Court agrees with Plaintiffs that the Departments' interpretation of the July Rule conflicts with the Act in this respect. The Act requires insurers to include in the QPA calculation the rates for services or items that are "provided by a provider." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Conversely, nothing in the Act permits including rates for services or items that are *not* "provided." "To 'provide' ordinarily means 'to make available,' 'furnish,' or 'to supply something needed or desired.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 476 (5th Cir. 2020) (cleaned up) (quoting *Provide*, AMERICAN HERITAGE DICTIONARY); *see also id.* n.29 ("To 'provide' ordinarily means 'to make available,' to 'furnish,' to 'supply,' or to 'equip.'"). The

Act thus requires calculating the QPA using only rates for items and services that are actually furnished or supplied by a provider—not those that a provider has not furnished or never supplied. By nonetheless permitting insurers to include ghost rates in calculating the QPA, the Department's interpretation of the July Rule conflicts with the Act.

The Departments argue that in the health-insurance industry, "contracted rates are generally negotiated prospectively." Docket No. 41 at 20. And "[t]he Act directs that the QPA be based on the median of *the rates themselves*, with each *rate* being a single data point in the calculation of the median." *Id.* (citing 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)). But that doesn't mean that *all* contracted rates should be included in the QPA calculation. The Act specifies that the QPA should include only *certain* contracted rates—specifically, rates for items or services "provided by a provider" in the same specialty in the relevant geographic region. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Indeed, the Departments acknowledge that at least some contracted rates should be excluded from the QPA calculation—$0 rates, for example. August FAQs at 16 (FAQ 13).

The Departments also argue that Congress chose to include in the calculation of the QPA an "item or service that *is* provided," not those that "have been provided." Docket No. 41 at 21. The Departments' interpretation of the July Rule, however, allows insurers to include contracted rates for items or services that are not provided, never have been provided, and never will be provided. At oral argument, counsel for the Departments conceded that some providers have rates for services they do not and will never provide and that "those arti-

ficially low out-of-specialty rates do sometimes appear in contracts." Docket No. 60 at 26:11-16. Further, the August FAQs state by way of example that, for an anesthesiologist whose "contract may also include contracted rates for other services the anesthesiologist does not provide (for example, dermatology services)," the insurer "would not be expected to calculate separate median contracted rates for the anesthesia service code . . . because the [insurer] does not have contracted rates for anesthesia services that vary based on provider specialties." August FAQs at 16-17 (FAQ 14).

This interpretation is unlawful. Whatever "is provided" means in § 300gg-111(a)(3)(E)(i)(I) of the Act, it cannot justify including rates for items or services that are not provided and never will be provided. To rule otherwise would read out of the statute the term "provided" altogether. *Cf. Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) ("[T]he interpretive canon against surplusage" [is] "the idea that 'every word and every provision is to be given effect.'" (quoting ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012))); *see also Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) (Courts must strive "to give effect, if possible, to every clause and word of a statute. . . . ").

Because the Departments' interpretation of "contracted rates" conflicts with the Act, the interpretation —set forth in the preamble to the July Rule and the August FAQs—fails at *Chevron* step one. Under the APA, the Court must set this interpretation aside and need not consider whether it is unreasonable at *Chevron* step two. *See Flight Training Int'l, Inc. v. FAA.*, 58 F.4th 234, 246 (5th Cir. 2023).

**2.**

Plaintiffs next argue the July Rule improperly allows insurers to include in the QPA calculation rates of providers in different specialties. Docket No. 25 at 19. The Act, in contrast, "requires insurers to always calculate the QPAs based on the rates of providers 'in the same or similar specialty.'" *Id.* (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)). Plaintiffs thus argue that the Rule conflicts with the Act and must be set aside on this basis as well.

Again, the Court agrees. As noted above, the Act defines the QPA as "the median of the contracted rates recognized by the plan or issuer. . . . for the same or a similar item or service that is provided by a provider in *the same or similar specialty*." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The July Rule, however, directs insurers to calculate rates by specialty "*only* where the [insurer] otherwise varies its contracted rates based on provider specialty," 86 Fed. Reg. at 36,891 (emphasis added), as part of its "usual business practice," 45 C.F.R. § 149.140(a)(12). Indeed, the August FAQs clarify that insurers need not separately calculate rates by specialty unless: (1) insurers "purposefully" vary "contracted rates based on provider specialty," or (2) insurers determine "that there is a material difference in the median contracted rates . . . between providers of different specialties." August FAQs at 16-17 (FAQ 14). These provisions deviate from the plain text of the Act by allowing insurers to include out-of-specialty rates in calculating the QPA in some instances. *Scofield v. Lewis*, 251 F.2d 128, 132 (5th Cir. 1958) ("A regulation which is in conflict with or restrictive of the statute is, to the extent of the conflict or re-

striction, invalid."); *see also Texas v. EPA*, 726 F.3d 180, 195 (D.C. Cir. 2013).

The Departments argue this error is harmless. They say the July Rule permits including out-of-specialty rates only when "there is no material difference in the contracted rates by specialty." Docket No. 41 at 25. The Departments thus claim Plaintiffs lack standing to challenge this particular provision. As in prior cases, however, the Court finds standing based on Plaintiffs' procedural injury and concrete economic harm. *TMA II*, 2023 WL 1781801, at *8-9. The July Rule "deprives [Plaintiffs] of the arbitration process established by the Act" by calculating the QPA—a factor arbitrators must consider—contrary to the statute. *Id.* That is sufficient to establish procedural harm. *See id.* (citing *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019)). Plaintiffs have also shown the likelihood of financial harm by submitting uncontroverted evidence that insurers' fee-schedule negotiation process will lead to out-of-specialty rates being included in QPAs. Docket No. 25, Ex. B ¶ 18 (noting that insurers offer most providers the same fee schedule for all services, and then providers negotiate increased reimbursement amounts for services they provide); *id.*, Ex. C ¶ 12 (same); *id.*, Ex. D ¶ 18 (same). And Plaintiffs contend that this will harm them because the out-of-specialty rates are often very low—sometimes nearing zero—and their inclusion will drive the QPA downward. *E.g.*, *id.*, Ex. C ¶ 12; *see also TMA II*, 2023 WL 1781801, at *8.

The Departments also argue they "declined to impose an entirely unnecessary burden on [insurers]" by requiring them to use specialty-specific rates in every instance, which is "a reasonable way to interpret a stat-

ute." Docket No. 41 at 25 (first citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 529 n.34 (2d Cir. 2017); and then citing *Nat'l Auto Dealers Ass'n v. FTC*, 864 F. Supp. 2d 65, 80 (D.D.C. 2012)). But the Departments may not ignore the plain requirements of the Act merely because insurers may be inconvenienced. The Departments' cited cases, moreover, are inapposite. In those cases, the statutes were ambiguous, and the courts held that the agencies' rationale of avoiding the "potential for disruptive results" or burdensome "practical effects" was reasonable under *Chevron* step two. *Catskill Mountains Chapter*, 846 F.3d at 529; *Nat'l Auto Dealers Ass'n*, 864 F. Supp. 2d at 80. Here, the Departments have failed to identify ambiguity in the Act.

Because including "out-of-specialty rates" in calculating the QPA unambiguously conflicts with the statute, this part of the July Rule must be set aside under the APA. *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).

**3.**

Plaintiffs next complain that the July Rule requires insurers to "[e]xclude" from rates used to calculate the QPA "risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments." 45 C.F.R. § 149.140(b)(2)(iv). Excluding such bonus and incentive payments, Plaintiffs argue, violates the plain text of the Act and unlawfully drives down the QPA. Docket No. 25 at 20, 22-23.

The Act states that the QPA is "the median of the contracted rates recognized by the plan or issuer . . . as the total maximum payment . . . under such plan or coverage," without exclusions or exceptions. 42 U.S.C.

§ 300gg-111(a)(3)(E)(i)(I). "Total" means "[c]onstituting or comprising a whole; whole, entire." *Total*, OXFORD ENG. DICTIONARY ONLINE (Dec. 2022 ed.). And "maximum" means the "highest value or extreme limit," the "greatest value which a variable or function takes," or the "highest possible magnitude or quantity of something which is attained, attainable, or customary." *Maximum*, OXFORD ENG. DICTIONARY ONLINE (Dec. 2022 ed.). The Act thus plainly requires insurers to calculate QPAs using the "entire," "highest possible" payment that a provider could receive for an item or service under the contracted rate. The July Rule, in contrast, requires insurers to exclude incentive-based payments from "the total maximum payment." 45 C.F.R. § 149.140(b)(2)(iv). The Court thus concludes that the Rule conflicts with the Act. *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

The Departments argue that this interpretation of the Act "read[s] the word 'potential' into the phrase 'total maximum payment.'" Docket No. 41 at 29. But the phrase "total maximum payment" already includes all potential payments—the "highest possible magnitude or quantity of something which is . . . attainable." *Maximum*, OXFORD ENG. DICTIONARY ONLINE, *supra*. The Departments also argue that the Act uses the term "total maximum payments" by referencing "the cost-sharing amount imposed for such item or service." Docket No. 41 at 29 (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I)). And, because cost-sharing amounts are determined at the time an item or service is furnished and do not change based on the amount ultimately paid, the Departments argue that only fixed contracted rates, not bonuses or incentives, should be included. *Id.* The Act, however, says that the QPA is "the

median of the contracted rates recognized . . . as the *total maximum payment* (*including the cost-sharing amount* imposed for such item or service and the amount to be paid by the plan or issuer, respectively) under such plans or coverage. . . . " 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I) (emphasis added). The "cost sharing amount" is thus just an example of, not a limitation on, what should be included in "the total maximum payment." *DIRECTV Inc. v. Budden*, 420 F.3d 521, 527 (5th Cir. 2005) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation. . . . [It] is not one of all embracing definition, but connotes simply an illustrative application of the general principle." (quotation marks omitted)).

Finally, the Departments argue that requiring insurers to include incentive-based payments violates the Act's purpose, which is to reduce the cost of out-of-network services. Docket No. 41 at 30. And they point out that the July Rule excludes "penalty" based adjustments from the QPA calculation, which Plaintiffs have not challenged, creating a "one-way ratchet" that increases costs against Congress' intent. *Id.* at 30 n.10 (citing 45 C.F.R. § 149.140(b)(2)(iv)). But the Departments—and the Court—are bound by the text of the statute. *In re Westmoreland Coal Co.*, 968 F.3d 526, 534 (5th Cir. 2020) ("[T]he best evidence of Congress's intent is the statutory text." (quoting *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012))). If the Act creates a "one-way ratchet," that's because it requires "the total maximum payment" to be included in the QPA while saying nothing about "penalties." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I).

Because excluding bonus and incentive payments from the QPA calculation unambiguously conflicts with

the Act, the Court will set these provisions aside under the APA. *See Pereira*, 138 S. Ct. at 2113.

**4.**

Finally, Plaintiffs argue that the July Rule unlawfully allows self-insured group health plans, or "plan sponsors," to "use either rates from only their own plans or rates from all plans administered by their third-party administrator to calculate QPAs." Docket No. 25 at 11, 21 (citing 45 C.F.R. § 149.140(a)(8)(iv)). They claim this part of the Rule conflicts with the plain text of the Act and "allow[s] self-insured group health plans to pick whichever method leads to lower QPAs on balance." *Id.* at 11.

As noted above, QPA is defined by the Act to mean "the median of the contracted rates recognized by the plan or issuer, respectively (determined with respect to all such plans of such sponsor . . . that are offered within the same insurance market. . . . )." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). The Act thus requires that QPAs be calculated using the rates of "*all* such plans of *such sponsor*." *Id.* (emphasis added). The July Rule, in contrast, permits self-insured group health plans, "at the option of the plan sponsor," to "allow their third-party administrators to determine the QPA for the sponsor by calculating the median contracted rate using the contracted rates recognized by all self-insured group health plans administered by the third-party administrator (not only those of the particular plan sponsor)." 45 C.F.R. § 149.140(a)(8)(iv). By allowing these self-insured plan sponsors to do what the Act prohibits, the Rule is not "in accordance with the law." 5 U.S.C. § 706(2)(A).

The Departments argue that the Act "inherently contemplates" that self-insured plan sponsors may calculate the QPA "with reference to other self-insured group health plans." Docket No. 41 at 30. This is because, the Departments claim, "the QPA is calculated based on plans offered 'within the same insurance market,' which the statute defines 'in the case of a self-insured group health plan, other self-insured group health plans.'" *Id.* (quoting 42 U.S.C. § 300gg-111(a)(3)(E)(iv)(IV)). But the Act still requires the QPA to be calculated using "all such plans of *such sponsor*"—and the Departments cite nothing in the statute that would permit using the rates from plans of *other sponsors*. 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). Nor does the Act permit plan sponsors to pick and choose from among plans or rates to calculate a lower QPA. *See id.*

The Departments also argue that Plaintiffs lack standing to bring this particular challenge. But, as explained above, Plaintiffs assert a procedural injury—that the July Rule permits the QPA to be calculated in a way that conflicts with the Act. This "deprives [Plaintiffs] of the arbitration process established by the Act," which is sufficient to confer Article III standing. *TMA II*, 2023 WL 1781801, at *8 (cleaned up); *see also Texas v. EEOC*, 933 F.3d at 447 ("A plaintiff can show a cognizable injury if [he] has been deprived of a 'procedural right to protect [his] concrete interests.'" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009))). The Departments claim that Plaintiffs "offer no evidence or, in fact, any basis at all, to theorize that self-funded plans are choosing how to calculate the QPA based on achieving the lowest possible QPA . . . or that this provision has any consistent effect on the QPA calculations." Docket No. 41 at 32. Not so. Plaintiffs submitted evidence that

self-funded plans *are* likely to calculate alternative QPAs and choose the lower amount if available. *E.g.*, Docket No. 25, Ex. A ¶ 20, Ex. B ¶ 21, Ex. D ¶ 19. This satisfies the "reasonable claim of minimal impact" necessary to establish procedural harm. *TMA II*, 2023 WL 1781801, at *8 (quoting *Kinetica Partners, LLC v. U.S. Dep't of the Interior*, 505 F. Supp. 3d 653, 671 (S.D. Tex. 2020)).

The Departments also contend the Rule is reasonable because it avoids administrative costs, reduces the burden on self-funded groups, is more practical than the alternative, and lowers reliance on third-party databases. Docket No. 41 at 32-33. But none of these potential benefits permits the Departments to draft a rule that conflicts with the plain text of the governing statute. *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

Because the third-party administrator provisions of the July Rule unambiguously violate the Act, they likewise must be set aside under the APA.[5] *See Pereira*, 138 S. Ct. at 2113.

---

[5] Plaintiffs also argue that the challenged provisions of the July Rule should be set aside as arbitrary and capricious. *See* Docket No. 25 at 22-24; Docket No. 26 at 15-16, 19-20, 23-24. Because the Court finds that the July Rule conflicts with the Act and sets it aside under the APA on that basis, the Court need not address Plaintiffs' alternative argument. *See Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234 (5th Cir. 2023) ("In light of this disposition, we do not reach FTI's alternative argument that the Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Marable v. Dep't of Com.*, 857 F. App'x 836, 837 (5th Cir. 2021) ("Because we conclude that the first basis relied upon by the district court for summary judgment . . . is dispositive, we need not address" other grounds.).

**B.**

Plaintiffs next challenge the provision of the July Rule specifying what information insurers must disclose concerning their QPA calculations. Docket No. 25 at 27-30. According to Plaintiffs, "[t]he Departments' disclosure rule requires no meaningful disclosure" and "gut[s] the [Act's] complaint process" because it "require[s] [insurers] to reveal nothing of substance about their QPAs." *Id.* at 28-29. They argue that the disclosure rule is therefore arbitrary and capricious.

The problem for Plaintiffs, however, is that the Act gives the Departments wide latitude in issuing a disclosure rule, and the Departments have shown that their rule is the result of reasoned decision making. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (explaining that the APA requires agencies only to engage in "reasoned decisionmaking" to avoid having actions set aside as arbitrary and capricious).

The Act requires the Departments to "establish through rulemaking . . . . a process to receive complaints of violations of the requirements" of the Act's QPA calculations. 42 U.S.C. § 300gg-111(a)(2)(B)(iv). The Departments are similarly required to establish through rulemaking "a process . . . under which [insurers] are audited . . . to ensure that" the QPA is calculated appropriately. *Id.* § 300gg-111(a)(2)(A)(i)(II). And under this "process . . . the Secretary . . . may audit any" insurer "if the Secretary has received any complaint" or information involving lack of compliance with the Act's QPA calculation rules. *Id.* § 300gg-111(a)(2)(A)(ii). Finally, and crucially here, the Departments "shall establish . . . the information [an insurer]

. . . shall share with the" provider. *Id.* § 300gg-111(a)(2)(B). Unlike the provisions governing the arbitration process and the calculation of the QPA, the Act lacks specifics about the kind of information the rule should require insurers to provide. Rather, Congress gave the Secretaries of the Departments wide discretion in the disclosure and auditing process surrounding the QPA.

Through the July Rule, the Departments exercised that discretion. The Departments explained that they "s[ought] to ensure a transparent and meaningful disclosure about the calculation of the QPA while minimizing administrative burdens on" insurers. 86 Fed. Reg. at 36,898. With that in mind, the Departments outlined a list of disclosure requirements. 45 C.F.R. § 149.140(d). Among other things, the July Rule requires insurers to provide (1) a certification that the QPAs were calculated in compliance with the Departments' regulations, (2) a notice when QPAs were not set on a fee-for-service basis, (3) a notice of when related service codes were used to calculate the QPA, and (4) a host of information at the request of providers. *Id.* § 149.140(d). The Departments explain they created these requirements to ensure the parties have fruitful open negotiations, thereby avoiding unnecessary IDR proceedings. *E.g.*, 86 Fed. Reg. 36,899.

Plaintiffs argue that the July Rule's disclosures make "the complaint process . . . toothless." Docket No. 25 at 28. They point out that the Departments "expect[] to conduct no more than 9 audits annually." 86 Fed. Reg. at 36,935. Plaintiffs also identify QPA-related information insurers are not required to divulge, including: "(1) each rate that was included in the QPA; (2) the spe-

cialty of the provider who agreed to that rate; (3) the number of times that rate was *actually* paid by the insurer; [and] (4) the amount of any incentive payments excluded from the rates." Docket No. 25 at 28. Plaintiffs insist that without this information providers are incapable of effectively advocating for themselves in the IDR process.

But it is the Act itself that deprives Plaintiffs of their preferred complaint process. Under the Act, the Departments are not required even to entertain a complaint. *See* 42 U.S.C. § 300gg-111(a)(2)(A)(ii)(II). Rather, the Act allows that "the Secretary . . . . *may* audit any" insurer "if the Secretary has received any complaint" or information involving lack of compliance with the Act's QPA calculation requirements. *Id.* § 300gg-111(a)(2)(A)(ii)(II) (emphasis added). Thus, it is the permissive language of the Act rather than the July Rule causing Plaintiffs the alleged harm here.

Further, the Departments did consider the problem of whether providers could advocate for themselves in the IDR process. And the Court can discern the path taken by the Departments. *Fox TV Stations, Inc.*, 556 U.S. at 513-14 (Courts "should uphold a decision of less than ideal clarity if the agency's path may be discerned."). The Departments decided to balance transparency for providers and administrability for insurers. 86 Fed. Reg. at 36,898. In doing so, they required a host of disclosures, 86 Fed. Reg. at 36,898-99; 45 C.F.R. § 149.140(d)(1)(ii), but they stopped short of granting Plaintiffs their wish list because it would not be administrable, Docket No. 25 at 28; *see also* 86 Fed. Reg. at 36,935 (calculating the estimated man-power hours and cost the July Rule's disclosure requirement would exert

upon insurers). The Departments also explained the reasoning behind certain disclosure requirements, which they included to increase the efficacy of open negotiations. *E.g.*, 86 Fed. Reg. at 36,899. Thus, the Court cannot say the Departments failed "entirely" to consider certain issues. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And granting Plaintiffs' wish list or requiring more audits would be the Court "substitut[ing] its own policy judgment for that of the agency"—*i.e.*, rulemaking from the bench, which the Court may not do. *Prometheus Radio Project*, 141 S. Ct. at 1158.

Because the Court finds that the July Rule's disclosure rule is both reasonable and reasonably explained, the Court concludes that it is not arbitrary and capricious. *La. PSC v. FERC*, 761 F.3d 540, 547 (5th Cir. 2014) (declining to set aside rule where the court "[found] that FERC's . . . interpretation is reasonable . . . "); *see also Tex. Oil & Gas Assoc. v. EPA*, 161 F.3d 923, 933-34 (5th Cir. 1998) ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld.").

**C.**

The Air Ambulance Plaintiffs challenge four additional aspects of the July Rule. Docket No. 26 at 10.

**1.**

As an initial matter, the Departments invite the Court to dismiss these Plaintiffs' claims "under the rule against claim splitting." Docket No. 41 at 17-18. The Departments contend that "[n]early all of the Air Ambulance Plaintiffs here are members or close affiliates of

members of the trade association plaintiff," the Air Association of Air Medical Services ("AAMS"), in a case filed in the District of Columbia, *Ass'n of Air Medical Services v. U.S. Department of Health & Human Services*, 1:21-cv-3031 (D.D.C. Nov. 16, 2021). *Id.* at 17. The Court declines the invitation.

The rule against claim splitting prohibits a party "from simultaneously prosecuting multiple suits involving the same subject matter against the same defendants." *Gen. Land Off. v. Biden*, 71 F.4th 264, 269-70 (5th Cir. 2023) (first citing *Oliney v. Gardner*, 771 F.2d 856, 859 (5th Cir. 1985); and then citing *Gulf Island-IV, Inc. v. Blue Streak-Gulf Is Ops*, 24 F.3d 743, 746 (5th Cir. 1994)); *see also Ameritox, Ltd. v. Aegis Scis. Corp.*, 2009 WL 305874, at *4 (N.D. Tex. Feb. 9, 2009). The rule primarily serves "to protect the defendant from being harassed by repetitive actions based on the same claim." *Ameritox*, 2009 WL 305874, at *4 (quoting *Matter of Super Van, Inc.*, 92 F.3d 366, 371 (5th Cir. 1996)). "In a claim splitting case, the second suit will be barred if the claim involves the same parties and arises out of the same transaction or series of transactions as the first claim." *Ameritox*, 2009 WL 305874, at *4 (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008)).

The rule does not apply here because the Departments have not shown that this case involves the same parties as *AAMS*. "[M]ere membership in or affiliation with" a trade association party is not enough to bar the member from later bringing its own lawsuit. *Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 82 (D.D.C. 2020); *Cal. Cosmetology Coal. v. Riley*, 871 F. Supp. 1263, 1267 (C.D. Cal. 1994) ("Under federal law, mere

membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization."); *Viceroy Gold Corp. v. Aubry*, 858 F. Supp. 1007, 1018 (N.D. Cal. 1994) (citing, *e.g.*, *Expert Elec., Inc v Levine,* 554 F.2d 1227, 1233 (2d Cir 1977) (precluding suit where the association was "the body vested with representative authority."), *rev'd on other grounds*, 75 F.3d 482, 489 (9th Cir. 1996)). The Departments, moreover, provide no evidence that any Air Ambulance Plaintiff was subsidizing, participating in, or controlling the *AAMS* litigation. *See Cal. Cosmetology Coal.*, 871 F. Supp. at 1267 (describing various circumstances where a member of a trade group may be in privity with the trade group); *Crane v. Comm'r of Dep't of Agric., Food, & Rural Res.,* 602 F. Supp. 280, 287 (D. Me. 1985) (citing *Montana v. United States,* 440 U.S. 147, 151 (1979)) (analyzing the trade association members' control or participation in the prior litigation).

The Departments do not cite a single case holding otherwise. Instead, the Departments note that one of the Air Ambulance Plaintiffs—Air Methods—"submitted declarations in support of summary judgment in" *AMMS*. Docket No. 41 at 18 (citing *Ass'n of Air Med Servs*, 1:21-cv-3031, Docket No. 1, Ex. 7 (D.D.C. 2021)). But that is also insufficient to bar Air Methods from later bringing its own claims in its own lawsuit. *See Benson & Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir. 1987) (denying preclusion for a "nonparty who was heavily involved" in the first litigation).

Accordingly, the Court concludes that the Departments' claim splitting argument fails.

**2.**

The Air Ambulance Plaintiffs first argue the July Rule "extends indefinitely" the statutory 30-day deadline for insurers to make a payment decision. Docket No. 26 at 11. As explained below, the Court agrees and sets aside this provision of the Rule as unlawful.

The Act requires insurers to send their initial payment decision to the provider "not later than 30 calendar days after the bill for such services is transmitted to the provider." 42 U.S.C. § 300gg-112(a)(3)(A). The statutory text is unambiguous and provides no exceptions. The July Rule, however, states that the 30-day deadline "begins on the date the plan or issuer receives the information necessary to decide a claim for payment for the services." 45 C.F.R. § 149.130(b)(4)(i). As the Air Ambulance Plaintiffs assert, the "insurer's initial payment (or notice of denial of payment) is a critically important date" because the provider "is unable to move forward with the IDR process until the insurer provides this initial payment [decision]." Docket No. 26 at 11. By starting the clock only after the insurer receives the information it deems "necessary," the Rule thus turns a firm 30-day deadline essential to an efficient process into an indefinite delay at the mercy of the insurer.

The Departments argue they never intended to create an indefinite delay. They explain that the 30-day clock should start when the insurer receives a "clean claim"—an industry term meaning "a claim that has no defect, impropriety, or special circumstances, including incomplete documentation that delays timely payment." Docket No. 41 at 41; *see also* 86 Fed. Reg. at 36,900; Federal IDR Process Guidance for Disputing Parties (Apr. 2022), at 33 (AR 10978). But the statute uses the term

"bill," not "clean claim." And elsewhere, Congress specified "clean claim" when it wanted to refer to "clean claim." *See* 42 U.S.C. § 1395w-112(4)(A)(ii) (requiring prompt payment of a "clean claim" for "prescription drug plan sponsors"); 10 U.S.C. § 1095c(a)(1) (requiring certain percentages of TRICARE "clean claims" to be processed within specified timeframes); *id.* § 1095c(3) (defining "clean claim" almost identically to the July Rule and 42 U.S.C. § 1395w-112(4)(A)(ii)); 38 U.S.C. § 1703D(d)(2)(A) (allowing the Secretary to require interest be paid on overdue "clean claims"); *id.* § 1703D(f)(1) (requiring the Secretary to provide "a list of information and documentation that is required to establish a clean claim"). The Departments cannot adopt a meaning of a statutory term where Congress used the same meaning in the same Title because, "[i]f Congress had intended that narrow meaning, it knew how to say so." *Wallaesa v. FAA*, 824 F.3d 1071, 1083 (D.C. Cir. 2016).

The Departments also argue that "bill" as used in the Act is "a technical term" and they "were within their authority" to align the meaning "with the industry standard definition of a 'clean claim.'" Docket No. 41 at 41-42. But "bill" is not the kind of technical term an agency can redefine—or as here, restrict the meaning of. *Cf.*, *e.g.*, *Becerra v. Empire Health Found.*, 142 S. Ct. 2354, 2362 (2022) (finding a complex multi-factor equation was sufficiently "technical" to warrant departing from the plain meaning of the statute). "Bill" is a common term with an ordinary meaning—"[a]n itemized list or statement of fees or charges." *Bill*, Am. Heritage Dictionary 180 (5th ed. 2011); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 113 (10th ed. 2001) ("[A]n itemized account of the separate cost of goods sold, services performed, or work done: invoice."). By deleting "bill"

and replacing it with "the information necessary to decide a claim" (or "clean claim"), the Departments have improperly rewritten the statute. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014) ("We reaffirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."); *accord Benjamin v. United States*, 932 F.3d 293, 300 (5th Cir. 2019).

This part of the July Rule thus conflicts with the Act and must be set aside. *See Pereira*, 138 S. Ct. at 2113.

**3.**

The Air Ambulance Plaintiffs next challenge the Departments' August Technical Guidance requiring two separate IDR processes for a single medical air transport. Docket No. 26 at 17. Plaintiffs argue that the Act unambiguously states that each air ambulance transport is a single service and requires only a single IDR process for each payment dispute. Plaintiffs thus contend that the Guidance is contrary to the statute and is arbitrary and capricious.

The Act states that "the term 'air ambulance service' means medical *transport* by helicopter or airplane for patients." 42 U.S.C. § 300gg-112(c)(1) (emphasis added). And if negotiations between the air ambulance provider and insurer fail, the statute provides that the parties "may . . . initiate the independent dispute resolution process . . . with respect to *such item or service*." *Id.* § 300gg-112(b)(1)(B) (emphasis added). The Act thus defines each air ambulance transport as a single service and allows initiation of a single IDR process for each service. Indeed, the Departments initially took the same view, defining "air ambulance service" as a single "transport by a rotary wing air ambulance," 45 C.F.R. § 149.30,

and a "Qualified IDR item or service" as "air ambulance services furnished by a nonparticipating provider of air ambulance services . . . ," *id.* § 149.510(a)(2)(xi)(A). And from April 2022 to August 2022, IDR entities initiated a single process and rendered a single decision for a single air ambulance transport—in at least 109 cases. Docket No. 26, Ex. A ¶ 7.

But in August 2022, the Departments issued Guidance stating that "multiple qualified IDR items or services" can be consolidated, or "batched," into a single IDR process only if, among other requirements, each service is "billed under the same service code." August Technical Guidance at 2. And because a single air ambulance transport requires two service codes—one code for the liftoff rate and one for the per-mile rate—the Departments informed IDR entities that each air transport claim dispute would now require two IDR processes. Docket No. 26, Ex. 3 ¶¶ 3-7; *id.*, Ex. 4 ¶¶ 2-4. That Guidance violates the unambiguous text of the Act, and none of the Departments' arguments to the contrary are persuasive. *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

The Departments first argue that the Act authorizes them to "specify criteria under which multiple qualified IDR dispute items and services are permitted to be considered jointly as part of a single determination. . . . " Docket No. 41 at 44 (quoting 42 U.S.C. § 300gg-111(c)(3)(A)). But that authority extends only to "items" and "services," and, as noted above, the Act defines an air ambulance service as a single service. 42 U.S.C. § 300gg-112(c)(1). The Departments also cite the need for uniformity as a reason to depart from the Act's text. Citing *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725

(2020), the Departments argue that allowing IDR entities to adjudicate an air ambulance service dispute in a single IDR, even though each service uses two codes, "would require defining 'services' one way for air ambulance transports and a different way in all other instances." Docket No. 41 at 45-46. But *Lomax* involved statutory interpretation, holding that "'[i]n all but the most unusual situations, a single use of a *statutory* phrase must have a fixed meaning' across a statute." 140 S. Ct. at 1725 (emphasis added) (quoting *Cochise Consultancy, Inc. v. United States ex rel Hunt*, 139 S. Ct. 1507, 1512 (2019)). *Lomax* does not entitle agencies to ignore statutory text and draft a rule that conflicts with the statute. The problem of consistency, moreover, is one of the Departments' own making—they decided to use service codes to determine batching. *See* August Technical Guidance at 2.

Because the August Technical Guidance prohibits a single air ambulance service from submitting to a single IDR process, the Guidance violates the Act and must be set aside. *See Pereira*, 138 S. Ct. at 2113.

**4.**

The Air Ambulance Plaintiffs next argue that the July Rule improperly excludes from the QPA calculation "the many hundreds of thousands of 'contracted rates' that have been agreed to by insurers and providers in case-specific agreements." Docket No. 26 at 20-21. Plaintiffs contend this part of the Rule conflicts with the statutory definition of the QPA. As explained below, the Court agrees.

The Act defines the QPA as the "median of the contracted rates recognized by" an insurer "under such plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i).

Many "case-specific agreements" for air ambulance services fall within this definition because they are contracts to pay a specific rate for an air ambulance transport for the insurers' beneficiaries, participants, or enrollees. Docket No. 55, Ex. A ¶¶ 7-11; *see also id.*, Ex. B ¶ ¶ 4-8. These contracts are typically "case-specific" or "single-case" agreements between insurers and providers to cover "patients with commercial insurance or a commercial group health plan" where such coverage "was available to the patient, under the terms of the policy or plan. . . . . " *Id.*, Ex. A ¶¶ 7-9; *see also id.* Ex. B ¶¶ 3-5. Under the July Rule, however, such agreements "do[] not constitute a contract" for QPA-calculation purposes. 45 C.F.R. § 149.140(a)(1). By excluding these contracted rates from the QPA calculation, the Rule conflicts with the Act. *Scofield*, 251 F.2d at 132; *see also Texas v. EPA*, 726 F.3d at 195.

The Departments agree that the QPA should include "contracted rates [that] are under the 'plan or coverage,'" but argue that case-specific or single-case agreements are not "contracted for under the generally applicable terms of a health plan or health insurance policy." Docket No. 41 at 35. These agreements, the Departments contend, "are not included in plans or coverage offered to individuals in a particular market, nor do they set recognized rates under such plans or coverage." *Id.* But the Act does not say to include only rates "contracted for under the generally applicable terms of a health plan or health insurance policy." The Act says to include "contracted rates recognized by [the insurer] . . . under the plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i)(I). And case-specific or single-case agreements are contracts between insurers and provid-

ers under a plan or policy providing coverage for air ambulance transports.

The Departments also argue that "contracted rates" refers only to rates negotiated "in advance" by providers or facilities "to participate in any of the networks of the plan or issuer." Docket No. 41 at 34. But the Act does not say anything about when the rates are negotiated, providing instead that the QPA should include all "contracted rates recognized by [an insurer under its] plans or coverage." 42 U.S.C. § 300gg-111(a)(3)(E)(i). The statutory definitions of "group health plan" and "health insurance coverage," in turn, confirm that case-specific and single-case agreements should be included in the QPA calculation. "Group health plan" is defined to mean "an employee welfare benefit plan . . . to the extent that the plan provides medical care" as defined in that section. 42 U.S.C. § 300gg-91(a)(1). And "health insurance coverage" means "benefits consisting of medical care (provided directly, through insurance or reimbursement, or otherwise and including items and services paid for as medical care). . . . " *Id.* § 300gg-91(b)(1). "Medical care" is defined broadly to "mean[] . . . *amounts paid for transportation* primarily for and essential to . . . the diagnosis, cure, mitigation, treatment, or prevention of disease, or amounts paid for the purpose of affecting any structure or function of the body." *Id.* § 300gg-91(a)(2) (emphasis added). Air ambulance services, therefore, fit comfortably within the definition of "medical care" covered by "group health plans" and "health insurance coverage." *Bilski v. Kappos*, 561 U.S. 593, 604 (2010).

The court in *Ass'n of Air Medical Services v. U.S. Department of Health & Human Services* reached a dif-

ferent conclusion regarding single-case agreements. 2023 WL 5094881, at *3-5 (D.D.C. Aug. 4, 2023) (concluding that the statutory definition of QPA does not include single-case agreements). But the court's analysis is unpersuasive and fails to address that many case-specific or single-case agreements are negotiated under a plan or policy providing coverage for air ambulance transports. *See id.*

Because the July Rule excludes these contracted rates in calculating the QPA, the Rule conflicts with the Act and must be set aside. *See Pereira*, 138 S. Ct. at 2113.

**5.**

Finally, the Air Ambulance Plaintiffs argue that "the July Rule's QPA calculation methodology" should be set aside for an additional reason: it is arbitrary and capricious because it "permits insurers to calculate QPAs based on rates agreed to in widely disparate geographic regions." Docket No. 26 at 25. As explained below, the Court concludes that this portion of the Rule is both reasonable and reasonably explained.

The Act requires that the QPA be calculated based on the contracted rates for an item or service "provided in the geographic region in which the item or service is furnished." 42 U.S.C. § 300gg-111(a)(3)(E)(i). When an insurer "does not have sufficient information to calculate the median of the contracted rates" in a particular "geographic region," the Act states that the insurer should refer to "any database . . . in the applicable geographic region." *Id.* § 300gg-111(a)(3)(E)(iii). The Act also directs the Departments to "establish through rulemaking . . . . the geographic regions . . . taking into

account access to items and services in rural and underserved areas." *Id.* § 300gg-111(a)(2)(B)(iii).

In the July Rule, the Departments exercised this rule-making authority by defining a "geographic region" for air ambulance services as "one region consisting of all metropolitan statistical areas . . . in the State" and "one region consisting of all other portions of the State." 45 C.F.R. § 149.140(a)(7)(ii)(A). If, however, an insurer has fewer than three contracted rates in a "geographic region," the Rule directs the insurer to broaden the "geographic region" to include "regions based on Census divisions—that is, one region consisting of all metropolitan statistical areas in each Census division and one region consisting of all other portions of the Census division." *Id.* § 149.140(a)(7)(ii)(B). The Departments explained they used larger regions because insurers are more likely to have a sufficient number of contracted rates with which to calculate the QPA. 86 Fed. Reg. at 36,893.

The Air Ambulance Plaintiffs complain about the Rule using Census divisions. "There are only nine Census divisions nationwide and they encompass enormous areas." Docket No. 26 at 26. Therefore, Plaintiffs contend, in some instances irregularities will arise—such as "a contracted rate for a medical air transport in Fairbanks, Alaska [dictating] the QPA for a medical air transport in Los Angeles or Honolulu." *Id.* at 26-27 (providing this and other examples). And Plaintiffs argue that the Departments' justification for using large Census divisions—to ensure insurers have sufficient information—is "not rational." Docket No. 26 at 27. "This is not a rational reason," Plaintiffs contend, because the Act requires insurers to refer to a third-party database

when they lack "sufficient information to calculate the median of the contracted rates" in a particular geographic region. 42 U.S.C. § 300gg-111(a)(3)(E)(i). And, finally, Plaintiffs argue, the Departments fail to explain "why that fallback, the neutral database, would not serve the supposed purpose of the QPA, which is to serve as a proxy of the 'market rates' in the relevant region.'" Docket No. 26 at 27.

In an arbitrary and capricious review, a court "is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may be discerned." *Fox TV Stations, Inc.*, 556 U.S. at 513-14. "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158. Here, the Departments' rule regarding geographic regions is reasonable and sufficiently explained.

As the Departments explained when promulgating the July Rule, air ambulance QPAs are likely to "result in more instances of insufficient information . . . . [g]iven the nature of air ambulance services, the infrequency with which they are provided relative to other types of items and services subject to [the Act], and the lower prevalence of participating providers of air ambulance services." 86 Fed. Reg. at 36,893. "Using larger geographic regions, for which plans and issuers are likely to have more information," the Departments stated, "is expected to reduce the likelihood that the median of contracted rates would be skewed by contracts under which the parties have agreed to particularly high or low payment amounts." *Id.* at 36,892. And the De-

partments acknowledged that third-party databases were authorized in instances of insufficient information but found that the Act "envision[ed] that these alternative methodologies be used in limited circumstances where the plan or issuer cannot rely on its contracted rates as a reflection of the market dynamics in a geographic region." *Id.* at 36,888; *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475-76 (5th Cir. 2021) ("Agencies . . . have expertise and experience in administering their statutes that no court can properly ignore." (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011))). In other words, the Departments considered the problem of insufficient data due to the nature of air ambulance services, contemplated the use of third-party databases, crafted a solution to the problem, and explained their rationale.

The Court thus concludes that the July Rule on geographic regions is both reasonable and reasonably explained. *See, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) ("[W]e conclude the FCC did not fail to offer a 'reasonable and reasonably explained' analysis of . . . [its regulations], which is all the APA requires." (quoting *Prometheus Radio Project*, 141 S. Ct. at 1160)); *see also Ass'n of Air Medical Servs.*, 2023 WL 5094881, at *6 (finding that the Departments reasonable explained their decision to rely on Census divisions as the geographic regions for air ambulance services).

**III.**

Having determined that certain portions of the July Rule, August FAQs, and August Technical Guidance violate the APA, the Court considers the proper remedy.

Plaintiffs seek vacatur of the offending provisions. Docket No. 25 at 30; Docket No. 26 at 28. They argue that the "'seriousness of the deficiency [of these provisions] weighs heavily in favor of vacatur' . . . [a]nd because the challenged provisions 'conflict with the unambiguous terms of the Act in several key respects,' the Departments cannot 'rehabilitate or justify' them on remand." *Id.* (cleaned up) (quoting *TMA I*, 587 F. Supp. 3d at 548). Plaintiffs also claim that vacating these provisions will not be unduly disruptive. Docket No. 54 at 27. Finally, Plaintiffs request that the Court "declare that arbitrators may not consider any QPA affected by the unlawful provisions" because they are not QPAs as defined by the Act. *Id.* (citing 42 U.S.C. § 300gg-111(c)(5)(C)(i)(I)).

The Departments argue that "any relief should be appropriately limited" because "[t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." Docket No. 41 at 49 (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018)); *see also id.* ("Nothing in the APA's directive to 'set aside' unlawful 'agency action' mandates that 'agency action' shall be set aside globally, rather than as applied to plaintiffs." (quoting 5 U.S.C. 706(2)). The Departments also argue that the Court should at most "remand the matter to the Departments without vacatur of the challenged provisions." *Id.* at 50. They claim that vacatur "would be highly disruptive" because "[t]he QPA plays a critical role in many aspects of the new processes effected by the Act and without clear guidance on how to calculate the QPA, every one of those process could come to a screeching halt." *Id.*

The Fifth Circuit has held that "vacatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). "[T]he ordinary result" of setting aside unlawful rules under the APA is that "the rules are vacated—not that their application to the individual petitioners is proscribed." *Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 944-45 (N.D. Tex. 2019) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).[6]

Courts consider two factors to determine whether vacatur is appropriate: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021) (citing *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)), *rev'd on other grounds*, 142 S. Ct. 2528, 2548 (2022). And "[b]ecause vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary." *Am. Hosp. Ass'n v. Becerra*, 2023 WL 143337, at *5 (D.D.C. Jan. 10, 2023).

---

[6] *But see United States v. Texas*, 143 S. Ct. 1964, 1981 (2023) (Gorsuch, J., joined by Thomas, J. and Barrett, J. concurring) (Section 706(2) of the APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise). . . . Still, from those two words alone, the district court thought the power to nullify the Guidelines with respect to anyone anywhere surely follows. . . . Color me skeptical."); *Arizona v. Biden*, 40 F.4th 375, 395 (6th Cir. 2022) (Sutton, C.J., concurring) (explaining that § 706's "set aside" language does not support disregarding "the long-understood view of equity—that courts issue judgments that bind the parties in each case over whom they have personal jurisdiction").

Here, the seriousness of the deficiencies weighs heavily in favor of vacatur. As explained above, the challenged portions of the regulations conflict with the unambiguous terms of the Act in several key respects. There is therefore nothing the Departments can do on remand to rehabilitate or justify the challenged portions of the Rule as written. *Sw. Elec. Power Co.*, 920 F.3d at 1022 (vacating and remanding part of final rule that was contrary to statute). Indeed, the Departments never contest the "seriousness of the deficiencies" prong. *See* Docket No. 41 at 49-50.

Nor is it clear on the record before the Court that vacatur would be unduly disruptive. The Departments claim that vacating the QPA-methodology rules would require "an immediate pause of patient cost-sharing, offers of payment, and IDR proceedings under the Act while payers are forced to somehow recalculate the QPA without adequate guidance from the Departments." Docket No. 41 at 50. But beyond this conclusory sentence, the Departments offer nothing to demonstrate undue disruption. As Plaintiffs note, for patient cost-sharing, the Departments can exercise their enforcement discretion to allow insurers to continue using their existing QPAs until new QPAs are calculated consistent with the Act. *See* Docket No. 54 at 27; *see also* August FAQs at 17 (exercising enforcement discretion to give insurers 90 days to adjust to new guidance). As for offers of payment and IDR proceedings, the Departments fail to explain why those cannot continue in the absence of properly calculated QPAs—or why a temporary pause in the proceedings would be more disruptive than continuing with unlawfully calculated QPAs. When the Court vacated the rules in *TMA I* and *TMA II*, for example, the Departments similarly claimed that vacatur would be se-

verely disruptive. Yet, the Departments simply paused arbitration proceedings until issuing further guidance conforming to the statute and the Court's orders. *See Payment Disputes between Providers and Health Plans: Notices*, CTRS. FOR MEDICARE & MEDICAID SERVS. (Feb. 10, 2023), https://www.cms.gov/nosurprises/help-resolve-payment-disputes/payment-disputes-between-providers-and-health-plans. The Departments nowhere claim that this pause was so disruptive that the Court should bypass the "default rule" of vacatur here. *Cargill*, 57 F.4th at 472.

The Departments cite *American Hospital Ass'n v. Becerra*, which remanded a rule without vacatur because vacatur would be "highly disruptive" due to the "staggering value and number of transactions at issue." 2023 WL 143337, at *4-6. But in that case the agency had presented specific facts justifying remand only, including that vacatur could cost nearly $10 billion and disrupt "an enormous number of settled transactions that occurred in those years" given that the relevant payment system processed more than 100 million claims per year. *See id*. The Departments have presented nothing similar here. The Court is thus left to guess how long any claimed disruption would last, how many IDR proceedings would be halted or delayed, and the cost of vacatur.

Accordingly, the proper remedy here is vacatur of the challenged provisions and remand to the Departments for "further consideration in light of this opinion." *Franciscan All., Inc.*, 414 F. Supp. 3d at 945; *see also Am. Hosp. Ass'n*, 2023 WL 143337, at *5.

**IV.**

In sum, the Court holds that the following regulations are unlawful and must be set aside because they

conflict with the No Surprises Act: (1) including in the calculation of QPAs contracted rates for services that providers have not provided, August FAQs (FAQ 14); 86 Fed. Reg. 36,872, at 36,889; (2) including in the calculation of QPAs out-of-specialty rates, 45 C.F.R. § 149.140(a)(12); (3) excluding from the calculation of QPAs risk sharing, bonus, penalty, or other incentive-based or retrospective payments or payment adjustments, 45 C.F.R. § 149.140(b)(2)(iv); 45 C.F.R. § 149.140(b)(3)(i); (4) allowing self-insured group health plans to use rates from all plans administered by a third-party administrator in calculating the QPA, 45 C.F.R. § 149.140(a)(8)(iv); (5) starting the 30-day deadline for notice or denial of payment when the insurer receives the information "necessary to decide a claim," 45 C.F.R. § 149.130(b)(4)(i); (6) requiring two separate IDR processes for a single medical air transport, *Technical Guidance for Certified IDR Entities*, CTRS. FOR MEDICARE & MEDICAID SERVS., at 2-3 (Aug. 18, 2022) (answering whether "multiple qualified IDR items or services be submitted together"); and (7) excluding from the calculation of air ambulance service QPAs case-specific or single-case agreements, 45 C.F.R. § 149.140(a)(1). The Court further holds that the following regulations are reasonable and reasonably explained and are upheld: (1) the challenged disclosure requirements, 45 C.F.R. § 149.140(d), and (2) the calculation of the QPA for air ambulance services based on census divisions in instances of insufficient information, 45 C.F.R. § 149.140(a)(7)(ii).

Accordingly, the Court **GRANTS in part** Plaintiffs' motions for summary judgment (Docket Nos. 25, 26), **DENIES in part** Defendants' cross-motion for summary judgment (Docket No. 41), and **ORDERS** that the follow-

ing provisions are **VACATED** and **REMANDED** for further consideration in light of this Opinion:

(1) 86 Fed. Reg. 36,872, at 36,889, the phrase "regardless of the number of claims paid at that contracted rate";

(2) 45 C.F.R. § 149.140(a)(8)(iv), 26 C.F.R. § 54.9816-6T(a)(8)(iv), and 29 C.F.R. § 2590.716-6(a)(8)(iv), from "or at the option" to "on behalf of the plan";

(3) 45 C.F.R. § 149.140(a)(12), 26 C.F.R. § 54.9816-6T(a)(12), and 29 C.F.R. § 2590.716-6(a)(12), from "as identified" to "practice";

(4) 45 C.F.R. § 149.140(a)(15)(ii)(B), 26 C.F.R. § 54.9816-6T (a)(15)(ii)(B), and 29 C.F.R. § 2590.716-6(a)(15)(ii)(B), from "(or the administering entity" to "if applicable)";

(5) 45 C.F.R. § 149.140(b)(1), 26 C.F.R. § 54.9816-6T(b)(1), and 29 C.F.R. § 2590.716-6(b)(1), from "(or the administering entity" to "if applicable)";

(6) 45 C.F.R. § 149.140(b)(2)(i), 26 C.F.R. § 54.9816-6T(b)(2)(i), and 29 C.F.R. § 2590.716-6(b)(2)(i), from "(or the administering entity" to "if applicable)";

(7) 45 C.F.R. § 149.140(b)(2)(iv), 26 C.F.R. § 54.9816-6T(b)(2)(iv), and 29 C.F.R. § 2590.716-6(b)(2)(iv), in their entirety;

(8) 45 C.F.R. § 149.140(b)(3)(i), from "If a plan or issuer" to "for the service code" and "as applicable"; 26 C.F.R. § 54.9816-6T(b)(3)(i), from "If a plan has" to "for the service code" and "as applicable"; 29 C.F.R. § 2590.716-6(b)(3)(i), from "If a plan or issuer" to "for a service code" and "as applicable";

(9) 45 C.F.R. § 149.130(b)(4)(i), 26 C.F.R. § 54.9817-1T(b)(4)(i), and 29 C.F.R. § 2590.717-1(b)(4)(i), from "For purposes of this paragraph (b)(4)(i), the 30-calendar-day period begins" to "decide a claim for payment for the services";

(10) 45 C.F.R. § 149.140(a)(1), 26 C.F.R. § 54.9816-6T(a)(1), and 29 C.F.R. § 2590.716-6(a)(1), from "Solely for purposes of this definition a single case agreement" to "or enrollee in unique circumstances, does not constitute a contract";

(11) 5 C.F.R. § 890.114(a), insofar as it requires compliance with the foregoing provisions;

(12) FAQs 14 and 15 of *FAQs About Affordable Care Act and Consolidated Act,2021 Implementation Part 55* (Aug. 19, 2022); and

(13) The portion of *Technical Guidance for Certified IDR Entities*, CTRS. FOR MEDICARE & MEDICAID SERVS., at 2-3 (Aug. 18, 2022) (answering whether "multiple qualified IDR items or services be submitted together"), which requires air ambulance service reimbursement disputes to undergo more than one IDR process (as set forth in 42 U.S.C. § 300gg-111(c)).

So **ORDERED** and **SIGNED** this day of

/s/ JEREMY D. KERNODLE
JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

**APPENDIX E**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 23-40605

TEXAS MEDICAL ASSOCIATION; TYLER REGIONAL HOSPITAL, L.L.C.; DR. ADAM CORLEY,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; ROBERT F. KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; CHARLES EZELL, IN HIS OFFICIAL CAPACITY AS THE ACTING DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HIS OFFICIAL CAPACITY; LORI CHAVEZ-DEREMER, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, IN HER OFFICIAL CAPACITY,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES

---

LIFENET, INCORPORATED; AIR METHODS CORPORATION; ROCKY MOUNTAIN HOLDINGS, L.L.C.; EAST TEXAS AIR ONE, L.L.C.,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF LABOR; UNITED STATES DEPARTMENT OF TREASURY; ROBERT F.

KENNEDY, JR., SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; CHARLES EZELL, IN HIS OFFICIAL CAPACITY AS THE ACTING DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT; SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HIS OFFICIAL CAPACITY; LORI CHAVEZ-DEREMER, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, IN HER OFFICIAL CAPACITY, DEFENDANTS-APPELLANTS

---

Filed: May 30, 2025

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 6:22-CV-450, 6:22-CV-453

---

ON PETITION FOR REHEARING EN BANC

(Opinion October 30, 2024, 5 CIR., 2024, 120 F.4th 494)

Before ELROD, *Chief Judge*, and JONES, SMITH, STEWART, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

PER CURIAM:

A member of the court having requested a poll on the petition for rehearing en banc, and a majority of the circuit judges in regular active service and not disqualified having voted in favor,

IT IS ORDERED that this cause shall be reheard by the court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs. Pursuant to 5th

Circuit Rule 41.3, the panel opinion in this case dated October 30, 2024 is VACATED.

## APPENDIX F

5 U.S.C. 706 provides:

**Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.